# United States Court of Appeals

*for the*

# Federal Circuit

CONTENT EXTRACTION AND TRANSMISSION LLC,

*Plaintiff-Appellant,*

– v. –

WELLS FARGO BANK, NATIONAL ASSOCIATION,

*Defendant-Appellee,*

– and –

THE PNC FINANCIAL SERVICES GROUP, INC. and PNC BANK, N.A.,

*Defendants-Appellees.*

---

DIEBOLD, INCORPORATED,

*Plaintiff-Cross-Appellant,*

– v. –

CONTENT EXTRACTION AND TRANSMISSION LLC,

*Defendant-Appellant,*

– and –

MITCHELL MEDINA, CATHERINE ELIAS, JOHN DOE COMPANIES 1-100, JOHN DOE COMPANIES 1-99, TD BANK GROUP, TD BANK, N.A. and JEAN-MARC ZIMMERMAN,

*Defendants.*

Appeals From The United States District Court For
The District Of New Jersey In Nos. 12-CV-2501, 12-CV-6960
And 12-CV-7640, Judge Michael A. Shipp

## BRIEF FOR PLAINTIFF-CROSS-APPELLANT DIEBOLD, INCORPORATED

ROY H. WEPNER
ARNOLD I. RADY
BRIAN D. HILL
LERNER, DAVID, LITTENBERG,
   KRUMHOLZ & MENTLIK, LLP
600 South Avenue West
Westfield, New Jersey 07090
908.654.5000

*Attorneys for Plaintiff-Cross-Appellant
   Diebold, Incorporated*

March 4, 2014

## <u>CERTIFICATE OF INTEREST</u>

Counsel for the Petitioner Diebold, Incorporated certifies the following:

1.  The full name of every party or *amicus* represented by me is:

DIEBOLD, INCORPORATED

2.  The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

N/A

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

None

4.  The names of all law firms and the partners or associates that appeared for the party or *amicus* now represented by me in the trial court or agency or are expected to appear for the party in this Court are:

Roy H. Wepner
Arnold I. Rady
Brian D. Hill
LERNER, DAVID, LITTENBERG,
  KRUMHOLZ & MENTLIK, LLP
600 South Avenue West
Westfield, NJ 07090

Dated  March 4, 2014          s/  Roy H. Wepner
                              Roy H. Wepner

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................iv

I.    STATEMENT OF RELATED CASES.........................................1

II.   STATEMENT OF JURISDICTION ..........................................1

III.  STATEMENT OF THE ISSUES ...............................................2

IV.   STATEMENT OF THE CASE ...................................................3

A.    The Four Patents Here At Issue Are Part Of A
      Family Of Patents That Have Been Unsuccessfully
      Enforced .........................................................................3

B.    CET Asserts The Patents Here At Issue Following
      A Judgment That Related Patents Are Ineligible
      Under 35 U.S.C. § 101.....................................................5

C.    The District Court Holds CET's Patents-In-Suit
      Ineligible Under § 101.....................................................5

D.    Diebold's Action Against CET And Its Principals
      Follows CET's Filing Of Five Separate Lawsuits
      Against Diebold's ATM Customers .................................7

E.    Despite Finding CET's Lawsuits Objectively
      Baseless, The District Court Dismisses Diebold's
      Tortious Interference And RICO Claims Based On
      The *Noerr-Pennington* Doctrine .........................................9

V.    SUMMARY OF THE ARGUMENT ..........................................11

A.    CET's Appeal....................................................................11

B.    Diebold's Cross-Appeal...................................................12

VI.   ARGUMENT.............................................................................14

A.    CET's Appeal....................................................................14

      1.    Statement Of The Standard Of Review ..................14

      2.    CET's Procedural Arguments Should Be
            Rejected.................................................................16

i

a.      CET Gave The District Court No Reason To Conduct Formal Claim Construction In This Case ......................................................................... 16

     i.      Formal Claim Construction Is Not Required For § 101 Issues ................................... 16

     ii.      CET Never Identified A Material Claim Construction Dispute Before The District Court ................................................. 18

     iii.      The District Court Properly Resolved Claim Construction Questions In CET's Favor ...................................................... 21

     iv.      CET's Claim Construction Arguments Raised For The First Time On Appeal Should Be Rejected ............................................ 22

b.      CET Gave The District Court No Reason To Analyze Each Of 242 Claims Separately ...................... 24

c.      CET Gave The District Court No Reason Not To Proceed Under Fed. R. Civ. P. 12(b)(6) .......................................................... 28

3.      CET's Substantive Arguments Should Be Rejected ............................................................................... 32

a.      The Claims Do Not Meet The "Machine" Prong Of The Machine-Or-Transformation Test .......................................................................... 33

     i.      The Scanner ......................................................... 33

     ii.      The Computer ...................................................... 37

b.      CET Has Abandoned Its Reliance On The "Transformation" Prong Of The Machine-Or-Transformation Test ................................. 40

c.      The District Court's General Inquiry As To Abstractness Was Clearly Correct .................................. 41

B.      Diebold's Cross-Appeal ...................................................... 45

　　　　1.　　Statement Of The Standard Of Review ....................................45

　　　　2.　　The District Court Erred In Dismissing
　　　　　　　Diebold's Tortious Interference And RICO
　　　　　　　Claims ...................................................................46

　　　　　　　a.　　Diebold's Pleading Overcame The
　　　　　　　　　　Traditional *Noerr-Pennington* Immunity .......................46

　　　　　　　　　　i.　　Diebold Adequately Pleaded  CET's
　　　　　　　　　　　　　Subjective Bad Faith In Suing
　　　　　　　　　　　　　Diebold's Customers.............................................48

　　　　　　　　　　ii.　　Diebold Adequately Pleaded That
　　　　　　　　　　　　　CET's Bad Faith Filing Of Lawsuits
　　　　　　　　　　　　　Was Directed At Diebold ....................................51

　　　　　　　　　　iii.　　Diebold's Complaint Alleged
　　　　　　　　　　　　　Sufficient Facts Showing That CET's
　　　　　　　　　　　　　Suits Were Not Aimed At Procuring
　　　　　　　　　　　　　Favorable Court Action........................................54

　　　　　　　b.　　Diebold's Pleading Satisfied The "Series Of
　　　　　　　　　　Legal Proceedings" Version Of
　　　　　　　　　　*Noerr-Pennington* ..........................................56

　　　　3.　　The District Court Erred In Dismissing
　　　　　　　Diebold's Declaratory Judgment Claims
　　　　　　　"With Prejudice As Moot" ....................................61

VII.　CONCLUSION.................................................................64

# TABLE OF AUTHORITIES

Page(s)

CASES

*Alice Corp. v. CLS Bank Int'l*,
    No. 13-298 (U.S. Jan. 22, 2014) .......................................................... 31

*Am. Standard, Inc. v. Pfizer, Inc.*,
    828 F.2d 734 (Fed. Cir. 1987) .............................................................. 43

*Am. Needle & Novelty Co. v. Schuessler Knitting Mills, Inc.*,
    379 F.2d 376 (7th Cir. 1967) ........................................................... 63, 64

*Ballard Med. Prods. v. Wright*,
    821 F.2d 642 (Fed. Cir. 1987) .............................................................. 15

*Bancorp Servs., LLC v. Sun Life Assurance Co. of Canada (US)*,
    687 F.3d 1266 (Fed. Cir. 2012), *petition for cert. filed*,
    82 U.S.L.W. 3319 (U.S. Nov. 8, 2013) ...................................... 16, 17, 45

*Bilski v. Kappos*,
    130 S. Ct. 3218 (2010) ............................................... 26, 29, 32, 33

*Biomedical Patent Mgmt. Corp. v. Calif. Dep't of Health Servs.*,
    505 F.3d 1328 (Fed. Cir. 2007) ............................................................ 49

*Calif. Transp. Co. v. Trucking Unlimited*,
    404 U.S. 508 (1972) .............................................................................. 57

*Cardpool, Inc. v. Plastic Jungle, Inc.*,
    No. 12-04182, 2013 U.S. Dist. LEXIS 9280 (N.D. Cal. Jan. 22, 2013) ............ 28

*City of Columbia v. Omni Outdoor Adver., Inc.*,
    499 U.S. 365 (1991) .............................................................................. 55

*CLS Bank Int'l v. Alice Corp.*,
    717 F.3d 1269 (Fed. Cir.), *cert. granted*,
    134 S. Ct. 734 (2013) ............................................... 16, 38, 39, 44

*Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*,
    Nos. 12-2501, -6960, 2013 U.S. Dist. LEXIS 107184
    (D.N.J. July 31, 2013) ............................................................................ 7

*CoreBrace LLC v. Star Seismic LLC*,
    566 F.3d 1069 (Fed. Cir. 2009) ............................................................ 45

*CyberFone Sys., LLC v. Cellco P'ship*,
    885 F. Supp. 2d 710 (D. Del. 2012) ................................................ 35, 40

*CyberFone Sys., LLC v. CNN Interactive Grp., Inc.*,
      ___ Fed. App'x ___, Nos. 2012-1673, -1674,
      2014 U.S. App. LEXIS 3599 (Fed. Cir. Feb. 26, 2014) ......................17, 35, 41

*CyberSource Corp. v. Retail Decisions, Inc.*,
      654 F.3d 1366 (Fed. Cir. 2011) ............................................................39, 40, 45

*Dana Corp. v. Am. Axle & Mfg.*,
      279 F.3d 1372 (Fed. Cir. 2002) ........................................................................18

*Dealertrack, Inc. v. Huber*,
      674 F.3d 1315 (Fed. Cir. 2012) ..................................................................34, 38

*Digital-Vending Servs. Int'l, LLC v. Univ. of Phoenix, Inc.*,
      672 F.3d 1270 (Fed. Cir. 2012) ........................................................................15

*Energy Transp. Grp., Inc. v. Wm. Demant Holdings A/S*,
      697 F.3d 1342 (Fed. Cir. 2012), *cert. denied*,
      133 S. Ct. 2010 (2013)......................................................................................15

*Eon-Net LP v. Flagstar Bancorp*,
      No. C 05-2129, 2010 WL 2026756
      (W.D. Wash. May 17, 2010), *aff'd*, 653 F.3d 1314
      (Fed. Cir. 2011), *cert. denied*, 132 S. Ct. 2391 (2012)............................4, 51, 55

*ERBE Elektromedizin GmbH v. Canady Technology LLC*,
      629 F.3d 1278 (Fed. Cir. 2010) ........................................................................59

*Gant v. United States*,
      417 F.3d 1328 (Fed. Cir. 2005) ........................................................................15

*Globetrotter Software, Inc. v. Elan Computer Grp., Inc.*,
      362 F.3d 1367 (Fed. Cir. 2004) ........................................................................60

*Glory Licensing LLC v. Toys "R" Us, Inc.*,
      No. 09-4252, 2011 U.S. Dist. LEXIS 51888
      (D.N.J. May 16, 2011) ...............................................................................*passim*

*Glory Licensing LLC v. Toys "R" Us, Inc.*,
      459 Fed. App'x 916 (Fed. Cir. 2011)..................................................................4

*Hartley v. Mentor Corp.*,
      869 F.2d 1469 (Fed. Cir. 1989) ..................................................................61, 62

*Interactive Gift Express, Inc. v. Compuserve, Inc.*,
      256 F.3d 1323 (Fed. Cir. 2001) ........................................................................15

*Kaspar Wire Works, Inc. v. Leco Eng'g & Mach., Inc.*,
      575 F.2d 530 (5th Cir. 1978) ............................................................................62

*Livingston Downs Racing Ass'n Inc. v. Jefferson Downs Corp.*,
192 F. Supp. 2d 519 (M.D. La. 2001)..........................................................56, 59

*Lumen View Tech. LLC v. Findthebest.com, Inc.*,
No. 13-CIV-3599, 2013 U.S. Dist. LEXIS 166852
(S.D.N.Y. Nov. 22, 2013) ...................................................................................29

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
132 S. Ct. 1289 (2012).......................................................................................34

*N.V. Akzo v. E.I. DuPont de Nemours & Co.*,
810 F.2d 1148 (Fed. Cir. 1987) .........................................................................27

*OIP Techs., Inc. v. Amazon.com, Inc.*,
No. C-12-1233, 2012 U.S. Dist. LEXIS 129396
(N.D. Cal. Sept. 11, 2012) .................................................................................29

*Phillips v. Cnty. of Allegheny*,
515 F.3d 224 (3d Cir. 2008) ..............................................................................46

*Primetime 24 Joint Venture v. Nat'l Broadcasting Co.*,
219 F.3d 92 (2d Cir. 2000) .................................................................56, 58, 59

*Professional Real Estate v. Columbia Pictures Indus., Inc.*,
508 U.S. 49 (1993)......................................................................................*passim*

*Research Corp. Techs., Inc. v. Microsoft Corp.*,
627 F.3d 859 (Fed. Cir. 2010) ....................................................................44, 45

*Shelcore, Inc. v. Durham Indus., Inc.*,
745 F.2d 625 (Fed. Cir. 1984) ...........................................................................26

*Shinseki v. Sanders*,
556 U.S. 396 (2009)............................................................................................16

*Simon Prop. Grp., Inc. v. Palombaro*,
682 F. Supp. 2d 508 (W.D. Pa. 2010)................................................................55

*SmartGene, Inc. v. Advanced Biological Labs., S.A.*,
___ Fed. App'x ___, No. 2013-1186,
2014 U.S. App. LEXIS 1357 (Fed Cir. Jan. 24, 2014)................................26, 39

*SmithKline Beecham Corp. v. Apotex Corp.*,
403 F.3d 1331 (Fed. Cir. 2005) .........................................................................32

*Superior Indus., LLC v. Thor Global Enters.*,
700 F.3d 1287 (Fed. Cir. 2012) .........................................................................45

*SiRF Tech., Inc. v. Int'l Trade Comm'n,*
   601 F.3d 1319 (Fed. Cir. 2010) ........................................................35, 36, 37

*U.S. Surgical Corp. v. Ethicon, Inc.,*
   103 F.3d 1554 (Fed. Cir. 1997) .......................................................19

*Ultramercial, Inc. v. Hulu, LLC,*
   722 F.3d 1335 (Fed. Cir. 2013), *petition for cert. filed,*
   82 U.S.L.W. 3107 (U.S. Aug. 23, 2013) ........................................17, 28, 29, 30

*Univ. of Pittsburgh v. Varian Med. Sys., Inc.,*
   569 F.3d 1328 (Fed. Cir. 2009) .....................................................46, 62

*USS-POSCO Indus. v. Contra Costa Cnty. Bldg. & Constr. Trades Council,*
   31 F.3d 800 (9th Cir. 1994) .........................................................56, 58, 60

*Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.,*
   200 F.3d 795 (Fed. Cir. 1999) .......................................................19

*Whitecotton v. Sec'y of Health & Human Servs.,*
   81 F.3d 1099 (Fed. Cir. 1996) .......................................................15

*Wiest v. Lynch,*
   710 F.3d 121 (3d Cir. 2013) .........................................................45, 46

## STATUTES, RULES & OTHER AUTHORITIES

28 U.S.C. § 1295(a)(1) ....................................................................1

28 U.S.C. § 1331 .........................................................................1

28 U.S.C. § 1332(a) ......................................................................1

28 U.S.C. § 1338(a) ......................................................................1

28 U.S.C. § 1338(b) ......................................................................1

28 U.S.C. § 1367(a) ......................................................................1

28 U.S.C. § 2111 .........................................................................16

35 U.S.C. § 101 .......................................................................*passim*

35 U.S.C. § 102(b) .......................................................................18

35 U.S.C. § 112(f) .......................................................................19

Fed. R. Civ. P. 1 ........................................................................32

Fed. R. Civ. P. 12 .......................................................................29

Fed. R. Civ. P. 12(b)(6) .............................................................*passim*

vii

Fed. R. Civ. P. 12(c)..................................................................................29

Fed. R. Civ. P. 15(a)(1).............................................................................27

Fed. R. Civ. P. 41(b)................................................................................63

Fed. R. Civ. P. 59(e)................................................................................10

Fed. R. Civ. P. 61...................................................................................16

Fed. R. Evid. 201(d)................................................................................49

Restatement (Second) of Judgments......................................................63

U.C.C. § 2-312(3)...................................................................................53

N.J. L.Civ.R. 7.1(i)................................................................................27

N.J. L.Civ.R. 7.1(d)(6)...........................................................................27

N.J. L.Civ.R. 7.2(b)..........................................................................25, 26

N.J. L.Civ.R. 9.3...................................................................................18

N.J. L. Pat. R. 4.3(b).............................................................................19

I.    **STATEMENT OF RELATED CASES**

(a)    Other than the appeals consolidated herein, Plaintiff/Cross-Appellant Diebold, Incorporated ("Diebold") is not aware of any appeal from the same civil actions from which these appeals arise that was previously before this or any other appellate court.

(b)    Other than the cases which are already consolidated herein, Diebold is not aware of any pending case that will directly affect or will be directly affected by this Court's decision in the pending appeals.

II.    **STATEMENT OF JURISDICTION**

The district court had subject matter jurisdiction over Diebold's suit against appellant Content Extraction and Transmission LLC ("CET") under 28 U.S.C. § 1338(a) based on Diebold's claims for declaratory judgment of patent invalidity and noninfringement.    The district court had subject matter jurisdiction over Diebold's remaining claims under 28 U.S.C. §§ 1331, 1332(a), 1338(b), and 1367(a).

This Court has appellate jurisdiction under 28 U.S.C. § 1295(a)(1).    The appeal by CET, No. 2014-1112, and Diebold's cross-appeal, No. 2014-1687, were both from an October 7, 2013 final order of the district court, which disposed of all claims in Civil Action No. 3:12-cv-7640 (A27-28).    Diebold's motion to alter or amend such final order (timely filed on October 10, 2013) tolled the time for appeal for both CET and Diebold until November 12, 2013, when Diebold's

motion was decided (A29).    CET's notice of appeal was timely filed on November 19, 2013 (A80 (Dkt.93)), and Diebold's notice of cross-appeal was timely filed on December 5, 2013 (A80 (Dkt.95)).

## III.    <u>STATEMENT OF THE ISSUES</u>

With regard to CET's appeal, the sole issue is whether the district court erred in dismissing CET's complaint under Fed. R. Civ. P. 12(b)(6) on the basis that all of the claims of the four patents-in-suit are invalid under 35 U.S.C. § 101 as being directed to abstract concepts.

Diebold's cross-appeal raises the separate issue as to whether the district court erroneously relied on the *Noerr-Pennington* doctrine in dismissing, as a matter of law, Diebold's claims against CET for tortious interference and RICO violations.

With further regard to Diebold's cross-appeal, an additional and independent issue is whether the district court abused its discretion in dismissing "with prejudice as moot" Diebold's claims for a declaratory judgment of invalidity and noninfringement as to the four CET patents that the district court invalidated, claims that would again become ripe for resolution if the present judgment of invalidity of CET's patents is not affirmed.

## IV.    STATEMENT OF THE CASE

### A.    The Four Patents Here At Issue Are Part Of A Family Of Patents That Have Been Unsuccessfully Enforced

These appeals involve four patents from a larger family of patents that trace back to an application filed in 1991.  All of such patents name as inventors, *inter alia*, Defendants Mitchell Medina and Catherine Elias ("the Medina/Elias Patent Family").  Each patent is entitled "Information Processing Methodology."  Various groups of patents within the Medina/Elias Patent Family have been owned and enforced by an array of nonpracticing legal entities, all of which are believed by Diebold to have been owned and/or controlled by Defendants Medina, Elias, and the attorney of record for each of those entities, Jean-Marc Zimmerman ("the Individual Defendants").

During the 2000s, these legal entities filed over 100 infringement suits seeking to enforce various patents in the Medina/Elias Patent Family.  In its first amended complaint, Diebold alleged that the owners of these patents had previously sought and obtained quick payments from defendants by exploiting the high cost of defending these actions, which essentially precluded any meaningful challenge to the asserted patents being decided by a court.  (*See* A320-21 ¶¶ 80-85.)

One group of patents (U.S. Patent Nos. 6,683,697; 7,075,673; and 7,184,162) was asserted by Eon-Net, LP, a company organized under the laws

3

of the Island of Nevis.  In one such suit, a district court construed the claims of those patents adversely to Eon-Net; entered a judgment of noninfringement based on that claim construction; and awarded sanctions (for, *inter alia*, filing an objectively baseless suit coupled with litigation misconduct) against Eon-Net and its counsel in the amount of $631,135.18, an award which this Court affirmed. *Eon-Net LP v. Flagstar Bancorp*, No. C 05-2129, 2010 WL 2026756 (W.D. Wash. May 17, 2010), *aff'd*, 653 F.3d 1314 (Fed. Cir. 2011), *cert. denied*, 132 S. Ct. 2391 (2012).  (A321-22 ¶ 86.)

A few years later, Glory Licensing LLC ("Glory"), another entity formed under the laws of the Island of Nevis, began filing suits alleging infringement of another group of patents within the Medina/Elias Patent Family (U.S. Patent Nos. 7,570,383; 7,762,007; and 7,619,768).  In one of those actions, a district court held all three patents invalid under 35 U.S.C. § 101 on the defendant's motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).  *Glory Licensing LLC v. Toys "R" Us, Inc.*, No. 09-4252, 2011 U.S. Dist. LEXIS 51888 (D.N.J. May 16, 2011).  Although Glory filed an appeal to this Court, no appeal brief was filed, and the appeal was dismissed.  *Glory Licensing LLC v. Toys "R" Us, Inc.*, 459 Fed. App'x 916 (Fed. Cir. 2011).  (A322 ¶¶ 87-90.)

### B.    CET Asserts The Patents Here At Issue Following A Judgment That Related Patents Are Ineligible Under 35 U.S.C. § 101

In 2012, CET was formed, and it acquired ownership of a number of the remaining patents in the Medina/Elias Patent Family.  CET began to file substantially identical patent infringement complaints against five banks, asserting infringement through, *inter alia*, their use of automatic teller machines ("ATMs"), some or all of which were purchased from Diebold.  (A304-09 ¶¶ 18-42.)

CET's complaint against Diebold's customer Bank of America was typical.  (A344-49.)  It asserted that six patents had been duly and legally issued and that CET was the owner of such patents.  (A345-46 ¶¶ 9-15.)  It went on to specifically allege infringement of only four of those patents; namely, U.S. Patent Nos. 5,258,855 ("the '855 Patent"); 5,369,508 ("the '508 Patent"); 5,625,464 ("the '464 Patent"); and 5,768,416 ("the '416 Patent") (collectively "the Invalidated Patents") in connection with (*inter alia*) ATMs and "application programs."  (A346-49.)  The infringement complaints identified no specific claims of the four patents as being asserted against the banks, and referenced no specific ATMs and no specific "application programs," by vendor or otherwise.  (A346 ¶¶ 17, 18.)

### C.    The District Court Holds CET's Patents-In-Suit Ineligible Under § 101

All of CET's substantially identical complaints were filed with the knowledge that the closely related patents at issue in the prior *Glory Licensing* case

had been held invalid under 35 U.S.C. § 101. (*See* A319-20 ¶ 79(g); A322 ¶ 87-91.)[1] On August 3, 2012, Bank of America filed a motion to dismiss CET's complaint under Fed. R. Civ. P. 12(b)(6) on the basis that the patents were invalid under 35 U.S.C. § 101. (A484-510.) In addition to urging invalidity under § 101, Bank of America pointed out several pleading deficiencies in CET's patent infringement complaint. (A495-96 n.5.)

Notwithstanding Bank of America having pointed out CET's pleading deficiencies, and having explained how the rationale of *Glory Licensing* applied to CET's asserted patents (*see* A319-20 ¶ 79(g)), CET filed two more suits against Diebold customers that contained the same deficiencies (A357-63; A365-71). Bank of America's motion to dismiss was never decided, CET having dismissed its case against Bank of America (based, presumably, on a payment from Bank of America) on the day the court was to hear oral argument on Bank of America's motion. (A326 ¶ 104.)

Subsequent to the dismissal of the Bank of America case, in another suit filed by CET against another Diebold customer, PNC Bank, PNC filed a motion to

---

[1] That was not the only deficiency in CET's suits against Diebold's customers. CET eventually admitted that its complaints against Diebold's customers did not identify the models of ATMs or the suppliers of the ATMs accused of infringement; did not identify the "application programs" referred to in the complaints; and did not properly plead the elements of inducement of infringement and contributory infringement. (A603-06 ¶¶ 22, 27, 32, 37, 41.)

dismiss CET's complaint, making many of the same arguments previously advanced by Bank of America. This time, PNC made no nuisance payment to CET. On July 31, 2013, based on the parties' written submissions, the district court issued an opinion and order holding all four patents invalid. (A1-26); *Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*, Nos. 12-2501, -6960, 2013 U.S. Dist. LEXIS 107184 (D.N.J. July 31, 2013).

In addition to entering a final order of dismissal in the *PNC* action, the district court filed its opinion and issued a final order of dismissal in the copending action against Wells Fargo Bank, in which the same four Invalidated Patents had been asserted by CET. (A54 (Dkts.64, 65).) The district court also filed its opinion and order in Diebold's action against CET (discussed *infra*) (A76 (Dkts.76, 77)), but no final order could be entered at that time due to the pendency of Diebold's additional claims for tortious interference and RICO violations, discussed *infra*.

### D. Diebold's Action Against CET And Its Principals Follows CET's Filing Of Five Separate Lawsuits Against Diebold's ATM Customers

Faced with multiple lawsuits brought by CET against banks using Diebold ATMs, and with the concern that many more might be filed, on December 7, 2012, Diebold filed an action in the District of New Jersey against CET and three of its principals, Mitchell Medina, Catherine Elias, and Jean-Marc Zimmerman ("the

7

Individual Defendants").   In its first amended complaint (A296-331), Diebold sought, in Count 1, a declaratory judgment of invalidity, unenforceability, and laches; in Count 2, a declaratory judgment of noninfringement; in Count 3, relief for tortious interference; and in Count 4, relief under the federal Racketeer Influenced And Corrupt Organizations Act ("RICO").

The declaratory judgment claims were directed to seven patents in the Medina/Elias Patent Family.  These patents included the four Invalidated Patents and three additional related patents, two of which were specifically identified in CET's complaints against Diebold's customers, but apparently not expressly asserted.

CET and the Individual Defendants filed motions to dismiss Diebold's first amended complaint.  With regard to the tortious interference and RICO claims, they asserted a failure to state a claim on various grounds, including asserted immunity from suit based on the *Noerr-Pennington* doctrine.  The Individual Defendants also moved to dismiss on the basis that Diebold had not properly pleaded a basis for personal liability of the Individual Defendants.

CET subsequently filed patent infringement counterclaims against Diebold based on the four Invalidated Patents, but did so without filing an accompanying answer to Diebold's complaint.  (A564-83.)  Diebold moved to dismiss or strike the counterclaims (A584-96), after which CET filed a partial answer and "amended"

8

counterclaims (A597-631), which Diebold also sought to strike (A634-36). CET's amended counterclaims asserted only the four Invalidated Patents (not the three related patents), and named TD Bank Group, TD Bank N.A., and John Doe companies, along with Diebold, as counterclaim defendants.

### E. Despite Finding CET's Lawsuits Objectively Baseless, The District Court Dismisses Diebold's Tortious Interference And RICO Claims Based On The *Noerr-Pennington* Doctrine

About 10 weeks after invalidating the four CET patents in the *PNC* and *Wells Fargo* actions, on October 7, 2013, the district court issued a final order (A27-28) in the *Diebold* case, supported by an oral opinion (A683-96; *see* addendum) in which it granted the motions by CET and the Individual Defendants to dismiss Diebold's tortious interference and RICO claims based on the *Noerr-Pennington* doctrine (A27-28 ¶¶ 1, 2(c)). Although CET and the Individual Defendants asserted other grounds to dismiss those claims, the district court considered and decided only one, the *Noerr-Pennington* immunity.

Diebold had argued that the *Noerr-Pennington* doctrine was not applicable here in view of the "sham litigation" exception to the doctrine. In its decision, the court agreed that Diebold had adequately alleged that CET had engaged in litigation that could be deemed objectively baseless. (A687-88.) However, the district court concluded that Diebold's complaint failed to meet the second prong of the "sham litigation" exception to *Noerr-Pennington*, because Diebold failed to

plead that the baseless lawsuits concealed an attempt to interfere directly with Diebold's business relationships through the use of governmental process as an anticompetitive weapon. (A688-89.)

As a separate matter, with regard to Diebold's first and second counts seeking declaratory relief as to the Invalidated Patents, without explanation, the district court's order disposed of those claims as "dismissed *with prejudice* as moot in light of the Court's July 31, 2013 Opinion and Order." (A27-28 ¶ 2(a) (emphasis added).) As to the three related patents, the district court dismissed the declaratory judgment claims without prejudice for lack of a current case or controversy. (*Id.* ¶ 2(b).)

Diebold timely filed a motion under Fed. R. Civ. P. 59(e) to alter or amend the judgment in which, *inter alia*, Diebold requested that the court dismiss its declaratory judgment claims as to the four Invalidated Patents *without* prejudice (instead of with prejudice) in view of mootness. (A639-42 ¶ 1.) On November 12, 2013, the district court issued an order on Diebold's motion (A29), in which, *inter alia*, the court denied Diebold's request to modify the dismissal of Diebold's declaratory judgment claims as to the four Invalidated Patents, again without explanation. These appeals followed.

## V.    SUMMARY OF THE ARGUMENT

### A. CET's Appeal

The district court committed no error in holding the claims of CET's patents invalid under 35 U.S.C. § 101.  Contrary to CET's arguments, CET advanced no reason for the district court to conduct claim construction (formal or otherwise) prior to ruling on whether CET's patents were directed to patent eligible subject matter.  Before the district court, CET never advanced any proposed construction of any claim term that would or even could alter the district court's § 101 analysis.  Nonetheless, the district court acknowledged its obligation to construe the claims in a manner most favorable to CET — and it did so.  CET's efforts to conjure claim construction issues for the first time on appeal should be rejected.

Similarly, CET gave the district court no reason to analyze each of CET's 242 claims separately.  After PNC demonstrated the flaws in CET's claims as they were illustrated in certain representative claims, CET never demonstrated otherwise, and made no effort to do so until this appeal.  Likewise, CET gave the district court no reason not to proceed under Fed. R. Civ. P. 12(b)(6).

Regarding the merits of the § 101 issues, the district court carefully analyzed the contentions of the parties regarding the machine-or-transformation test in light of recent binding precedent from this Court and the Supreme Court.  It correctly concluded that the scanner and the computer featured in CET's claims did not cause the claims to meet the "machine" prong.  And the district court's analysis of

the "transformation" prong was so clearly correct that CET has abandoned that argument on appeal.

Moreover, the district court's general inquiry as to abstractness was clearly correct.  CET's efforts to demonstrate that its patent claims have some limits do not cause the claims to comply with § 101.  CET's argument that the patents do not cover what is outside the scope of the claims is an approach that would make all claims patent eligible, and which disregards the nature and scope of coverage that is *inside* the claims.

## B.    Diebold's Cross-Appeal

The district court erred by applying the *Noerr-Pennington* immunity doctrine to dismiss Diebold's tortious interference and RICO claims, and to provide CET and the Individual Defendants with an immunity from any liability for the damages caused by their egregious misuse of the courts in commencing at least five sham litigations knowing they were baseless.  Under two separate lines of legal authority considered by the district court, the *Noerr-Pennington* doctrine should not have been applied under the facts in this case.

The first line of precedent asserted by Diebold established the applicability of the "sham litigation" exception to the traditional *Noerr-Pennington* doctrine, which required two elements.  Under the first element, CET must have filed an objectively baseless lawsuit.  The district court found that this element was

12

established.  The district court held, however, that Diebold's pleading did not meet the second element.  It concluded that Diebold did not allege in its first amended complaint that the baseless lawsuits concealed an attempt to interfere directly with Diebold's business relationships through the use of governmental process as an anticompetitive weapon.  The court appears to have found that the baseless lawsuits only attempted to interfere with the customers of Diebold.

However, Diebold adequately alleged in its first amended complaint that Diebold (along with its bank customers) was a target of CET's baseless actions.  Diebold specifically alleged facts that establish that CET knew that the ATMs of at least one bank which CET accused of infringement were supplied by Diebold; that Diebold was likely to have obligations to its bank customers in connection with those Diebold ATMs; and that a bank which was known to have Diebold ATMs had contacted Diebold regarding CET's settlement demands and possible indemnification payments by Diebold.

The second line of precedent holds that the *Noerr-Pennington* doctrine is not applicable when the asserted sham litigation consists of a "series of legal proceedings."  The five objectively baseless lawsuits that CET brought against Diebold's customers plainly established the requisite "series of legal proceedings."  The district court's only explanation as to why this line of precedent did not apply

to this case was the legally erroneous conclusion that the "series of lawsuits" authorities are limited to antitrust cases, and therefore not applicable here.

As shown below, the Diebold pleading was more than sufficient to establish that the *Noerr-Pennington* doctrine should not have been applied in this case as a basis to dismiss Diebold's counts for tortious interference and RICO violations at the pleading stage.

Finally, the district court abused its discretion in dismissing Diebold's declaratory judgment claims "with prejudice as moot," since the district court had clearly made no adjudication of fact or law regarding the validity or infringement of CET's patents which was adverse to Diebold. Thus, in the event the district court's judgment of invalidity is not affirmed, Diebold should not be precluded from asserting invalidity and/or noninfringement, through an affirmative defense or a declaratory judgment claim, on any grounds.

## VI.  ARGUMENT

### A. CET's Appeal

#### 1.  Statement Of The Standard Of Review

Diebold agrees with CET that — as a general proposition — this Court reviews dismissals under Fed. R. Civ. P. 12(b)(6) and the ultimate issue of patent eligibility under 35 U.S.C. § 101 *de novo*. However, CET's concept of *de novo* review is inconsistent with principles of appellate practice and other jurisprudence of this Court.

*First*, in the course of its *de novo* review, absent unusual circumstances not present here, this Court should not entertain arguments that are raised for the first time on appeal.  *See, e.g., Gant v. United States*, 417 F.3d 1328, 1332 (Fed. Cir. 2005) ("Arguments not made in the court or tribunal whose order is under review are normally considered waived."); *Energy Transp. Grp., Inc. v. Wm. Demant Holdings A/S*, 697 F.3d 1342, 1357 (Fed. Cir. 2012) ("This court will not consider arguments raised for the first time on appeal."), *cert. denied*, 133 S. Ct. 2010 (2013).  This is true even when appellate review is *de novo* "because appellate courts are courts of review and no matter how independent an appellate court's review of an issue may be, it is still no more than that — a review." *Digital-Vending Servs. Int'l, LLC v. Univ. of Phoenix, Inc.*, 672 F.3d 1270, 1278 (Fed. Cir. 2012) (quoting *Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1344 (Fed. Cir. 2001)).

*Second*, even where issues are subject to *de novo* review, that review cannot include materials that were not made of record in the district court.  *See, e.g., Whitecotton v. Sec'y of Health & Human Servs.*, 81 F.3d 1099, 1104 (Fed. Cir. 1996) ("we may consider only the record developed in the proceedings below"); *Ballard Med. Prods. v. Wright*, 821 F.2d 642, 643 (Fed. Cir. 1987) ("An appellate court may consider only the record as it was made before the district court.").

*Third*, after filtering out arguments made for the first time on appeal and arguments based on evidence not made of record below, CET as the appellant must demonstrate that if any errors were made by the district court, such errors affected CET's substantial rights and were not harmless.   28 U.S.C. § 2111; Fed. R. Civ. P. 61.   CET thus has the burden on appeal of showing that prejudice resulted from any of the district court's rulings.  *See Shinseki v. Sanders*, 556 U.S. 396, 409 (2009).

## 2.    CET's Procedural Arguments Should Be Rejected

CET accuses the district court of committing various procedural improprieties en route to its decision.   As Diebold will demonstrate, the district court committed no reversible error — or any error at all; and its handling of this case was pragmatic, efficient, and fair to all parties.

### a.    CET Gave The District Court No Reason To Conduct Formal Claim Construction In This Case

### i.  Formal Claim Construction Is Not Required For § 101 Issues

During the last several years, while the judges of this Court may have differed on the substantive application of 35 U.S.C. § 101, they have agreed on at least this: formal claim construction is *not* a rigid prerequisite for resolving issues under § 101.  *See, e.g., CLS Bank Int'l v. Alice Corp.*, 717 F.3d 1269, 1282 (Fed. Cir.) (Opinion of Lourie, J.) (claim construction analysis may be helpful but is not required), *cert. granted*, 134 S. Ct. 734 (2013); *Bancorp Servs., LLC v. Sun Life*

16

*Assurance Co. of Canada (US)*, 687 F.3d 1266, 1273 (Fed. Cir. 2012) ("We perceive no flaw in the notion that claim construction is not an inviolable prerequisite to a validity determination under § 101."), *petition for cert. filed*, 82 U.S.L.W. 3319 (U.S. Nov. 8, 2013) (No. 13-584); *CyberFone Sys., LLC v. CNN Interactive Grp., Inc.*, ___ Fed. App'x ___, Nos. 2012-1673, -1674, 2014 U.S. App. LEXIS 3599, at *7 n.1 (Fed. Cir. Feb. 26, 2014) (nonprecedential) ("There is no requirement that the district court engage in claim construction before deciding § 101 eligibility.").  In *Ultramercial, Inc. v. Hulu, LLC*, 722 F.3d 1335 (Fed. Cir. 2013), *petition for cert. filed*, 82 U.S.L.W. 3107 (U.S. Aug. 23, 2013) (No. 13-255), the majority stated that while claim construction normally will be required, "claim construction may not always be necessary for a § 101 analysis." *Id.* at 1350.  The majority in *Ultramercial* ultimately concluded that the court "[did] not need the record of a formal claim construction" to rule on the § 101 issue before it, *id.* at 1339, and the concurring opinion of Judge Lourie agreed with the majority that no formal claim construction was needed at this stage, *id.* at 1355.

Notwithstanding several decisions of this Court to the contrary, CET broadly argued below, without providing any specifics, that the lack of claim construction made it "impossible" for the district court to resolve the § 101 issue.  (A242-43.) But this Court has repeatedly demonstrated that resolving § 101 issues is not at all "impossible" without claim construction.  *See, e.g., Ultramercial*, 722 F.3d

at 1335.  *Dana Corp. v. American Axle & Manufacturing*, 279 F.3d 1372, 1376 (Fed. Cir. 2002), now cited repeatedly by CET for the proposition that a court "may not" invalidate claims without construing them (CET Br. 14, 19, 22), involved anticipation under 35 U.S.C. § 102(b), not § 101.

In the end, CET got it right when it admitted before the district court that "there is no strict requirement to construe claims before determining subject matter eligibility . . . ." (A239.)

### ii.  CET Never Identified A Material Claim Construction Dispute Before The District Court

Against this jurisprudential backdrop, it can be seen that while CET repeatedly promoted the notion of claim construction *in the abstract* before the district court, CET filed no motion or request to accelerate claim construction proceedings, even though local patent rules contemplated this.  *See* N.J. L.Civ.R. 9.3 (Local Patent Rule 1.3) (court can modify deadlines for claim construction based on circumstances of case, upon showing of good cause).  Nor did CET ever advance a concrete reason before the district court as to how or why construction of any term could make a difference in the § 101 analysis *in this case*. To the contrary, by its failure to act appropriately and its failure to show prejudice on the § 101 issue, CET effectively conceded below that claim construction was unnecessary.

18

CET has failed to recognize in connection with claim construction that: "only those terms need to be construed that are in controversy, and only to the extent necessary to resolve the controversy." *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999). As explained in *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554 (Fed. Cir. 1997): "Claim construction is a matter of resolution of *disputed* meanings and technical scope, to clarify and *when necessary* to explain what the patentee covered by the claims . . . ." *Id.* at 1568 (emphasis added); *see also* N.J. L. Pat. R. 4.3(b) (requiring the submission of each parties' proposed construction of each "disputed" term), (c) (requiring identification of terms whose construction will be "most significant to the resolution of the case" and "any terms whose construction will be case or claim dispositive").

In the very first paragraph of its district court brief in opposition to PNC's motion to dismiss, CET accused PNC of seeking dismissal based solely on PNC's "own incorrect construction of two of the claims" (A233) — without ever explaining *what* PNC's construction in the two claims was, *why* it was incorrect, or *how* it would impact on the § 101 analysis.

Later in that same opposition brief before the district court, CET noted that some of its claims include means-plus-function limitations under 35 U.S.C. § 112(f), which — according to CET — "must be construed based on a detailed

analysis of the specification." (A236.)  But at no time did CET present a construction or explain how or why the construction of any means-plus-function limitation would impact on the § 101 analysis as advanced by PNC and subsequently adopted by the district court.

CET then turned to exemplary claim 1 of the '855 Patent and exemplary claim 1 of the '416 Patent and noted that each of these claims has "a number of terms" that have not been construed by the district court. (A236-38.)  Again, CET never explained *what* terms in those claims were disputed by the parties or were even susceptible to different constructions, or *how* any particular construction of any particular term could save any claim from invalidity under § 101.

Having urged the district court that it would be remiss if it failed to construe every term of every claim, CET then turned to PNC, noting that PNC "utterly failed to construe even the limitations" discussed by PNC. (A240.)  But once again, CET never indicated how any construction would make it more or less likely that CET's patent claims were invalid under § 101.  Neither this Court nor the district court's local patent rules requires that every term of every claim must be construed by the court without identifying a dispute and without at least one party asserting a need for construction.

CET "anticipated" before the district court that "many" claim terms would be disputed (A242-43), and now asserts that various claim terms were "sharply"

20

disputed (CET Br. 17) and many claim terms are "clearly" disputed today (*id.* at 19). But this is baseless rhetoric, because nowhere does CET tell us *who* disputes which terms, or *why* the resolution of any such dispute affects the § 101 analysis.

CET ultimately conceded that claim construction was not needed *in this case*. For example, before the district court, in discussing claim 1 of the '855 Patent, CET argued that the claim met the "machine-or-transformation" test "[o]n the face of it . . . ." (A237.) CET also argued to the district court that claim 1 of the '416 Patent was "obviously" tied to a particular machine "given *any* reasonable construction . . . ." (A238 (emphasis added).)

### iii. The District Court Properly Resolved Claim Construction Questions In CET's Favor

In its reply brief before the district court, PNC aptly summarized the insufficiency of CET's position thusly:

> [CET] has not explained ***how*** claim construction might alter the Court's analysis, has not offered the Court with a construction of any claim term that would impact the § 101 analysis, and has not articulated any reason why the Court "w[ill] lack a full understanding of the claimed subject matter if it d[oes] not first construe the claims." [Citing *Cyberphone Sys., LLC v. Cellco P'ship*, No. 11-827, 2012 WL 3528115, at *4 (D. Del. Aug. 16, 2012.] Nor does [CET] identify any claim term requiring construction before this Motion is resolved. Its blanket statement that "[t]his is not the right time to decide patent-eligibility" [A243], is not enough. If [CET] cannot identify a single construction of a claim term that would impact the analysis required to decide this Motion, there is no reason to postpone resolution of this issue until after claim construction.

(A277 (footnotes omitted; emphasis in original).)

The district court agreed.  It acknowledged that it was obliged to adopt a construction "most favorable to the patentee," but concluded that CET's patents "encapsulate invalid abstract ideas, even when construed in the manner most favorable to [CET]."  (A11.)  That the district court did indeed adopt a construction most favorable to CET is clear.  CET notes on appeal that some claims recite a "broader digitizing unit" while others recite a "narrower scanner."  (CET Br. 28 n.5.)  The district court's machine-or-transformation analysis treated all claims as reciting the narrower "scanner" (as opposed to the broader digitizing unit) (A21-25), a choice which properly favored CET on the § 101 issue.

### iv. CET's Claim Construction Arguments Raised For The First Time On Appeal Should Be Rejected

In its brief before this Court, for the first time in these cases, CET suggests that certain terms "may" be construed in a particular way which presumably might assist CET in arguing that the claims are patent eligible.  This includes terms that appear in representative claim 1 of the '855 Patent and representative claim 1 of the '416 Patent.  (CET Br. 37-39.)  These were the exemplary claims addressed by the parties and the district court, but those potential constructions of claim terms in CET's appeal brief were never so much as mentioned by CET before the district court.  They should not be entertained for the first time on appeal.

CET makes similar arguments about claims 43 and 44 of the '416 Patent, noting that such terms had not been construed by the district court.  (*Id.* at 40.)  But

although CET had every opportunity before the district court to single out these claims and any other claims that had terms for which the construction might impact the § 101 analysis, CET never so much as mentioned those claims — until this appeal.

*          *          *

Accordingly, under the circumstances of this case, CET has not demonstrated that the district court erred in failing to conduct formal claim construction before addressing and granting PNC's motion.  No binding precedent required formal claim construction.  And because CET's arguments on appeal that the construction of certain claim terms might matter in the § 101 analysis were not made below and thus have been waived, absent those arguments, CET cannot avoid a holding that any error in failing to conduct formal claim construction was indeed harmless.[2]

---

[2] This case aptly demonstrates the wisdom of not imposing a rigid requirement of formal claim construction before a ruling on § 101 can take place.  The District of New Jersey, where these cases originated, has special patent rules setting forth a procedure for exchanging infringement and invalidity contentions, identifying claim construction disputes, and resolving them.  In an appropriate case, where the failure of asserted patents to comply with § 101 is manifest, requiring full-blown formal claim construction before considering dismissal under § 101 would unnecessarily burden trial courts and force defendants to bear the substantial cost of claim construction, followed by a motion for summary judgment (which some judges will seldom entertain until *all* fact discovery is completed).

### b.    CET Gave The District Court No Reason To Analyze Each Of 242 Claims Separately

Although CET may never have intended to assert infringement by PNC of each of CET's 242 claims in pretrial proceedings (let alone at trial), CET nonetheless filed its complaint against PNC asserting all 242 claims of its four patents.  Indeed, rather than simplify the case, CET inexplicably included in its complaint allegations that two *additional* patents (U.S. Patent Nos. 7,259,887 and 7,474,434), with another 64 claims, were duly and legally issued and were owned by CET (A84 ¶¶ 13-15), even though CET *did not* expressly accuse PNC of infringing those additional patents (A4 n.3).

In its opening brief before the district court, PNC first noted that the four patents-in-suit are in the same "family," share the same title, name the same three inventors, and share the same specification.  (A208.)  PNC then noted that CET's '855 and '508 Patents "contain similar claims" and asserted that claim 1 of the '855 Patent was "representative."  (A209.)  In similar fashion, PNC noted that CET's '416 and '465 Patents "contain similar claims to one another" and that claim 1 of the '416 Patent was "representative."  (A210.)  PNC further noted that claims very similar to those in CET's patents-in-suit had already been held invalid under § 101.  (A211 (citing *Glory Licensing*, 2011 U.S. Dist. LEXIS 51888).)  PNC then proceeded to demonstrate why the two representative claims were clearly invalid under § 101.

PNC could hardly have proceeded otherwise.  The 242 claims were all of record as exhibits to CET's complaint.  (A89-199.)  They consumed part or all of 42 columns of the patents and now consume part or all of 22 pages of the Joint Appendix on these appeals.  (A112-15, A139-41, A162-72, A196-99.)  PNC could not have reproduced even a fraction of CET's 242 claims in a brief limited to 40 pages using a large font.  *See* N.J. L.Civ.R. 7.2(b).

Faced with PNC's brief, had CET believed that the two claims identified by PNC were not "representative," CET could have scoured its remaining 240 claims to find one claim — *any* claim — that was not similar to the "representative" claims PNC had identified and which raised issues of patent eligibility that were not shared with PNC's "representative" claims.  But CET did nothing of the sort.

Accordingly, in its reply brief, PNC directly responded to CET's contention that PNC should have treated each claim separately in its brief, asserting that CET was

> wrong because all of the claims are addressed to the same abstract idea of "extracting," "storing," and "routing" information from a document. Indeed, all of the claims suffer from the same fatal defects.  None of the claims describe any special programming code or any specific algorithm to perform the claimed functions.  None of the claims are directed to any specific field of use.  None of the claims are tied to a particular machine or effect a transformation in data.

(A278.)  PNC added: "[CET] makes no effort to identify any meaningful difference in the outcome based on one claim compared to another — because it cannot." (*Id.*)

The district court rejected CET's assertion that PNC was obligated to "engage in an extended attack on each of the 242 claims . . . ."  (A12.)  On the contrary, "[w]here the claims, as here, are substantially similar and linked to the same abstract idea, the Court is free to dispose of the additional claims in a less detailed fashion."  (*Id.*)  For support, the district court cited *Glory Licensing*, in which another judge had invalidated 121 claims across 3 patents from the same family while analyzing only a single claim of a single patent in detail, as well as *Bilski v. Kappos*, 130 S. Ct. 3218 (2010)[3] (A12); *see also SmartGene, Inc. v. Advanced Biological Labs., S.A.*, ___ Fed. App'x ___, No. 2013-1186, 2014 U.S. App. LEXIS 1357, at *4-9 (Fed Cir. Jan. 24, 2014) (nonprecedential) (where patentee offered no refutation to assertion that selected claim was representative, patentee forfeited any argument that claims should be treated differently).

CET's reliance on *Shelcore, Inc. v. Durham Industries, Inc.*, 745 F.2d 625 (Fed. Cir. 1984) (CET Br. 20) is misplaced.  In *Shelcore*, a district court

---

[3] CET argues that, in *Bilski*, the patent applicants had argued all of the claims together.  (CET Br. 22.)  Here, however, by failing to even attempt to rebut PNC's assertion that two claims were representative, CET acquiesced in PNC's contention that all of the claims should rise or fall together insofar as § 101 was concerned.

improperly invalidated *dependent* claims because an independent claim was invalidated *over the prior art*. But where (as here) "representative" claims are shown to be invalid, and there is no "indication that other claims contained other limitations that might have" led to a different result, the invalidation of all claims is proper. *See N.V. Akzo v. E.I. DuPont de Nemours & Co.*, 810 F.2d 1148, 1152 (Fed. Cir. 1987).

CET had every opportunity to identify even one claim for which those selected by PNC was not "representative." CET could have and should have done so in its opposition brief in the district court. CET could have sought leave from the district court to submit a surreply brief. *See* N.J. L.Civ.R. 7.1(d)(6). CET could have filed an amended complaint as of right, specifically asserting claims which CET believed to be materially different from those identified by PNC as representative. *See* Fed. R. Civ. P. 15(a)(1). And after Judge Shipp ruled against CET, CET might have filed a motion for reconsideration, *see* N.J. L.Civ.R. 7.1(i), in which CET could have attempted to demonstrate (perhaps with a belated request for early claim construction) that the district court's view of the scope of CET's claims was in error as to specific claims which CET did not consider "representative," and that correction of such error would alter the result.

Instead, CET waited for this appeal to provide specifics as to claims 43 and 44 of the '416 Patent purportedly differing from those specifically analyzed by

the district court.  (CET Br. 40.)  This attempt to raise a brand new argument on appeal is clearly improper.

Finally, CET's contention that all 242 claims must be analyzed separately is belied by CET's present ability to summarize "[t]he claims" (all of them) in about six lines of its appeal brief.  (CET Br. 10 Part IV.)

### c.    CET Gave The District Court No Reason Not To Proceed Under Fed. R. Civ. P. 12(b)(6)

Before the district court, while CET argued that PNC's motion was "premature" (A239), CET did not specifically argue that invalidity under 35 U.S.C. § 101 cannot be decided by a motion to dismiss under Fed. R. Civ. P. 12(b)(6). Now, on appeal, CET makes a full-throated argument that employing Rule 12(b)(6) was improper.  (CET Br. Part VI.A.)  Assuming that this argument was properly preserved and not waived, it is nonetheless wrong.

As CET has argued, in *Ultramercial*, 722 F.3d at 1335, this Court stated that "it will be rare that a patent infringement suit can be dismissed at the pleading stage for lack of patentable subject matter," *id.* at 1338, and that "Rule 12(b)(6) dismissal for lack of eligible subject matter will be the exception, not the rule," *id.* at 1339.

However, a number of district courts have dismissed patent infringement cases based upon § 101 under Rule 12.  *See, e.g., Cardpool, Inc. v. Plastic Jungle, Inc.*, No. 12-04182, 2013 U.S. Dist. LEXIS 9280, at *9 (N.D. Cal. Jan. 22, 2013)

(finding "no authority for the proposition that a patent may not be deemed ineligible subject matter on a motion to dismiss"); *OIP Techs., Inc. v. Amazon.com, Inc.*, No. C-12-1233, 2012 U.S. Dist. LEXIS 129396, at \*14-16 (N.D. Cal. Sept. 11, 2012) (holding that "the procedural posture of this case does not render [defendant's] motion premature"); *Glory Licensing*, U.S. Dist. LEXIS 51888, at \*1.

Indeed, such decisions to grant dismissal under Rule 12 have continued even after this Court's decision in *Ultramercial*. *See, e.g., Lumen View Tech. LLC v. Findthebest.com, Inc.*, No. 13-CIV-3599, 2013 U.S. Dist. LEXIS 166852, at \*40 (S.D.N.Y. Nov. 22, 2013) (granting dismissal under Fed. R. Civ. P. 12(c) and noting, in reference to *Ultramercial*, "But rare does not mean never"). Here, *Ultramercial* was decided after the district court briefing, but the district court nonetheless was aware of the decision and discussed it repeatedly. (A10-11, A13 n.6, A20-23, A25.)

The Supreme Court held in *Bilski* that the § 101 patent eligibility inquiry is a "threshold test." *Bilski*, 130 S. Ct. at 3225; *see also id.* at 3236 (Stevens, J., concurring) ("Section 101 imposes a threshold condition."). Diebold submits that, in an appropriate case like this one, a litigant should have the opportunity to resolve a "threshold" issue like patent eligibility at the outset of a lawsuit, under Fed. R. Civ. P. 12.

Before the district court, CET advanced no argument that proceeding under Rule 12(b)(6) was inherently improper.  As already discussed, CET identified no material claim construction issue that required resolution prior to deciding the § 101 issue.  While now suggesting that a § 101 issue may be "rife with underlying factual issues" (CET Br. 15 (quoting *Ultramercial*)), CET identifies no factual issues that required resolution and — most assuredly — it identified no such factual issues before the district court and proffered no evidence.  Nor did CET ever suggest that it needed discovery from PNC or anyone else.  Thus, even given this Court's statement that employing Rule 12(b)(6) should be "rare" and "the exception, not the rule," CET has made no showing that the use of Rule 12(b)(6) was improper or prejudicial *in this case*.

The public, the Administration, Congress, and the courts are currently exploring methods to impose on nonpracticing entities a burden to substantiate in their pleadings the merits of their patent infringement allegations, and to provide defendants with procedures and remedies to enable courts to address these issues before the defendants must submit to expensive discovery.  Motions under Rule 12(b)(6) are more important than ever before as a tool to be employed in cases like these.

In an *amicus* brief recently filed at the Supreme Court, a number of retailers that were repeatedly sued for patent infringement urged the Court to adopt a

"threshold test for patentability" under 35 U.S.C. § 101, advocating for early resolution of the "gateway" issue of subject matter eligibility, because the alternative (lengthy and expensive discovery, claim construction, trial, etc.) "virtually guarantees that most companies will accept a cost-of-litigation settlement rather than find out whether the alleged invention is actually patentable." *Amicus Curiae* Brief of Retailers in Support of Neither Party, *Alice Corp. v. CLS Bank Int'l*, No. 13-298, at 1-2 (U.S. Jan. 22, 2014).  As those *amici* further noted:

> While [Sections 102, 103, and 112] assess the validity of a claim against specific prior art references or standards of adequacy of the patent's specification, Section 101 asks a court to police the boundaries of what can and cannot be patented, a different enterprise with a different set of aims. If the former sections tell us whether a patentee played the game by the rules, the latter section tells us whether he or she was playing the game at all.

*Id.* at 9.

Forcing manufacturers like Diebold and their customers like PNC to slog through months of patent litigation, spending hundreds of thousands of dollars in providing discovery regarding multiple ATMs, at numerous locations, performing thousands of transactions every day, before having an opportunity to assert that the patents are not even directed to eligible subject matter under the patent laws, would guarantee that more and larger settlement payments will be made to patent owners in baseless cases.  Limiting Rule 12(b)(6) would run counter to the rules being administered "to secure the just, speedy and inexpensive determination of every

31

action and proceeding." Fed. R. Civ. P. 1. And unnecessarily delaying resolution of § 101 issues would impair the "significant public policy interest in removing invalid patents from the public arena." *SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1354 (Fed. Cir. 2005).

As Diebold has demonstrated, CET provided the district court with no reason not to entertain — and grant — PNC's timely motion under Fed. R. Civ. P. 12(b)(6), having identified *no* material claim construction issues, *no* material differences between and among the 242 claims at issue, and *no* material issues of fact that required resolution. Indeed, the district court arguably would have been remiss if it had failed to address PNC's motion based simply on a generalized preference for full-blown claim construction for unspecified terms and development of unidentified factual issues before patent eligibility can even be considered.

### 3.    CET's Substantive Arguments Should Be Rejected

The parties and the district court analyzed the patent eligibility issue under 35 U.S.C. § 101 in accordance with *Bilski*.[4] More specifically, PNC addressed the "machine" prong of the machine-or-transformation test (A216-20), followed by the "transformation" prong (A220-21), followed by a more general consideration of the abstract nature of the claims (A221-26). The district court did likewise.

---

[4] CET's four patents-in-suit all issued in or before 1998, well before *Bilski* and its progeny.

32

(A12-26.)  Although CET in its appeal brief chose not to analyze the foregoing factors in the same sequence before this Court, Diebold will do so, and will demonstrate that the district court properly resolved each of the three phases of the analysis as outlined by the Supreme Court in *Bilski*.

### a.  The Claims Do Not Meet The "Machine" Prong Of The Machine-Or-Transformation Test

Working from a definition of "machine" in prior decisions of this Court, the district court first acknowledged that: "Both a general purpose computer and an automated digitizing unit such as a scanner fall under that definition."  (A15.) However, the district court concluded that for the claims of the CET patents to be patent eligible, the machines had to provide a "meaningful limitation upon the claims," and concluded that they did not do so.  (*Id.*)

After reviewing extensive precedent, the district court concluded that the scanner and computer referenced in the CET patents were not integral to the claims and were not tied to the claims in a manner that would suggest that the claims were directed to an application of an abstract idea rather than the idea itself.  (A21.)

### i.  The Scanner

Dealing first with the scanner, the district court explained:

First, the use of the scanner is pre-solution activity that does not provide any meaningful limitation on the extent of the claims contained in the Patents-in-Suit.  Unlike *SiRF* [*Tech., Inc. v. Int'l Trade Comm'n*, 601 F.3d 1319 (Fed. Cir. 2010)], the scanner here is not integral to the first step of the claims in which it is featured because the step in which it is used can be accomplished without using a scanner or similar device.

33

(A22.)  It further noted that the addition of the scanner to the core activity in the claims of the CET patents, *i.e.*, "associating information from a given field on a hardcopy document to a corresponding field in a computer memory location or database," was not sufficient "integrality" to pass the machine prong.  (*Id.*)

The district court's characterization of the scanner as "pre-solution activity that does not provide any meaningful limitation on the extent of the claims contained in the Patents-in-Suit" (A22) was in reference to Supreme Court precedent from the analogous situation of patent claims directed to laws of nature. In that context, the Court had held that "[p]urely conventional or obvious presolution activity is normally not sufficient to transform an unpatentable law of nature into a patent eligible application of such a law."  *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1298 (2012) (internal citations omitted).

The district court also held in connection with the scanner: "Simply stated, gathering information from a hardcopy document can be done by hand and manually input into a general purpose computer.  The fact that a scanner, or other machine, may make a given step more efficient does not render the machine integral."  (A22 (citing *Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1333-34 (Fed. Cir. 2012)).)  Indeed, the CET patents acknowledge this to be the case.  (*See, e.g.*, A105 col.1 ll.11-13 ("In the past, information contained on hard copy documents

34

was manually entered into a computer via the input controller of a particular computer.").)[5]

The district court also relied on *CyberFone Systems, LLC v. Cellco Partnership*, 885 F. Supp. 2d 710 (D. Del. 2012), for its analysis of the "machine" prong insofar as the claims in *CyberFone* recited the use of a telephone. After noting that the district court in *CyberFone* did not consider the use of a telephone integral to the larger idea embraced in the claims, it concluded as to the present case that: "The addition of the scanner to the core activity in the Patents-In-Suit — associating information from a given field on a hard copy document to a corresponding field in a computer memory location or database — is not the type of integrality found in *SiRF* and is insufficient to pass the machine prong." (A22.) This Court recently affirmed the district court's ruling in *CyberFone*, concluding that the telephone recited in the claim was "not a specific machine, and adds nothing of significance to the claimed abstract idea." *CyberFone*, 2014 U.S. App. LEXIS 3599, at *12.

The correctness of the district court's observations is manifest when considered in the context of CET's assertion of its patents in these cases against devices and methods that involve envelope-free deposit of checks in an ATM.

---

[5] Since CET's four patents have substantially the same specification, the quoted language appears in all four patents.

Clearly, long before scanners existed — and even after — bank tellers receiving checks for deposit would routinely read information from the check (such as the amount of the check, etc.) and manually input that information into a computer system. While scanners might do this more quickly, that hardly means that it cannot be done by hand and then manually input into a general purpose computer, as the district court held. CET essentially concedes this. (CET Br. 6, 9.)

CET now argues that a scanner converts information from a hard copy document into a "stream of bits" which are meaningless to the human eye and mind. (*Id.* at 11.) But in the example discussed above involving a human teller, the human teller did the same thing by reading the document and manually inputting information using a keyboard into a computer to form a "string of bits."

As it did in the district court, CET relies on *SiRF Technology, Inc. v. ITC*, 601 F.3d 1319 (Fed. Cir. 2010), in which the claims involved methods employing a GPS receiver to gather and calculate positions. But CET's attempt to analogize its claimed scanner to the GPS receiver in *SiRF* is untenable. The claims in *SiRF* recited numerous steps that specifically called for a GPS receiver and its operation. *See id.* at 1331-33. Here, the scanner is used only to gather data as the source of information, and it is never referenced again in the claims.

Most importantly, it was clear in *SiRF* that "the methods at issue could not be performed without the use of a GPS receiver . . . ." *Id.* at 1332. As Diebold has

demonstrated, the methods recited in the CET patents could be performed without a scanner, *e.g.*, by a teller manually inputting data to a computer with a keyboard.

Accordingly, the district court was correct in rejecting CET's reliance on *SiRF*.

## ii. __The Computer__

Turning to the computer, the district court held that this, too, did not meaningfully limit the scope of the claims, even assuming that all of the steps alluded to in the CET patent claims beyond the importation of data from the scanner took place on a computer. (*Id.*) As the court went on to explain:

> [T]he mere use of a computer to more quickly and efficiently — or as in the case of the alleged infringement in this case, process deposits at an ATM — accomplish a given task does not create meaningful limitation on an otherwise abstract and wide-ranging concept. Mere transposition of information from a hardcopy document to a computerized database or application according to user instructions, even accomplished on a computer, does not meet the machine prong.

(A23 (citation omitted).) The court concluded that the computer in CET's claims was a general purpose computing device being asked to do some unspecified sorting function. (*Id.*) The court ultimately concluded with regard to the "machine" prong:

> The presence of a computer does not meaningfully limit the basic flaw in the Patents-in-Suit: they attempt to patent the abstract idea of extracting information from a hardcopy document, recognize certain information on that document and save certain user selected information in computer memory. The breadth of the Patents-in-Suit is staggering and the inclusion of a scanner and computer into the process confers no meaningful limit

upon their scope.  As such, the Court has concluded that the Patents-in-Suit do not pass the machine prong of the Machine-or-Transformation Test.

(*Id.*)

CET repeatedly refers to the computer as being "specially-configured." (CET Br. 11, 13, 28, 34; *see also id.* at 6 ("a computing device that is configured specifically to perform various steps").)  But CET's patent claims contain nothing to support that characterization.  And CET points to nothing else as support for the computer being "specially-configured."  CET cannot point to anything in its claims that describes any special programming code or any specific algorithm to perform the functions recited in the claims.  *See CLS Bank*, 717 F.3d at 1305 (Opinion of Rader, C.J.) ("A computer without software collects dust, not data.").

Clearly, CET's patents contemplate nothing more than a general purpose computer which cannot and does not meaningfully limit its claims.  In *Dealertrack*, after noting that the patent "does not specify how computer hardware and database are specially programmed to perform the steps claimed in the patent," the court observed: "The claims are silent as to how a computer aids the method, the extent to which the computer aids the method, or the significance of the computer to the performance of the method."  *Dealertrack*, 674 F.3d at 1333.  The court added that the mere addition of "computer aided" to a claim covering an abstract concept is insufficient to render the claim patent eligible.  *Id.*

CET argues that: "Each check deposit made through a teller requires some teller time — time not spent when the bank customer deposits the same item through an ATM or a mobile device."  (CET Br. 9.)  But CET's suggestion that speed alone can confer patent eligibility is simply wrong:

> At its most basic, a computer is just a calculator capable of performing mental steps faster than a human could.  Unless the claims require a computer to perform operations that are not merely accelerated calculations, a computer does not itself confer patent eligibility.

*CLS Bank*, 717 F.3d at 1286 (Opinion of Lourie, J.).

Moreover, as was the case with the scanner (*see supra*), all the remaining steps in CET's claims were done by humans before the age of computers, and are done by humans today.  *See CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1372 (Fed. Cir. 2011) ("All of [the claim's] method steps can be performed in the human mind, or by a human using pen and paper."); *SmartGene*, 2014 U.S. App. LEXIS 1357, at *9-14 (reaffirming that § 101 "[does] not embrace a process defined simply as using a computer to perform a series of mental steps that people, aware of each step, can and regularly do perform in their heads. . . . nor processes that merely invoke a computer and its basic functionality for implementing such mental processes, without specifying even arguably new physical components or specifying processes defined other than by the mentally performable steps.").

The same reasoning applies here.  The notion of a bank processing the deposit of a check was plainly not eligible for patent protection before the

computer age, and it is no more eligible today.  The district court correctly rejected CET's argument that the computer satisfies the "machine" test.

### b.   CET Has Abandoned Its Reliance On The "Transformation" Prong Of The Machine-Or-Transformation Test

Before the district court, CET argued that its claims satisfied the "transformation" prong of the machine-or-transformation test.  (A253-54.)  CET appears to have abandoned that argument on appeal, but lest Diebold be mistaken, we address it here briefly.

CET had argued below that its scanner "transforms" ink on paper into bit-mapped pixels, and that the computer also "transforms" the bit-mapped pixels into machine-readable values stored in targeted memory locations.  (*See* A24 (citing A253).)  In rejecting this argument, the district court cited *Cybersource* for its holding that: "The mere manipulation or reorganization of data . . . does not satisfy the transformation prong."  *CyberSource*, 654 F.3d at 1375.  It also relied on two district court decisions: *Glory Licensing*, 2011 U.S. Dist. LEXIS 51888, at *11-12 (holding in connection with patents from the Medina/Elias Patent Family that the mere transfer of data from an electronic or hard copy document to an application program is not deemed a "transformation"), and the district court's opinion (subsequently affirmed) in *CyberFone*, 885 F. Supp. 2d at 717 (holding

that organizing data into subsets is not "transformation," and that a storage device is not "transformed" when it receives data).

As the district court correctly concluded in holding that the CET patents fail the transformation prong: "The *conversion* of the hardcopy documents into a bitmapped image which is then manipulated and stored into computer memory does not constitute a transformation of the underlying data contained in the hardcopy document."  (A24-25 (emphasis in original).)

### c.    The District Court's General Inquiry As To Abstractness Was Clearly Correct

CET argues that the claims of its patents do not even raise abstractness concerns.  (CET Br. 28.)  But the basis for this contention is the presence of a scanner and what CET inaccurately describes as a "specially-programmed computer."  (*Id.*)  CET's arguments in this regard are essentially warmed-over versions of its arguments as to why the scanner and the computer satisfy the "machine" prong of the machine-or-transformation test.

The district court's core distillation of CET's patent claims demonstrates that it is remarkably similar to the abstract idea that was at issue in the *CyberFone* case:

41

| **CET Patents (A5)** | ***CyberFone*, 2014 U.S. App. LEXIS 3599, at *7** |
|---|---|
| "[T]he Patents-In-Suit focus on the processing of information in a three step process. First, information or data from a hard copy document is gathered by an 'automated digitizing unit,' such as a scanner, into computer memory. Second, the information gathered by the scanner is recognized as corresponding to certain data fields. Third, the information corresponding to the data fields on the hardcopy documents are then stored in corresponding data fields in computer memory." | "[U]sing categories to organize, store and transmit information is well-established. Here, the well-known concept of categorical data storage, i.e., the idea of collecting information in classified form, then separating and transmitting that information according to its classification, is an abstract idea that is not patent-eligible." |

CET also asserts that its claims are not directed to "core business methods," such as those involved in operations relating to investments, tax, financial obligations or property exchanges.  (CET Br. 29.)  But, if anything, the "core" of CET's claims, as quoted above, is even *broader* than the foregoing areas and operations identified by CET.  The subject matter of CET's claims could not only be used in *all* of those fields identified by CET; they could be used in countless other fields.

CET's focus on the application of the patent claims to the accused infringement via envelope-free deposit of checks in an ATM should not confuse the Court as to the scope of the claims.  To be sure, on their face, CET's claims are not *limited* to that arena.  The common specification of CET's subject patents states that the document source can be letters, forms, pictures, reports, music scores, film,

and other types of hard copy documents that can be processed by the invention "for accounts payable/receivable accounting, inventory control, record keeping, budgeting, data base management, music transcription, forms processing, computerized art, survey and questionnaire processing, statistical data analysis, correspondence processing and other applications." (A112 col.15 ll.50-57.) The district court concluded that the breadth of CET's patents is "staggering" (A23) — and clearly that is true.

CET then engages in an effort to show that none of the claims pose a risk of "preempting" an abstract idea. CET attempts to do so by citing specific limitations in certain of CET's claims and arguing that anything which lacks that limitation cannot be preempted by that claim. (CET Br. 35-41.) CET concludes by declaring: "Each of the claims does not preempt methods that do not include all of the limitations recited in the claim." (*Id.* at 41.)[6]

But that cannot conceivably be the appropriate approach. *Every* claim of *every* patent can be said to not preempt subject matter that lacks one or more claim limitations. If this were the test, *no* claim could ever be held to lack patent

---

[6] In arguing that its claims are "circumscribed," CET refers to claim limitations mentioned in the PTO's reasons for allowance (CET Br. 10) and includes that document in the Joint Appendix (A697-98). However, no part of the prosecution histories was made of record below; consequently, this argument should be disregarded. *See Am. Standard, Inc. v. Pfizer, Inc.*, 828 F.2d 734, 746 (Fed. Cir. 1987) (where no part of file history was before the district court, submission of excerpts to the Federal Circuit was improper).

eligibility, because one could *always* argue that because there is some subject matter that exists outside the scope of the claims, the level of preemption necessarily cannot be excessive. But the reality is that many claims have been found by this Court and other courts to be too abstract and therefore not eligible for patent protection because *the claimed subject matter itself* is excessive if not unlimited. As noted in *CLS Bank*, 717 F.3d at 1281 (Opinion of Lourie, J.), claims should not be coextensive with an abstract idea; they must add "significantly more," with the result that the claim covers significantly less.

Rather than focus on what the claims *do not* cover, what matters here under § 101 is the *absence* of any real limitations in the claims, which allows the claims to be so broadly asserted to so many industries involving standard methods of gathering and routing information that are merely computer assisted.

CET relies heavily on *Research Corp. Technologies, Inc. v. Microsoft Corp.*, 627 F.3d 859 (Fed. Cir. 2010). (CET Br. 33-34.) That reliance is misplaced. *Research Corp.* involved processes for enabling a computer to render a half-tone image of a digital image by comparing, pixel by pixel, the digital image against a two-dimensional array referred to as a "mask." This Court concluded that the invention claimed in *Research Corp.* presented "functional and palpable" applications in computer technology. *Id.* at 868.

As this Court subsequently pointed out in *Bancorp*, the claimed processes in *Research Corp.* plainly represented improvements to computer technologies in the marketplace. *Bancorp*, 687 F.3d at 1279 (citing *Research Corp.*, 627 F.3d at 865). This is manifestly not the case with CET's patents. In addition, as noted in *CyberSource*, 654 F.3d at 1376, the method in *Research Corp.* could not, as a practical matter, be performed entirely in a human's mind. Here, as previously demonstrated, the very opposite is true. In *Glory Licensing*, involving patents from the same family as the CET patents, the court considered any comparison with *Research Corp.* to be "absurd." *Glory Licensing*, 2011 U.S. Dist. LEXIS 51888, at *15.

Clearly, the district court concluded correctly that the abstract nature of CET's patents was "manifestly apparent," and that because the claims are directed to abstract concepts, they are not eligible for patent protection. (A26.)

## B.    Diebold's Cross-Appeal

### 1.    Statement Of The Standard Of Review

In reviewing the propriety of decisions under Fed. R. Civ. P. 12(b)(6), the Federal Circuit applies the rule of the regional circuit. *Superior Indus., LLC v. Thor Global Enters.*, 700 F.3d 1287, 1292 (Fed. Cir. 2012) (quoting *CoreBrace LLC v. Star Seismic LLC*, 566 F.3d 1069, 1072 (Fed. Cir. 2009)). In the Third Circuit, dismissals under Rule 12(b)(6) are reviewed *de novo*. *Wiest v. Lynch*, 710

F.3d 121, 128 (3d Cir. 2013) (citing *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 230 (3d Cir. 2008)).

With regard to review of the dismissal of Diebold's declaratory judgment claims "with prejudice as moot," this Court also applies the law of the regional circuit; and the Third Circuit reviews such rulings for abuse of discretion. *See Univ. of Pittsburgh v. Varian Med. Sys., Inc.*, 569 F.3d 1328, 1331 (Fed. Cir. 2009).

### 2. The District Court Erred In Dismissing Diebold's Tortious Interference And RICO Claims

#### a. Diebold's Pleading Overcame The Traditional *Noerr-Pennington* Immunity

The district court concluded that CET enjoyed complete immunity from Diebold's claims for tortious interference and RICO violations based on the *Noerr-Pennington* doctrine.  Diebold had argued that the *Noerr-Pennington* doctrine should not be applied because of the "sham litigation" exception to *Noerr-Pennington* as enunciated in *Professional Real Estate v. Columbia Pictures Industries, Inc.*, 508 U.S. 49 (1993) ("*PRE*").  The district court noted that the application of the traditional "sham litigation" exception has two requirements.  First, the lawsuit must be objectively baseless.  Second, the Court must then determine whether the baseless lawsuit conceals an attempt by the party asserting *Noerr-Pennington* (*i.e.*, CET) to interfere directly with business relationships of the party seeking to rely upon the sham litigation exception (*i.e.*, Diebold) through the

use of the governmental process as an "anticompetitive weapon."  (A686-87 (citing *PRE*, 508 U.S. at 60-61).)

The court readily concluded that Diebold had adequately alleged in its first amended complaint that CET[7] had engaged in litigation that could be deemed objectively baseless.  (A687.)  The court noted various prior court decisions, including its own previous decision in this case holding CET's asserted patents invalid under 35 U.S.C. § 101.  (A688.)  CET itself admitted that the complaints it filed in each of its suits against Diebold's customers had numerous deficiencies. (A603-06 ¶¶ 22, 27, 32, 37, 41.)

The district court concluded, however, that no matter how egregious CET's five sham lawsuits might have been, CET enjoyed complete immunity based on the *Noerr-Pennington* doctrine.  The sole basis upon which the district court dismissed Diebold's tortious interference and RICO claims was the district court's conclusion that Diebold had failed to adequately plead the second prong of the "sham litigation" exception to *Noerr-Pennington*, in that Diebold had failed to allege that CET's lawsuits intended to and/or had the effect of causing injury to Diebold.  This

---

[7] Diebold's tortious interference and RICO allegations were directed to CET as well as the Individual Defendants Medina, Elias, and Zimmerman; they are all referred to collectively in this argument as "CET."  Given the district court's dismissal of Diebold's tortious interference and RICO claims under *Noerr-Pennington*, the court never reached the Individual Defendants' separate motion to dismiss based on lack of personal liability.  (A379-96.)

conclusion of the district court was legal error. As demonstrated below, Diebold adequately alleged that CET did act with subjective bad faith; that such bad faith was directed at Diebold; and that CET's actions were not aimed at procuring favorable court action.

### i. Diebold Adequately Pleaded CET's Subjective Bad Faith In Suing Diebold's Customers

To begin with, Diebold alleged that CET itself was a sham corporation, which repeatedly withheld its address from its pleadings in violation of a local court rule. (A298 ¶ 4.) CET was formed the day before it filed its first patent infringement suit. (A299 ¶ 5.) CET neither makes nor sells products, nor offers any services, and has no full-time employees (*id.*), as CET admitted (A600 ¶ 5). CET can be found nowhere in the records of Dunn & Bradstreet; and it likely has no meaningful assets. (A299 ¶ 5.) In other words, CET was consciously designed to be judgment proof following the massive award of sanctions against CET's predecessor, Eon-Net, that remains uncollected.[8]

---

[8] In Eon-Net's case against Flagstar, the sanction award was $631,135.18 covering attorney fees, costs and sanctions, and was assessed against both Eon-Net and its attorney, Mr. Zimmerman. As Diebold noted to the district court (A77, Dkt.82, at 4), when that amount was not paid, Flagstar filed a suit to collect those funds from Mr. Zimmerman. *Flagstar Bancorp, Inc. v. Jean-Marc Zimmerman*, No. 2:12-cv-00956 (D.N.J., filed Feb. 16, 2012). Thereafter, Mr. Zimmerman declared Chapter 7 bankruptcy. *See In re Jean-Marc Zimmerman*, No. 12-24044 (Bankr. D.N.J., filed May 31, 2012). Flagstar then filed an adversary proceeding to determine that Mr. Zimmerman's debt to Flagstar was not dischargeable in

*(continued)*

Diebold alleged that CET filed its suits against Diebold's customers knowing that its complaints were objectively baseless.  (A322 ¶ 91.)  For example, the motion to dismiss filed on August 3, 2012, by Bank of America identified fatal deficiencies in CET's complaint in that case (A495 n.5), but CET subsequently filed essentially the same deficient complaint against PNC (A318 ¶¶ 79a, 79b; A82-88).  Diebold further alleged that CET filed infringement suits against Diebold's customers, one at a time, so as to take advantage of the significant costs of each customer defending a lawsuit, so CET could most effectively extract quick and substantial payments from the customers while avoiding a court ruling on the lack of merit of the patent infringement charges.  (A297 ¶ 1.)

In addition, Diebold alleged:

> Rather than vindicate any legitimate patent rights, and attempt to recover damages based on the customers' usage of the alleged inventions purportedly covered by the patents, [CET] sued Diebold's customers with the knowledge and intent that the customers would make a nuisance payment to [CET] having no relationship to the customers' usage of the alleged inventions purportedly covered by the patents, or any other bona fide damage claim, and that the customers would do so irrespective of the merits of the patent infringement claims simply because the cost of investigating and defending against the patent infringement claims far

---

bankruptcy.  *See Flagstar Bancorp, Inc. v. Jean-Marc Zimmerman*, Adv. No. 12-01885 (Bankr. D.N.J., filed Aug. 31, 2012).  Mr. Zimmerman has opposed that action, and it remains unresolved at this time.  This Court may take judicial notice of these facts pursuant to Fed. R. Evid. 201(d) ("court may take judicial notice at any stage of the proceeding"); *Biomedical Patent Mgmt. Corp. v. Calif. Dep't of Health Servs.*, 505 F.3d 1328, 1331 n.1 (Fed. Cir. 2007) (federal court filings may be judicially noticed).

exceeded [CET's] payment demands; because the customer banks were perceived by [CET] to have the financial wherewithal to make the payments; and (in at least certain instances) because [CET] knew and expected that the customer banks could seek and obtain compensation from Diebold and/or other suppliers.

(A323-24 ¶ 95.)

Still further, Diebold alleged in its First Amended Complaint that CET's demands for payment from Diebold's customers "were accompanied by time limitations on acceptance by the defendant banks, thus pressuring the defendant banks to simply pay off [CET] and be rid of the case quickly and at a relatively low cost, as compared to the extraordinary costs of investigating and defending, irrespective of the merits of the claims or lack thereof." (A326 ¶ 104.)

Diebold also alleged that these actions by CET were a continuation of an earlier pattern of bad-faith litigation conduct which the same principals and attorney inflicted on huge numbers of defendants through other sham corporations, including Eon-Net LP, employing patents from the same family as the CET patents. (*See* A320-22 ¶¶ 83-90.) As Diebold alleged in its complaint in this action, Eon-Net and Defendant Jean-Marc Zimmerman were correctly found by one district court and/or by this Court to have acted in bad faith (so as to justify a substantial sanction award) on numerous grounds including

having filed numerous complaints that were virtually identical but which failed to give adequate notice of the acts that were alleged to be infringing; having demonstrated indicia of extortion by demanding payments that were small relative to the high cost of patent litigation; by having failed to

50

perform a reasonable prefiling investigation; . . . by having avoided challenges to the validity of their patents; by having exercised the ability to impose disproportionate discovery costs on the defendants sued, at least in part because accused infringers often possess enormous amounts of potentially relevant documents that must be ultimately collected and produced; and by having placed little if anything at risk in such suits, because Eon-Net was a nonpracticing entity that did not engage in business activities, such that Eon-Net did not face any business risk resulting from any possible loss of patent protection as a result of its enforcement activities.

(A321 ¶ 86 (citing *Eon-Net*, 2010 WL 2026756).)

### ii.  Diebold Adequately Pleaded That CET's Bad Faith Filing Of Lawsuits Was Directed At Diebold

The district court concluded that in Diebold's complaint, "no allegation of a subjective desire to cause injury to *plaintiff* [Diebold] has been stated.  Although the first amended complaint does state that defendant's litigation practices cause it harm, there is nothing in the first amended complaint that supports a conclusion that defendants filed their suit *with the goal of causing plaintiff harm*, as opposed to merely seeking financial settlements from banks and other alleged infringers." (A689 (emphasis in original).)

Given the foregoing, Diebold understands the district court to have been of the view that even though Diebold alleged that CET's "litigation practices cause [Diebold] harm," Diebold did not allege that CET's subjective bad faith was directed (in whole or in part) at *Diebold*, but only directed at Diebold's *customers*.

To the extent this was the district court's view, it was erroneous on two levels.  First, none of the authorities cited by the district court hold that the

subjective bad faith must be directed solely at the party seeking redress.  But even if were necessary for Diebold to plead that CET had a subjective desire to cause Diebold harm, Diebold's pleading did include such allegations.

To begin with, in discussing the five suits filed by CET against Diebold's bank customers, in each instance Diebold alleged that each customer had purchased ATMs from Diebold.  (*See* A305-09 ¶¶ 21, 26, 31, 36, 40.)  Diebold also alleged that each Diebold ATM clearly and publicly identified Diebold as the supplier.  (A311 ¶ 49.)  As to one bank (PNC), Diebold alleged that it was the "predominant" supplier to that bank of ATMs (A308 ¶ 36); and as to another bank (San Diego County Credit Union ("SDCCU")), Diebold alleged that it was the bank's *sole* supplier of ATMs (A307 ¶ 31).

Accordingly, Diebold further alleged that because the ATMs sold by Diebold openly and publicly identified Diebold as the supplier, CET and its principals necessarily had knowledge of the business relationships between Diebold and the banks CET chose to sue.  (A316-17 ¶ 75.)  This was particularly true as to PNC Bank, for which Diebold was the predominant supplier of ATMs, and even more so as to SDCCU, for which Diebold was the sole supplier.  (*Id.*)  Thus, Diebold alleged that, at a minimum, CET knew or should have known that it was standard commercial practice that Diebold warranted that its ATMs and

operating software were delivered to customers free of any rightful claim of any third person by way of patent infringement. (*Id.*) *See, e.g.*, U.C.C. § 2-312(3).

If there were any doubt in this regard, it was erased by an event that took place in CET's suit against SDCCU. Specifically, CET and that bank filed a joint motion to enlarge time "so that the parties may discuss potential resolution of the matter" and so that SDCCU could "contact suppliers of the accused products/services." (A323 ¶ 94; A373-76.) Thus, Diebold alleged that CET knew and expected that SDCCU as well as other customer banks would seek and obtain compensation from Diebold, thus establishing that CET's litigation practices would be harming Diebold directly. (A323-24 ¶¶ 94-95.)

The district court dismissed an argument in Diebold's brief that CET "extracted payments from a Diebold customer knowing the bank *could* recover same from suppliers such as Diebold . . . . " (A689 (emphasis in original).) To the extent the district court believed that Diebold had not actually made payments to customers who paid monies demanded by CET, the district court was mistaken. Diebold's pleading in fact made clear that it had made payments to customers who paid CET to settle infringement cases. (A317 ¶ 77.)

Accordingly, Diebold plausibly alleged that:

- CET necessarily *knew* that its own (admittedly deficient) complaints asserted infringement through the use of ATMs;

- CET *knew* that Diebold was a supplier (or, in one case, *the* supplier) of the ATMs used by the banks CET sued;

- CET *knew* that Diebold had indemnification or other business relationships with or other obligations to its customers under which Diebold would stand behind its ATMs;

- CET *knew* that at least one of the banks it sued (SDCCU, which only used one brand of ATM: DIEBOLD) had contacted its vendors, *viz.*, Diebold, when discussing settlement with CET;

- SDCCU thereafter made the payment demanded by CET for settlement; and

- Diebold provided a payment to SDCCU.

This was more than enough at the pleading stage to make out a case that CET targeted Diebold, to the extent such a showing is even necessary to establish the sham litigation exception to the *Noerr-Pennington* immunity.

### iii. Diebold's Complaint Alleged Sufficient Facts Showing That CET's Suits Were Not Aimed At Procuring Favorable Court Action

In the end, the court agreed with CET that Diebold's pleading failed to suggest that CET intended to achieve any purpose other than to obtain settlement payments. (A689.) But Diebold's pleading made clear that CET's litigation campaign *was not*, in the district court's words, "genuinely aimed at procuring

favorable government action . . . . " (*Id.* at 688 (citing *City of Columbia v. Omni Outdoor Adver., Inc.*, 499 U.S. 365, 380 (1991).)  Diebold's pleading as a whole made clear that CET, knowing that its claims were objectively baseless, did not seek patent infringement damages on account of infringement of a valid patent. Rather, as the district court itself concluded, Diebold had alleged that CET's "conduct was solely designed to engender settlement." (A688.)

The last thing CET wanted was a decision on the merits.  Each time a court evaluated claims based on patents in this family, CET and its predecessors suffered a resounding loss: noninfringement of three related patents (with a massive award of sanctions) in *Eon-Net*; invalidity of three more related patents under § 101 in *Glory*; and — in this case — invalidity of four more patents under § 101.  Clearly, CET was — in the district court's words — using its patents as an "anticompetitive weapon." (*See* A688 (citing *Simon Prop. Grp., Inc. v. Palombaro*, 682 F. Supp. 2d 508, 570 (W.D. Pa. 2010).)  It filed suits that were known to be baseless, with fatally deficient complaints, *not* to recover patent infringement damages after a trial, but to leverage the cost of litigation and thus extort the customer banks into making nuisance payments.

*      *      *

Thus, Diebold marshaled more sufficient plausible facts to support a conclusion that CET acted in subjective bad faith to interfere with the business

relationships and dealings of Diebold and its customers. As Diebold argued below, courts should not readily dismiss claims under *Noerr-Pennington* at the pleading stage. (A461-62.) And this was particularly true, given that — as the district court acknowledged — all of Diebold's well-pleaded allegations had to be accepted as true, and the complaint had to be construed in the light most favorable to Diebold. (A685.) And it makes no difference whether CET targeted its bad faith directly at Diebold, or whether CET's actions caused its bad faith to necessarily impact Diebold by reimbursing its customers. CET's subjective bad faith, as pleaded by Diebold, satisfied the second prong of the "sham litigation" exception to the traditional *Noerr-Pennington* doctrine. The district court's conclusion to the contrary was simply incorrect.

**b.    Diebold's Pleading Satisfied The "Series Of Legal Proceedings" Version Of *Noerr-Pennington***

The district court also considered but rejected an alternative test for denying applicability of the *Noerr-Pennington* doctrine enunciated by three cases: *USS-POSCO Industries. v. Contra Costa County Building & Construction Trades Council*, 31 F.3d 800 (9th Cir. 1994), *Primetime 24 Joint Venture v. National Broadcasting Co.*, 219 F.3d 92 (2d Cir. 2000), and *Livingston Downs Racing Ass'n Inc. v. Jefferson Downs Corp.*, 192 F. Supp. 2d 519 (M.D. La. 2001). (A687.) Contrary to the district court's conclusion, the doctrine exemplified by these cases — that a different test applies when the defendant files a *series* of sham

legal proceedings — was completely applicable here, and should have resulted in a conclusion that CET was not entitled to *Noerr-Pennington* immunity.

In *USS-POSCO*, the Ninth Circuit concluded that the Supreme Court's decision in *PRE* had not effectively overruled *California Transport Co. v. Trucking Unlimited*, 404 U.S. 508 (1972). As the Ninth Circuit explained:

> We reconcile these cases by reading them as applying to different situations. *Professional Real Estate Investors* provides a strict two-step analysis to assess whether a single action constitutes sham petitioning. This inquiry is essentially retrospective: If the suit turns out to have objective merit, the plaintiff can't proceed to inquire into subjective purposes, and the action is perforce not a sham. *See 113 S. Ct. at 1928* & n.5.

> *California Motor Transport* deals with the case where the defendant is accused of bringing a whole series of legal proceedings. Litigation is invariably costly, distracting and time-consuming; having to defend a whole series of such proceedings can inflict a crushing burden on a business. *California Motor Transport* thus recognized that the filing of a whole series of lawsuits and other legal actions without regard to the merits has far more serious implications than filing a single action, and can serve as a very effective restraint on trade. When dealing with a series of lawsuits, the question is not whether any one of them has merit - some may turn out to, just as a matter of chance - but whether they are brought pursuant to a policy of starting legal proceedings without regard to the merits and for the purpose of injuring a market rival. The inquiry in such cases is prospective: Were the legal filings made, not out of a genuine interest in redressing grievances, but as part of a pattern or practice of successive filings undertaken essentially for purposes of harassment?

*USS-POSCO*, 31 F.3d at 810-11.  The court concluded that the allegations before it, if proven, would have been sufficient to overcome the *Noerr-Pennington* defense in question.  *Id.* at 811.[9]

In *Primetime 24*, the conduct in question was a series of challenges brought under the Satellite Home Viewer's Act ("SHVA") of 1988.  The plaintiff alleged that the defendants filed baseless challenges for the purpose of raising the plaintiff's costs and thereby reducing competition from the plaintiff.  *Primetime 24*, 219 F.3d at 96.  The Second Circuit concluded that Congress did not intend to permit coordinated SHVA challenges to be made without regard to the merits and for the purpose of imposing unnecessary costs as a means to limit the opposing party's ability to operate and compete.  *Id.* at 98.  After concluding that, as a general matter, *Noerr-Pennington* protection was available in connection with SHVA challenges, the Second Circuit agreed with *USS-POSCO* in holding that the two-step inquiry based upon *PRE* involves situations where a single action constitutes allegedly sham petitioning.  *Primetime 24*, 219 F.3d at 101.  Where, as in this case, the defendant is accused of bringing a whole series of legal

---

[9] On the relatively well-developed record before it, the court in *USS-POSCO* concluded that the *Noerr-Pennington* defense prevailed because more than half of the suits had been resolved in favor of the party which brought the suits.  This can provide no comfort to CET, since (aside from cost of litigation settlements) neither CET nor any of its predecessors is believed to have ever prevailed in any case on the merits.

proceedings, the test is not "retrospective" but "prospective," *i.e.*, were the filings made as a pattern or practice of successive filings undertaken essentially for purposes of harassment, without regard to the merits and for the purpose of injuring a market rival? *Id.* Under that standard, the complaint was held to state a valid claim based on sham proceedings. *Id.*

In *Livingston Downs*, a district court was faced with a question of first impression within the Fifth Circuit as to whether the traditional *PRE* test applies to a series of predatory lawsuits, noting that the Ninth and Second Circuits had concluded that it does not. *Livingston Downs*, 192 F. Supp. 2d at 537. The court agreed that the "series of lawsuits" test enunciated in *USS-POSCO* should apply in the case before it, where the plaintiff had alleged that the defendants filed a series of predatory, repetitive, and groundless claims. *See id.* at 538.[10]

In concluding that the foregoing line of authority did not apply in this case, the district court acknowledged that while Diebold had alleged that CET caused Diebold injury through a series of lawsuits, rather than a single suit, the traditional two-step process from *PRE* would nonetheless apply because Diebold was "not alleging an antitrust injury." (A687.) In support of this conclusion, the district

---

[10] In *ERBE Elektromedizin GmbH v. Canady Technology LLC*, 629 F.3d 1278 (Fed. Cir. 2010), this Court found it unnecessary to decide if it would adopt the test employed in these cases because there was no "series" of legal proceedings, *see id.* at 1291 — a distinction which would not assist CET here.

court cited *Globetrotter Software, Inc. v. Elan Computer Group, Inc.*, 362 F.3d 1367 (Fed. Cir. 2004), as "inferring that the two-step process applies to the sham litigation exception when the plaintiff alleges a business tort such as tortious interference." (A687.)

It is true that *Globetrotter* involved state law claims such as tortious interference (a claim asserted here by Diebold) rather than violation of the antitrust laws. However, *Globetrotter* did not involve the filing of multiple bad-faith lawsuits or other legal proceedings; indeed, it involved the filing of no legal proceedings at all. Rather, the conduct in question consisted of sending two letters and a single e-mail. *See Globetrotter*, 362 F.3d at 1370. Nor is there anything in this Court's opinion in *Globetrotter* to suggest that the Court ever considered any legal standard other than the one enunciated in *PRE* with regard to the "sham action" exception to the *Noerr-Pennington* doctrine. Moreover, none of the "series of legal proceedings" cases suggested that their rationale was limited to antitrust cases.

Accordingly, it was erroneous for the court to reject the *USS-POSCO/Primetime 24/Livingston Downs* line of authority. And had the district court properly employed the standard set forth in those cases, it should have and would have concluded that Diebold's pleading was more than adequate to rebut the *Noerr-Pennington* immunity. Without question, Diebold fully and

properly alleged that CET and its principals had filed a series of suits — five, to be specific — against Diebold's customers pursuant to a policy of starting legal proceedings without regard to the merits (*i.e.*, CET knew its complaints were objectively baseless) and for the purpose of injuring a market rival (extracting cost-of-litigation payments from Diebold and/or its customers).

### 3.    The District Court Erred In Dismissing Diebold's Declaratory Judgment Claims "With Prejudice As Moot"

In its October 7, 2013 final order, the district court dismissed Diebold's first and second claims, seeking declaratory judgments of patent invalidity and noninfringement regarding the four Invalidated Patents, "with prejudice as moot in light of the Court's July 31, 2013 Opinion and Order." (A27 ¶ 2.a.)  In response to Diebold's motion to alter or amend that portion of the judgment so that the dismissal would instead be "without prejudice as moot," the district court declined to grant such relief without providing any explanation.  (A29.)  The district court abused its discretion in so ruling.

There is considerable precedent for the proposition that the district court's dismissal "with prejudice as moot" could not and should not preclude Diebold from asserting invalidity or noninfringement of the patents at issue in the event this Court should vacate or reverse the district court's holding of invalidity.  For instance, in *Hartley v. Mentor Corp.*, 869 F.2d 1469, 1472 n.3 (Fed. Cir. 1989), this Court stated that a stipulated dismissal with prejudice of a declaratory

judgment claim does not resolve the merits of the underlying claim. In *University of Pittsburgh*, this Court vacated a dismissal of a patent infringement action for lack of standing which had been designated as "with prejudice," and remanded the case with instructions to designate the dismissal as without prejudice, reasoning that a dismissal for lack of standing is jurisdictional and not an adjudication on the merits. *Univ. of Pittsburgh*, 569 F.3d at 1332. Here, the dismissal based on mootness is analogous to the dismissal for lack of standing in *University of Pittsburgh*, in that both involved the conclusion that there is no justiciable case or controversy.

In *Hartley*, this Court referenced a frequently cited case from the Fifth Circuit, *Kaspar Wire Works, Inc. v. Leco Engineering & Machine, Inc.*, 575 F.2d 530 (5th Cir. 1978). In *Kaspar*, the Fifth Circuit found that an agreement to dismiss a declaratory judgment claim of invalidity with prejudice did not bar a subsequent challenge to the patent's validity, absent evidence that the parties intended there be such a bar. *Id.* at 537. In *Kaspar*, the court recognized that no issue of law or fact had been adjudicated, and therefore there could be no *res judicata*. *Id.*

Here, there had clearly been no adjudication of fact or law *adverse to Diebold* regarding the validity or infringement of the patents. Therefore, even if CET were to bring a motion to dismiss a future invalidity claim or defense of

Diebold by asserting that Judge Shipp's dismissal of Diebold's declaratory judgment claims with prejudice was *res judicata* to Diebold's attack on the validity to the CET patents, Diebold could rely on these cases to argue the contrary.

There is additional authority to support the proposition that the dismissal of a declaratory judgment claim on jurisdictional grounds cannot preclude that same claim being brought again if the jurisdictional issue is later cured, irrespective of whether the judgment is specified as with or without prejudice. The Restatement (Second) of Judgments states in § 20 that "[a] personal judgment for the defendant, although valid and final, does not bar another action by the plaintiff on the same claim . . . [w]hen the judgment is one of dismissal for lack of jurisdiction . . . ." As stated in comment d to § 20, "in a jurisdiction having a rule patterned on Rule 41(b) of the Federal Rules of Civil Procedure, a dismissal for lack of jurisdiction . . . may not be a bar regardless of the specification made" (*i.e.*, with or without prejudice).

Thus, while Diebold is confident that the district court's dismissal of its declaratory judgment claim "with prejudice" should not properly prevent Diebold from defending against the patents in questions in the future, because CET opposed Diebold's motion to alter or amend the judgment (A643-44), Diebold is concerned that CET may assert at a later date that Diebold cannot argue noninfringement or invalidity. In that regard, in *American Needle & Novelty Co. v. Schuessler Knitting*

*Mills, Inc.*, 379 F.2d 376 (7th Cir. 1967), a trial court had found there was no justiciable case or controversy, but dismissed the plaintiff's declaratory judgment claim with prejudice.   The plaintiff sought relief on appeal in the form of converting the judgment to one "without prejudice."   In overturning the lower court's characterization of the holding as being "with prejudice," the Seventh Circuit noted that, absent reversal, the defendant "could assert" at a later date that the prior holding with prejudice was *res judicata* against a subsequent claim.   *Id.* at 378.

Accordingly, Diebold requests this Court to vacate the dismissal of Diebold's declaratory judgment claims "with prejudice as moot" with instructions to designate the dismissal as *without* prejudice.

## VII.   <u>CONCLUSION</u>

For all of the foregoing reasons:

The district court's invalidation of CET's patents should be *affirmed*.

This Court should *modify* the district court's dismissal of Diebold's declaratory judgment claims as to the Invalidated Patents to be "without prejudice as moot."

Irrespective of how this Court disposes of the Invalidated Patents, this Court should *reverse* the district court's dismissal of Diebold's tortious interference and RICO claims.

Respectfully submitted,

LERNER, DAVID, LITTENBERG,
  KRUMHOLZ & MENTLIK, LLP
*Attorneys for Plaintiff-Cross-Appellant*
  *Diebold, Incorporated*

Dated:  March 4, 2014          By:   s/ Roy H. Wepner
                                     Roy H. Wepner

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| DIEBOLD, INC., | : | |
| Plaintiff, | : | No. 12-6960 (MAS) (TJB) |
| v. | : | |
| CONTENT EXTRACTION AND | : | **ORDER** |
| TRANSMISSION LLC, *et al.*, | : | |
| Defendants. | : | |

This matter comes before the Court on Defendants' Motions to Dismiss Counts Three and Four of Plaintiff's First Amended Complaint. (ECF Nos. 40-41.) Plaintiff filed Opposition. (ECF No. 46-47.) Defendants Replied. (ECF Nos. 59-60.) Oral argument was held on October 2, 2013. The Court has carefully considered the Parties' submissions and the arguments of counsel put forth at oral argument. For the reasons set forth on the record, and other good cause shown,

**IT IS**, on this <u>7th</u> day of <u>October</u>, 2013, **ORDERED** that:

1) Defendants' Motions to Dismiss are granted.

2) Plaintiff's First Amended Complaint is dismissed:

    a. Plaintiff's first and second claims seeking a declaratory judgment regarding U.S. Patent Nos. 5,258,855, 5,369,508, 5,625,465, and 5,768,416 are dismissed with prejudice as moot in light of the Court's July 31, 2013 Opinion and Order. (ECF Nos. 76-77.)

    b. Plaintiff's first and second claims seeking a declaratory judgment regarding U.S. Patent Nos. 6,094,505, 7,259,887, and 7,474,434 are dismissed without prejudice for lack of a current case or controversy.

**A27**

    c.   Plaintiff's third and fourth claims alleging tortious interference and RICO are dismissed with prejudice due to the *Noerr-Pennington* doctrine.

3) Defendant CET's Counterclaim and Third Party Complaint (ECF No. 66) are dismissed.

4) Plaintiff's Motion to Strike (ECF No. 68) is administratively terminated as moot.

5) The Clerk is ordered to close this action.

6) This Order shall also be docketed in Civil Action Nos. 12-2501 and 12-6960.

MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE

2

A28

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

DIEBOLD, INCORPORATED,

        Plaintiff,

        v.

CONTENT EXTRACTION AND,
TRANSMISSION LLC, *et al.*,

        Defendants.

Civil Action No. 12-7640 (MAS)

**ORDER**

This matter comes before the Court on Plaintiff Diebold, Incorporated's motion to alter the Court's October 7, 2013 Order. (Mot., ECF No. 88.) Defendant Content Extraction and Transmission LLC responded by correspondence dated October 15, 2013. (ECF No. 89.) Upon careful consideration of the parties' submissions, and for good cause shown,

IT IS, on this 12th day of <u>November</u>, 2013, **ORDERED** that:

1.    The Court's October 7, 2013 Order (ECF No. 86) is amended as follows:

    a.    The case number "12-7640" is substituted for "12-6960" in the caption; and

    b.    Paragraph 3 now provides that "Defendant CET's Counterclaim and Third Party Complaint (ECF No. 66) and Amended Counterclaims (ECF No. 69) are dismissed with prejudice."

2.    Plaintiff's motion is denied in all other respects.

3.    This Order shall also be docketed in Civil Action Nos. 12-2501 and 12-6960.

MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE

A29

1              UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF NEW JERSEY
2

3    _____

     DIEBOLD, INCORPORATED,
4
               Plaintiffs,              CIVIL ACTION NUMBER:
5
               -vs-                      3:12-cv-7640 (MAS)
6
     CONTENT EXTRACTION AND
7    TRANSMISSION, LLC; MITCHELL
     MEDINA, CATHERINE ELIAS, AND
8    JEAN-MARC ZIMMERMAN

9          Defendants.
     _____
10        Clarkson S. Fisher United States Courthouse
          402 East State Street
11        Trenton, New Jersey 08608
          October 7, 2013
12
     B E F O R E:          HONORABLE MICHAEL A. SHIPP
13                         UNITED STATES DISTRICT JUDGE

14

15   A P P E A R A N C E S:

16   LERNER, DAVID, LITTENBERG, KRUMHOLZ & MENTLIK, LLP
     BY:  ROY H. WEPNER, ESQUIRE
17        ARNOLD I. RADY, ESQUIRE
          BRIAN D. HILL, ESQUIRE
18   Attorneys for the Plaintiffs

19   ZIMMERMAN & WEISER, ESQUIRES
     BY:  ANATOLY S. WEISER, ESQUIRE
20        JEAN-MARC ZIMMERMAN, ESQUIRE
     Attorneys for the Defendants
21

22
          Certified as True and Correct as required by Title 28,
23   U.S.C., Section 753
          /S/ Cathy J. Ford, CCR, CRR, RPR
24

25

1          THE COURT:  Good morning, counsel.

2          This is the matter of Diebold versus CET, Docket

3     Number 12-7640.  Who's on the line for the plaintiff?

4          MR. WEPNER:  Your Honor, this is Roy Wepner with

5     Arnold Rady and Brian Hill for the plaintiff.

6          THE COURT:  Okay.  And who's on for the defendants?

7          MR. WEISER:  Jean-Marc Zimmerman and Anatoly Weiser

8     for defendants CET, your Honor.

9          MR. CASELLO:  Joseph Casello for defendants Medina,

10    Elias, and Zimmerman.

11         THE COURT:  Thank you, and welcome to all of you.

12    First of all, gentlemen, I also want to thank you, again, for

13    your arguments last week.  During the course of today, I want

14    to put my decision on the record.  We are on the record.  I'm

15    going to basically leave out the names of the citations.  I'll

16    state the name of the case that I'm relying on so that you'll

17    have the case name, but if you get the transcript, you'll have

18    the full citation.  The citations will be added to the

19    transcript by my court reporter and there'll be available

20    when, and if, you order the transcript.

21         Due to the oral nature of this motion, I am not going

22    to outline the detailed facts contained in the complaint other

23    than to note that the plaintiff contends that the defendants'

24    actions enforcing its patents against certain of plaintiff's

25    customers have allegedly harmed the plaintiff.  Plaintiff's

1  first amended complaint alleges two remaining cause of action:

2  tortious interference and RICO.  The other claims challenging

3  defendants' patents are dismissed with prejudice as moot in

4  light of the Court's July 31st Order and Opinion in Civil

5  Action Numbers 12-2501 and 12-6960, which invalidated

6  defendants' patents as abstract in violation of 35 U.S.C.

7  Section 101.

8      A district court conducts a three-part analysis when

9  considering a Rule 12(b)(6) motion *Malleus v. George*, 641 F.3d

10  560, 563 (3d Cir. 2011).  "First, the court must 'take note of

11  the elements a plaintiff must plead to state a claim.'" *Id.*

12  (quoting *Ashcroft v. Iqbal*, 556 U.S. 662,675 (2009)).  Second,

13  the Court must accept as true all of a plaintiff's

14  well-pleaded factual allegations and construe the complaint in

15  the light most favorable to the plaintiff.  *Fowler v. UPMC*

16  *Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009).  The Court,

17  however, must disregard any conclusory allegations proffered

18  in the complaint. *Id.*  For example, the Court is free to

19  ignore legal conclusions or factually unsupported accusations

20  which merely state that "the-defendant-unlawfully-harmed-me."

21  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

22  Finally, once the well-pleaded facts have been identified and

23  the conclusory allegations ignored, a court must next

24  determine whether the "facts alleged in the complaint are

25  sufficient to show that plaintiff has a 'plausible claim for

1  relief.'" *Fowler,* 578 F.3d at 211 (quoting *Iqbal,* 556 U.S. at

2  679).

3        After careful review of the parties' submissions, as

4  well as the positions offered during oral argument, the Court

5  grants defendants' motions and dismisses plaintiff's first

6  amended complaint with prejudice.

7        The *Noerr-Pennington* Doctrine protects defendants'

8  litigation activity.  Plaintiff has failed to adequately

9  allege that the sham litigation exception should apply.  This

10  exception applies to both plaintiff's tortious interference

11  claim and RICO claim.  *Globetrotter Software, Inc. v. Elan*

12  *Computer Group, Inc.*, 362 F.3d 1367 (Fed. Cir. 2004); *Sosa v.*

13  *DIRECTV, Inc.*  437 F.3d 923 (9th Cir. 2006).  Moreover, the

14  Court has concluded that further amendments to the pleadings

15  will not cure that deficiency.

16        The sham litigation exception has two requirements:

17        First, the lawsuit must be objectively baseless in the
          sense that no reasonable litigant could realistically
18        expect success on the merits.  If an objective litigant
          could conclude that the suit is reasonably calculated
19        to elicit a favorable outcome, the suit is immunized
          under *Noerr*, and [a]... claim premised on the sham
20        exception must fail.  Only if challenged litigation is
          objectively meritless may a court examine the
21        litigant's subjective motivation.  Under this second
          part of our definition of sham, the Court should focus
22        on whether the baseless lawsuit conceals "an attempt to
          interfere directly with the business relationships of a
23        competitor," through the "use [of] the governmental
          process -- as opposed to the outcome of that process --
24        as an anticompetitive weapon."

25        *Professional Real Estate Investors v. Columbia Pictures*

1 *Industry, Inc.*, 508 U.S. 49,60-61 (1993) ("*PRE*")(internal

2 citations omitted).

3     The Court notes that both parties have briefed and

4 argued their positions with the implied agreement that the

5 Court must utilize the two-step analysis outlined in *PRE*.

6 (Defs.' Br. 9-13; Pl.'s Opp'n 10-16; Defs.' Reply 1-2.)

7 Moreover, the Court has independently concluded that the

8 two-step process is appropriate and the concerns raised in

9 *USS-POSCO Industries v. Contra Costa County Building &*

10 *Construction Trades Council*, 31 F.3d 800, 810-811 (9th Cir.

11 1994), *Primetime 24 Joint Venture v. National Broadcasting*

12 *Company*, 219 F.3d 92,101 (2d Cir. 2000), and *Livingston Downs*

13 *Racing Association Inc. v. Jefferson Downs Corp.*, 192 F. Supp

14 2d 519,537 (M.D. La. 2001), do not apply in this case.

15 Although plaintiff has alleged that defendants caused it

16 injury through a series of lawsuits, rather than a single one,

17 the two step-process from *PRE* applies because plaintiff is not

18 alleging an antitrust injury.  *See Globetrotter Software, Inc.*

19 *v. Elan Computer Group, Inc.*, 362 F.3d 1367, 1377 (Fed. Cir.

20 2004) (inferring that the two-step process applies to the sham

21 litigation exception when the plaintiff alleges a business

22 tort such as tortious interference.)

23     Here, the Court finds that plaintiff has adequately

24 alleged that defendants engaged in litigation that could be

25 considered "objectively baseless."  This conclusion is

1  supported by the various court decisions, including one I

2  recently reached, that defendant's patents were invalidly

3  abstract, as well as plaintiff's allegations that defendant's

4  litigation conduct was solely designed to engender settlement.

5       Plaintiff, however, has failed to fulfill the sham

6  litigation exception's second prong.  Regarding this

7  subjective element, the critical inquiry is whether or not the

8  defendant's actions sought to obtain an actual positive result

9  from the government or whether the process is merely being

10  used to harass a competitor regardless of the end result.

11  *City of Columbia v. Omni Outdoor Adver., Inc.*, 499 U.S.

12  365,380 (1991).  "A sham situation involves a defendant whose

13  activities are not genuinely aimed at procuring favorable

14  government action at all, not one who genuinely seeks to

15  achieve his governmental result, but does so *through improper*

16  *means*." *Id.*  (Internal citations and quotations omitted).  "A

17  classic example is the filing of frivolous objections to the

18  license application of a competitor, with no expectation of

19  achieving denial of the license but simply in order to impose

20  expense and delay." *Id.*

21       Stated differently, the second element asks whether the

22  defendant was "subjectively motivated to interfere with

23  business competition by using a governmental procedure as an

24  anticompetitive weapon."  *Simon Prop. Grp., Inc., v.*

25  *Palombaro*, 682 F. Supp. 2d 508,510 (W.D. Pa. 2010) (citation

1   omitted).

2       Here, even taking the facts in the first amended

3   complaint as true and providing plaintiff with requisite

4   inferences, no allegation of a subjective desire to cause

5   injury to *plaintiff* has been stated.  Although the first

6   amended complaint does state that defendant's litigation

7   practices cause it harm, there is nothing in the first amended

8   complaint that supports a conclusion that defendants filed

9   their suits *with the goal of causing plaintiff harm*, as

10  opposed to merely seeking financial settlements from banks and

11  other alleged infringers.  Plaintiff's allegations that

12  "defendants extracted payments from a Diebold customer knowing

13  the bank *could* recover same from suppliers such as Diebold,"

14  (Pl.'s Opp'n 15), does not alter the Court's conclusion.

15  Rather, the Court agrees with defendants that the first

16  amended complaint does not "suggest that CET intended to

17  achieve any purpose other than to obtain payments." (CET

18  reply1.)

19      This decision applies to the individual defendants as

20  well.  Plaintiff's case will be dismissed with prejudice.  An

21  order to that effect will be entered today.

22      The final issue to be addressed is CET filed

23  counterclaims for patent infringement of the patents I

24  invalidated.  That counterclaim was filed on July 5th.  The

25  patents allegedly infringed were invalidated in my written

1  opinion and order on July 31st.  It seems clear to me that
2  CET's counterclaims must be dismissed with prejudice in light
3  of the invalidation of the underlying patent infringement
4  action.  As such, this action has no remaining open claims or
5  issues and will be closed by the clerk.
6      That's all we have for today.  Gentlemen, again, I
7  thank you for being able to do all this via telephone and not
8  having to have you folks travel to the courthouse.
9      MR. WEPNER:  May I ask one question.  This is Roy
10 Wepner.
11     THE COURT:  Yes, Mr. Wepner.
12     MR. WEPNER:  There are three other patents that were
13 in the case that were pleaded in our declaratory judgment
14 claims, Counts One and Two, those are not patents that were
15 invalidated by your Honor in the PNC case.  These are patents,
16 just to review the bidding on them, we pleaded specifically,
17 one, there was an additional case of controversy as to those
18 patents, the defendants did not move to dismiss the claims for
19 lack of a controversy, they did not counterclaim on those
20 patents.  So it would seem to us that if the Court is looking
21 to put this case in position for a final judgment, we need to
22 dispose of those three patents and our suggestion would be to
23 dismiss them without prejudice for lack of a continuing case
24 of controversy.
25     THE COURT:  Mr. Weiser or Mr. Zimmerman, let me hear

1  from defense counsel on this.

2       MR. WEISER:  Yes, your Honor, if I may.  Mr. Wepner

3  is correct that we have not asserted, that Diebold, or any of

4  its customers, infringed on this patent.  Now, a declaratory

5  judgement jurisdiction, I think, becomes moot or

6  subject-matter jurisdiction is extinguished once there is no

7  controversy.  There is no controversy as to the group one

8  patent that we have actually asserted.  And we respectfully

9  submit that there was never any controversy regarding the

10  other three patents which we have not asserted.  Now, our

11  counterclaims, here, are compulsory.  And, at this point, at

12  the point we have filed those counterclaims, and today, we're

13  not aware of any basis for us to assert those patents because

14  of Diebold, or any of its customers.  We're not saying that

15  this may not happen in the future, but as of today, as of the

16  time we filed the counterclaims, we were not aware so we

17  respectfully submit that there was no controversy regarding

18  this patent and there is no longer subject matter jurisdiction

19  regarding our counterclaims.

20       THE COURT:  So that, Mr. Weiser, you don't disagree

21  with Mr. Wepner that the Court can dismiss this without

22  prejudice for lack of a continuing controversy?

23       MR. WEISER:  Yes.

24       THE COURT:  Okay.  Mr. Casello, any opinion from you

25  on this?

1          MR. CASELLO:  No, your Honor.

2          THE COURT:  Okay.  Then the Court will dismiss those

3   as well for the reasons set forth by Mr. Wepner.

4       Are there any other issues to be discussed on this call

5   today?  From the plaintiff?

6          MR. WEPNER:  Your Honor, just as a housekeeping

7   matter will your Honor be entering --

8          THE COURT:  Yes, I'm going to enter a full order, and

9   the order should be available today.

10         MR. WEPNER:  Okay.  That's great.  And do you need

11  the patent numbers of the three additional patents?

12         THE COURT:  No, sir, we have all of that, counsel.

13  We'll take care of it.

14         MR. WEPNER:  Excellent.  Okay.  Then, we have nothing

15  else, your Honor.  Thank you.

16         THE COURT:  Anything else from the defendants?

17         MR. WEISER:  No, your Honor.

18         MR. CASELLO:  No, your Honor.

19         THE COURT:  Thank you very much, gentlemen.  Have a

20  great day.

21              (Matter is concluded.)

22

23

24

25

## CERTIFICATE OF SERVICE
### 2013-1588, -1589, 2014-1112, -1687

I, Robyn Cocho, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by LERNER, DAVID LITTENBERG, KRUMHOLZ & MENTLIK, LLP, Attorneys for Plaintiff-Cross-Appellant to print this document. I am an employee of Counsel Press.

On **March 4, 2014**, Counsel for Plaintiff-Cross-Appellant has authorized me to electronically file the foregoing **Brief of Plaintiff-Cross-Appellant Diebold, Incorporated** with the Clerk of Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Jean-Marc Zimmerman, Esq.
ZIMMERMAN & WEISER, LLP
226 St. Paul Street
Westfield, NJ 07090
Tel: 908.654.8000
*Attorneys for Plaintiff-Appellant*
*Content Extraction & Transmission*
*LLC*

Noam J. Kritzer, Esq.
BAKOS & KRITZER
14 7 Columbia Turnpike
Florham Park, NJ 07932
Tel: 732.751.1766
*Attorneys for The PNC Financial*
*Services Group, Inc.*
*and PNC Bank, NA.*

Frederick L. Whitmer, Esq.
KILPATRICK TOWNSEND &
STOCKTON LLP
The Grace Building
1114 A venue of the Americas
New York, NY 07450
Tel: 212.775.8773
*Attorneys for Wells Fargo Bank,*
*National Association*

Copies will be sent to the above counsel upon the court's approval.

Upon acceptance by the Court of the e-filed document, six paper copies will

filed with the Court, via Federal Express, within the time provided in the Court's

rules.

/s/ Robyn Cocho
Counsel Press

## CERTIFICATE OF COMPLIANCE
## <u>WITH TYPE-VOLUME LIMITATION</u>

Pursuant to Rule 32(a)(7)(B) and (C) of the Federal Rules of Appellate Procedure, the undersigned hereby certifies that, based upon the word count of the word-processing system used to prepare this brief, the number of words in this brief is 15,400.


Dated: <u>March 4, 2014</u>                    By: <u>  s/  Roy H. Wepner           </u>
                                                            Roy H. Wepner