# 2013-1588, -1589, 2014-1112, -1687

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

**CONTENT EXTRACTION AND TRANSMISSION LLC,**
*Plaintiff-Appellant,*
**v.**
**WELLS FARGO BANK, NATIONAL ASSOCIATION,**
*Defendant-Appellee,*
**AND**
**THE PNC FINANCIAL SERVICES GROUP, INC. AND PNC BANK, N.A.,**
*Defendants-Appellees.*

---------------------------------------------------

**DIEBOLD, INCORPORATED,**
*Plaintiff-Appellee,*
**v.**
**CONTENT EXTRACTION AND TRANSMISSION LLC,**
*Defendant-Appellant,*
**AND**
**MITCHELL MEDINA, CATHERINE ELIAS, JOHN DOE COMPANIES 1-100, JOHN DOE COMPANIES 1-99, TD BANK GROUP, TD BANK, N.A., AND JEANMARC ZIMMERMAN,**
*Defendants.*
(Caption continued on inside cover)

Appeals from the United States District Court for the District of New Jersey
in Nos. 12-CV-2501, 12-CV-6960, and 3:12-CV-07640, Judge Michael A. Shipp.

## BRIEF FOR APPELLANT

ZIMMERMAN & WEISER LLP
Jean-Marc Zimmerman
Anatoly S. Weiser
226 St. Paul Street
Westfield, New Jersey 07090
Tel:  (908) 654-8000
Fax: (908) 654-7207
jmz@iplcounsel.com
aw@ iplcounsel.com
*Attorneys for Content Extraction and Transmission LLC*

**AND**
**DIEBOLD, INCORPORATED,**
*Plaintiff-Cross-Appellant*
v.

**CONTENT EXTRACTION AND TRANSMISSION LLC**,
*Defendant-Appellant*

**MITCHELL MEDINA, CATHERINE ELIAS, JEAN-MARC ZIMMERMAN, JOHN DOE COMPANIES 1-100, TD BANK GROUP, TD BANK, N.A., JOHN DOE COMPANIES 1-99**,
*Defendants*

**2013-1588, -1589, 2014-1112, -1687**

**– CONTENT EXTRACTION AND TRANSMISSION, LLC,**

**CERTIFICATE OF INTEREST**

Counsel for Content Extraction and Transmission, LLC ("CET"), Jean-Marc Zimmerman, Anatoly S. Weiser, and Zimmerman & Weiser, LLP ("Z&W") certify the following:

1.      The full name of the only party or amicus represented by us is:

Content Extraction and Transmission, LLC.

2.      The name of the real party in interest represented by us is:

Content Extraction and Transmission, LLC.

3.      We do not represent any parent corporations or any publicly held companies that own ten percent (10%) or more of the stock of the parties or amicus curiae represented by us.

4.      The names of all law firms and the partners or associates that appeared for the parties or amicus now represented by us in the District Court or are expected to appear in this Court are:

Jean-Marc Zimmerman,

Anatoly S. Weiser, and

Zimmerman & Weiser, LLP

i

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST .................................................................. i

TABLE OF AUTHORITIES ................................................................... iv

STATEMENT OF RELATED CASES ................................................. vii

I.     JURISDICTIONAL STATEMENT ................................................. 1

II.    STATEMENT OF THE ISSUE PRESENTED............................... 2

III.   STATEMENT OF THE CASE ....................................................... 3

A.    Statement Of The Facts .................................................................. 6

IV.   SUMMARY OF ARGUMENTS ..................................................... 10

V.    STANDARD OF REVIEW .......................................................... 13

VI.   ARGUMENT................................................................................. 14

A.    The District Court Erred In Deciding Patent Eligibility On A Motion
      To Dismiss Under Fed. R. Civ. P. 12(b)(6) Without Making Any
      Factual Findings That Underlie A Patent Eligibility Inquiry And
      Without Construing Disputed Limitations .................................... 14

B.    The District Court Erred By Not Requiring The Accused Infringer To
      Establish Invalidity On A Claim-By-Claim Basis ....................... 20

C.    The Claims Of The CET Patents Are Directed To Patent Eligible
      Subject Matter............................................................................. 23

       1.     CET's Patent Claims Fit Within The Statutory Classes Of § 101 ..... 26

       2.     None Of The Claims Raises Abstractness Concerns ......................... 28

       3.     None Of The Claims Poses Risk Of Preempting An Abstract
              Idea ...................................................................................... 34

      4.      Section 101 Does Not Require Copyright-Like Recitation Of Algorithms .......................................................................... 42

VII.  CONCLUSION.............................................................................. 45

CERTIFICATE OF SERVICE ............................................................. 46

CERTIFICATE OF COMPLIANCE..................................................... 47

ADDENDUM

# TABLE OF AUTHORITIES

## CASES

*Altoona Publix Theatres v. American Tri-Ergon Corp.*,
   294 U.S. 477 (1935) ........................................................................... 20

*Autogiro Co. of Am. v. United States*,
   181 Ct. Cl. 55, 384 F.2d 391, 155 U.S.P.Q. (BNA) 697 (Ct. Cl. 1967) ........... 18

*Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of Can. (U.S.)*,
   687 F.3d 1266 (Fed. Cir. 2012) ......................................... 5, 17, 29, 31

*Bilski v. Kappos*,
   130 S.Ct. 3218 (2010) ................................................................. *passim*

*In re Bilski*, 545 F.3d 943 (Fed. Cir. 2008) .................................. 14, 22, 24, 25, 31

*CLS Bank Int'l v. Alice Corp.*,
   717 F.3d 1269 (Fed. Cir. 2013) ................................................... *passim*

*Continental Can Co. v. Monsanto Co.*,
   948 F.2d 1264 (Fed. Cir. 1991) ......................................................... 20

*CyberFone Sys., LLC v. Cellco P'ship*,
   885 F. Supp. 2d 710 (D. Del. 2012) .................................................. 17

*Cybersource Corp. v. Retail Decisions, Inc.*,
   654 F.3d 1366 (Fed. Cir. 2011) ....................................... 29, 30, 31

*Dana Corp. v. Am. Axle & Mfg.*,
   279 F.3d 1372 (Fed. Cir. 2002) ...................................... 14, 19, 21, 22

*Dealertrack, Inc. v. Huber*,
   674 F.3d 1315 (Fed. Cir. 2012) ....................................... 29, 30, 31

*Diamond v. Chakrabarty*,
   447 U.S. 303 (1980) ........................................................................ 23

*Diamond v. Diehr*,
   450 U.S. 175, 101 S.Ct. 1048 (1981)............................................. 24, 26, 42, 43

*Fonar Corp. v. Johnson & Johnson*,
   821 F.2d 627 (Fed. Cir. 1987) ....................................................... 19

*Jones v. Hardy*,
   727 F.2d 1524 (Fed. Cir. 1984) ..................................................... 20

*Mayo Collaborative Serv. v. Prometheus Lab., Inc.*,
   132 S.Ct. 1289, 182 L.Ed.2d 321 (2012)......................................... 26

*MeadWestVaco Corp. v. Rexam Beauty and Closures, Inc.*,
   731 F.3d 1258 (Fed. Cir. 2013) ..................................................... 20

*Microsoft Corp. v. i4i Limited Partnership*,
   131 S.Ct. 2238, 180 L.Ed.2d 131 (2011)......................................... 21

*Multiform Desiccants, Inc. v. Medzam, Ltd.*,
   133 F.3d 1473 (Fed. Cir. 1998) ..................................................... 43

*Ortho Pharm. Corp. v. Smith*,
   959 F.2d 936 (Fed. Cir. 1992) ....................................................... 20

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) ................................................ 18, 43

*Pitney Bowes, Inc. v. Hewlett-Packard Co.*,
   182 F.3d 1298 (Fed. Cir. 1999) ..................................................... 30

*Research Corp. Tech., Inc. v. Microsoft Corp.*,
   627 F.3d 859 (Fed. Cir. 2010) ............................................ 25, 33, 34

*Sands v. McCormick*,
    502 F.3d 263 (3d Cir. 2007) ........................................................ 13, 14

*Shelcore, Inc. v. Durham Indus.*,
    745 F.2d 621 (Fed. Cir. 1984) ......................................................... 20

*SiRF Tech, Inc. v. ITC*,
    601 F.3d 1319 (Fed. Cir. 2010) ...................................... 11, 25, 32, 33

*State Street Bank & Trust Co. v. Signature Fin. Group, Inc.*,
    149 F.3d 1368 (Fed. Cir. 1998) ....................................................... 10

*Ultramercial, Inc. v. Hulu, LLC*,
    722 F.3d 1335 (Fed. Cir. 2013) ............................................... *passim*

*Unique Concepts, Inc. v. Brown*,
    939 F.2d 1558 (Fed. Cir. 1991) ....................................................... 18

## STATUTES

28 U.S.C. § 1331 ..................................................................................... 1

28 U.S.C. § 1338(a) ................................................................................ 1

28 U.S.C. § 2107 ................................................................................. 1, 2

28 U.S.C. § 1295(a)(1) ........................................................................... 1

35 U.S.C. § 101 ............................................................................. *passim*

35 U.S.C. § 282 ..................................................................................... 20

## RULES

Fed. R. App. P. 4(a) ............................................................................ 1, 2

Fed. Cir. R. 4 ...................................................................................... 1, 2

Fed. R. Civ. P. 12(b)(6) ................................................................. *passim*

## <u>STATEMENT OF RELATED CASES</u>

Pursuant to Federal Circuit Rule 47.5, counsel for Appellant Content Extraction and Transmission, LLC ("CET") state that no other appeal from the civil actions in the lower court that are the subject of the present appeal was previously before this Court, or any other court. Counsel for CET states that there is no case that will directly affect, or be directly affected by, this Court's decision in the pending appeals.

## I.   __JURISDICTIONAL STATEMENT__

These actions arose under the patent laws of the United States of America, Title 35 of the United States Code.   The United States District Court for the District of New Jersey ("District Court") had jurisdiction of the action under 28 U.S.C. §§ 1331 and 1338(a).

This Court has exclusive jurisdiction over the present appeals pursuant to 28 U.S.C. § 1295(a)(1).   Four appeals are involved.   The first appeal, Case No. 2013-1589, is from a final and appealable order entered by the District Court on July 31, 2013, in favor of Appellees The PNC Financial Services Group, Inc., and PNC Bank, National Association (collectively "PNC"), in District Court Case No. 12-cv-06960 (the "PNC action"), granting PNC's Motion to Dismiss the Complaint in the PNC action under Fed. R. Civ. P. 12(b)(6). (A1-A2)  CET timely filed a Notice of Appeal in accordance with 28 U.S.C. § 2107, Fed. R. App. P 4(a), and Fed. Cir. R. 4, on August 28, 2013.

The second appeal, Case No. 2013-1588, is from a final and appealable order entered by the District Court on July 31, 2013, in favor of Appellee Wells Fargo Bank, National Association ("Wells Fargo"), in District Court Case No. 12-cv-2501 (the "Wells Fargo action"), dismissing the Complaint in the Wells Fargo action. (A1-A2)   CET timely filed a Notice of Appeal in accordance with 28 U.S.C. § 2107, Fed. R. App. P. 4(a), and Fed. Cir. R. 4, on August 28, 2013.

The third appeal, Case No. 2014-1112, is from a final and appealable order entered by the District Court on November 12, 2013 (A29), which modified a final order it entered on October 7, 2013 (A27-28), dismissing the First Amended Counterclaims and First Amended Third-Party Complaint of CET, in District Court Case No. 12-cv-2501 (the "Diebold action"). CET timely filed a Notice of Appeal in accordance with 28 U.S.C. § 2107, Fed. R. App. P. 4(a), and Fed. Cir. R. 4, on November 19, 2013.

The fourth appeal, Case No. 2014-1687, is a cross-appeal from the final and appealable order entered by the District Court on November 12, 2013 (A29), which modified the final order it entered on October 7, 2013 (A27-A28), dismissing the Declaratory Judgment Complaint of Appellee and Cross-Appellant Diebold, Incorporated ("Diebold") in the Diebold action.  Diebold filed a Notice of its Cross-Appeal on December 5, 2013.

The District Court had consolidated the PNC action, the Wells Fargo action, and the Diebold action for pretrial purposes. (A377-A378)  On December 12, 2013, this Court consolidated the appeals in the three actions.

## II.    STATEMENT OF THE ISSUE PRESENTED

Did the District Court err in holding, on a motion under Fed. R. Civ. P. 12(b)(6), that all 242 claims of (1) U.S. Patent Number 5,258,855, (2) U.S. Patent Number 5,369,508, (3) U.S. Patent Number 5,625,465, and (4) U.S. Patent Number

5,768,416, are invalid on the ground that each claim is not directed to patent eligible subject matter as required by 35 U.S.C. § 101, and dismissing CET's patent infringement claims and counterclaims against Appellees and Third Parties, without any factual development and without a claim-by-claim analysis?

## III.    STATEMENT OF THE CASE

CET brought the PNC action and the Wells Fargo action, alleging infringement of U.S. Patent Number 5,258,855 ("the '855 patent"), U.S. Patent Number 5,369,508 ("the '508 patent"), U.S. Patent Number 5,625,465 ("the '465 patent"), and U.S. Patent Number 5,768,416 ("the '416 patent"). (A82-A88, A288-A295)  In the Diebold action, CET filed counterclaims against Diebold and Third-Party defendants, alleging infringement of the same four patents (collectively, the "CET Patents"). (A564-A583, A612-A631)

CET has asserted that PNC and Wells Fargo employ check deposit systems and methods that infringe the claims of the CET Patents (A82-A88, A288-A295); and that Diebold manufactures check deposit hardware and software that infringe the claims of the CET Patents, and sells the hardware and software to PNC, Wells Fargo, and others. (A612-A631)

PNC filed a motion to dismiss the Complaint in the PNC action, under Fed. R. Civ. P. 12(b)(6). (A200-A227)   In the motion, PNC asserted that the claims of the CET Patents are directed to subject matter that is not patent eligible, and

therefore the claims are invalid.  Of the 242 claims at issue, PNC's motion discussed only two. (A209-A211)  CET opposed the motion (A228-A261), and PNC filed a Reply (A262-A280)

On July 31, 2013, the District Court granted PNC's motion to dismiss (A1-A2).  On the same date, acting *sua sponte*, the District Court dismissed CET's Complaint against Wells Fargo, because the Wells Fargo Complaint alleged infringement of the same CET Patents. (A1-A2)  On October 7, 2013, the District Court, also acting *sua sponte*, dismissed CET's Counterclaims and Third Party Complaint in the Diebold action, based on the District Court's previous invalidation of CET's Patents. (A27-A28)  On November 12, 2013, the District Court modified its order in the Diebold action, dismissing *with prejudice* "CET's Counterclaim and Third Party Complaint . . . and Amended Counterclaims." (A29)

In invalidating the CET Patents, the District Court found that "the basic character of the claimed subject matter" was clearly evident and no "further construction" of the claims was required. (A11)  The District Court also found that all 242 claims are "substantially similar and linked to the same abstract idea," allowing disposition of the claims in "a less detailed fashion" even in the absence of PNC's discussion of all but two of the claims. (A12)   The District Court acknowledged that in the procedural posture of a Fed. R. Civ. P. 12(b)(6) motion, it must adopt a construction of the claims most favorable to the patentee. (A11)  The

4

District Court found that the claims seek to effectuate the broad idea of extracting, storing and sending information in any industry or commercial endeavor, for any purpose, without leaving any room for other methods. (A21)  The District Court further found that the use of a scanner is not integral to the claims (A22), and that the claims do not impose meaningful "restrictions on the scope of the gathering, recognizing, and sorting steps allegedly covered by the Patents-in-Suit." (A22-A23)

In invalidating all claims, the District Court acted under the belief that when "the patent may have failed the Machine-or-Transformation test, the Court [must be] convinced that it is not an abstract idea" to avoid invalidity under § 101. (A9-A10)

The District Court made these findings and invalidated 242 claims of four patents without construing any of the claim terms, without considering any evidence regarding the meaning of any terms of any of the claims, without specific discussion of a single claim, and without considering any evidence regarding the scope of preemption created by a single claim.  The District Court explained its approach by quoting this Court's statement in *Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of Canada (U.S.)*, 687 F.3d 1266, 1273-74 (Fed. Cir. 2012), that "claim construction is not an inviolable prerequisite to a validity determination under §101." (A10-A11)

A.    <u>**Statement Of The Facts**</u>

CET is the owner of the CET Patents.  As described in the four patents, which issued on substantially the same specification, the claimed systems and methods implement specific techniques for processing information embedded in hard copy documents.  These techniques are useful for extracting with a scanner (or another image digitizer) information from a diversity of hard copy documents, recognizing within the extracted information specific data items corresponding to "fields" in one or more application programs, and then transmitting or inputting to the application program(s) the recognized information in a targeted manner in accordance with the corresponding fields.  In this way, labor and delays from manual processing of information embedded in the ink and paper of the hard copy documents are reduced or even completely avoided.

The machinery used for such document processing inherently requires an image digitizer – such as a scanner – interfaced with a computing device that is configured specifically to perform various steps.  The process thus uses digitized image data, such as data generated by a digital scanner or digital camera – a string of bits meaningless to the human eye and mind, but carrying information that is embedded in the ink and paper of the digitized documents.

The steps typically include processing the scanned image of a document to recognize not only the characters in the scanned image, but entire fields of

information, such as amounts, account numbers, addresses.  Once the different fields are recognized, the data items in the fields may be transferred to various applications.  The data are transferred in a targeted, field-specific manner.  For example, an amount read from the paper document may be input into an appropriate field of an accounting application, for debiting an account of a bank's customer; and the corresponding bank account number, which may also be read from the paper document, may be input into another field of the accounting application.  As explained in the specification, the computing device may store and use a previously created "template" for recognizing the locations and interrelationships of the different fields in the hard copy document.  The template may be created through an interaction between a person and a computing device, whereby the person marks the fields as they appear in a document.

Consider an example – directly relevant to CET's patent infringement claims – of processing a check deposited through an automatic teller machine ("ATM"). A bank customer feeds the check into the ATM, which immediately scans the check and recognizes one or more information items on the check, such as the amount of the check, the account number on the check, and the routing number on the check.[1]  The ATM does this for a variety of types of checks.  The ATM then

---

[1]     The specification of the CET Patents discloses recognition and subsequent manipulation of amounts and account numbers. *E.g.*, Fig. 3B of the '855 patent and the associated description. (A93, A107)

displays the amount to the customer and asks the customer to verify the amount. After verification, the ATM can send the information from the check to a number of applications, both local and remote, including:

(1) an application for printing a deposit receipt containing a scanned representation of the check and the amount of the deposit;

(2) an application for (i) emailing to the customer the transaction verification, and (ii) sending the transaction verification to the electronic banking center for future access by the customer;

(3) an application for transmitting the amount of the check and the scanned information to a bank employee who visually compares the automatically recognized amount to the amount in the scanned image;

(4) an accounting application, for crediting the depositor's account with the amount of the check (and possibly debiting the account against which the check was written); and/or

(5) an application that interacts with a computer system of another bank (*e.g.*, a clearing bank), for crediting the depositor's bank with the amount of the check, and debiting the amount from the payor's bank.

Currency bills (*e.g.*, dollar bills in different denominations) may be deposited and processed in a similar fashion.

Another similar and relevant example comes from the so-called "mobile" deposit processing. A bank customer installs a banking application on a mobile device (*e.g.*, a smartphone, a tablet). To deposit a check, the application photographs the check, and transmits the image to a server computer operated by the bank. The server computer recognizes one or more information items on the check, such as the amount, the account number, and the routing number printed on the check. The server computer then transmits the amount to the mobile device application, which asks the customer to verify the amount. After the application on the mobile device acknowledges the verification to the server computer, the server computer can perform various applications, such as the ones described above for the ATM example.

Each check deposit made through a teller requires some teller time – time not spent when the bank customer deposits the same item through an ATM or a mobile device. Equally important, when using an ATM or a mobile device the bank customer enjoys the convenience of 24-7 banking and need not go to the bank and stand in line to deposit the item. Moreover, the automation of the deposit process reduces errors inherent in human entry of information. With each ATM or mobile deposit, the banks enjoy substantial labor savings, reduced demand for branch space, improved and expanded service for their customers, as well as a reduced potential for errors.

Each of the CET Patents was issued between 1993 and 1998, on applications that were filed, examined, and allowed before this Court broadened patent eligibility standards in *State Street Bank & Trust Co. v. Signature Fin. Group, Inc*., 149 F.3d 1368 (Fed. Cir. 1998).  Regarding claim 1 of the '855 patent, the Patent and Trademark Office Examiner wrote that the claim is allowable because "the prior art fails to teach among the other limitations of the claim, 'said receiving step not preceded by scanning, via said automated digitizing unit, of a separate document containing format requirements.'" (A697-A698)  In holding the claim invalid, along with over 200 other claims of the four patents, the District Court did not discuss these limitations, or the way these and other limitations circumscribe the scope of each of the claims.

## IV.    <u>SUMMARY OF ARGUMENTS</u>

The claims at issue on PNC's Motion to Dismiss are directed to tangible methods and systems for processing physical documents.  The claims recite (1) processing a stream of digital bits that are generated by a scanner from hard copy documents, (2) recognizing from the bits not merely the characters printed on the documents, but entire data fields, such as amounts and account numbers, and then (3) transferring the information in a <u>targeted, field-specific way</u>, to one or more other applications.  The transferring may be performed in accordance with a "template" that defines the fields in the documents.

A scanner is a device that converts an image of a hard copy document into a stream of bits that correspond to the colors and shades of specific pixels of the image. The computer-implemented steps of the method claims are qualitatively different from the steps that can be performed by people in reading information from documents, because bit streams are generally meaningless to the human eye and mind. This is not the case where a computer is used simply to perform the same steps faster than a person could perform them. To the contrary, the steps here are not mental steps, are not the kind of steps that can be performed by people at all, at least not with reasonable effort. It follows that the claims are integrally tied to a particular apparatus: to a scanner coupled to a specially-configured computer. The integral apparatus limits the scope of the claims. The scanner and the computer play a significant part in the operation of the claimed methods, and therefore the claims pass the Machine-or-Transformation ("MOT") test and are patent eligible. *See SiRF Tech, Inc. v. ITC*, 601 F.3d 1319, 1333 (Fed. Cir. 2010).

The system claims recite structural limitations of the specially-configured computer, and some of them also recite the scanner, and are perforce patent eligible.

Additionally, the claims do not raise any abstractness concerns because they are not directed to core business methods, such as methods relating to investments, tax planning, financial obligations, or property exchanges.

The scope of the claims does not approach the preemption of the "fundamental concept" identified by the District Court, that of "the extraction of information from hardcopy documents and the processing of information contained in those documents." (A26)  Claim 1 of the '855 patent (one of only two claims argued by PNC on the Motion to Dismiss) does not preempt methods that include receiving output representing a diversity of types of hard copy documents from a scanner wherein the receiving step is preceded by scanning of a separate document containing format requirements.  It does not preempt methods that do not include recognizing document portions corresponding to a particular data field.  And the claim does not preempt methods that do not include targeted storing of the information from the documents. (A112)  Claim 1 of the '416 patent (the second of the claims PNC discussed) does not preempt methods in which the image digitizer is not a scanner, and which do not meet the limitations related to a template. (A196)

Other claims have a still narrower – and often much narrower – scope of preemption.   The District Court invalidated all the claims, without even a perfunctory analysis of most of their limitations.  The opinion of the District Court focuses squarely on the link between the claims and a supposedly abstract idea. *E.g.*, (A12)  The District Court did not construe a single claim term, including "template" and a multitude of others.  The District Court instead found the claims

to be "substantially similar and linked to the same idea," without claim construction, without a determination of the actual scope of preemption created by each claim, and without any claim-by-claim analysis mandated by this Court's precedents. The wholesale invalidation of the claims on a motion under Fed. R. Civ. P. 12(b)(6) was manifestly improper.

The District Court erred in invalidating the claims without a claim-by-claim analysis and without any factual development. The claims facially fit within the patentable subject matter classes of 35 U.S.C. § 101. They are inextricably tied to a scanner and a specially-configured computer, do not recite steps that can be performed mentally, and are not directed to creation or manipulation of abstractions such as investments, tax and other financial obligations, property exchanges, and similar core business concepts. They are directed to processing of hard copy documents, that is, processing of concrete, physical articles. The claims are patent-eligible. This Court should reverse and remand.

## V.    <u>STANDARD OF REVIEW</u>

This Court reviews a district court's dismissal for failure to state a claim under the law of the regional circuit. *Ultramercial, Inc. v. Hulu, LLC*, 722 F.3d 1335, 1338 (Fed. Cir. 2013). The Third Circuit reviews *de novo* challenges to a dismissal for failure to state a claim under Fed. R. Civ. P. 12(b)(6). *Sands v. McCormick*, 502 F.3d 263, 267 (3d Cir. 2007). "In evaluating the propriety of the

13

dismissal, we accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Id*. at 267–67 (citations omitted). This Court also reviews *de novo* the ultimate determination regarding patent eligible subject matter under 35 U.S.C. § 101. *In re Bilski*, 545 F.3d 943, 951 (Fed. Cir. 2008), *aff'd* on other grounds by *Bilski v. Kappos*, 130 S. Ct. 3218 (2010).

## VI.    ARGUMENT

### A.    The District Court Erred In Deciding Patent Eligibility On A Motion To Dismiss Under Fed. R. Civ. P. 12(b)(6) Without Making Any Factual Findings That Underlie A Patent Eligibility Inquiry And Without Construing Disputed Limitations

The need for factual findings before invalidating claims has been well established. A decade ago, this Court wrote:

> [A] court may not invalidate the claims of a patent without construing the disputed limitations of the claims and applying them to the allegedly invalidating acts. . . . Otherwise, as in this case, the decision invalidating the patent becomes effectively unreviewable. Such evaluation must recognize the statutory presumption of validity and the need for facts supporting a conclusion of invalidity by clear and convincing evidence.

*Dana Corp. v. Am. Axle & Mfg.*, 279 F.3d 1372, 1376 (Fed. Cir. 2002). More recently, this Court explained:

> [I]t will be rare that a patent infringement suit can be dismissed at the pleading stage for lack of patentable subject matter. This is so because every issued patent is presumed to have been issued properly,

14

> absent clear and convincing evidence to the contrary. . . . Further, if Rule 12(b)(6) is used to assert an affirmative defense, dismissal is appropriate only if the well-pleaded factual allegations in the complaint, construed in the light most favorable to the plaintiff, suffice to establish the defense.

*Ultramercial, Inc. v. Hulu*, LLC, 722 F.3d 1335, 1338 (Fed. Cir. 2013) ("Ultramercial II") (internal citations omitted).  The general rule requiring factual findings before claims can be invalidated is hardly subject to reasonable disagreement.

Patent eligibility is not an exception to this general rule.  To the contrary, the "abstractness" inquiry under § 101 is "rife with underlying factual issues." *Ultramercial II*, 722 F.3d at 1339.  The underlying factual issues include "a search for limitations in the claims that narrow or tie the claims to specific applications of an otherwise abstract concept." *Id.* (citing *inter alia CLS Bank Int'l v. Alice Corp.*, 717 F.3d 1269, 1282-83 (Fed. Cir. 2013) (opinion of Lourie, J.)).  The factual issues requiring resolution also include whether a claim recites a "genuine human contribution," and if so, whether the contribution is "more than a trivial appendix to the underlying abstract idea," and whether the contribution was "routine, well-understood, or conventional." *Ultramercial II*, 722 F.3d at 1339 (quoting from *CLS Bank*, 717 F.3d  at 1283-85 (opinion of Lourie, J.)).  "Likewise, any inquiry into the scope of preemption – how much of the field is 'tied up' by the claim – by definition will involve historic facts: identifying the 'field,' the available

alternatives, and preemptive impact of the claims in that field." *Ultramercial II*, 722 F.3d at 1339.   The factual issues and the clear and convincing evidence requirement normally make dismissal in the pleading stage improper. *Id*.

In the present case, CET argued that the motion to dismiss was premature, because PNC asked the District Court to invalidate the claims without the benefit of any factual exploration, without analysis of the specification in view of the prosecution history, without expert opinions or any other extrinsic evidence, and without construction of any terms of the claims. (A239-A243)  Nevertheless, the District Court held that all 242 claims – including the 240 claims that PNC did not discuss in its memorandum in support of the Motion to Dismiss – "are substantially similar and linked to the same abstract idea." (A12)  The District Court further held that

> The scanner and computer referenced in the Patents-in-Suit are not integral to the claims and none of the various steps contained in the claims in the Patents-in-Suit otherwise tie the claims to a machine in a manner that would indicate that the Patents-in-Suit are an *application* of an abstract idea rather than the idea *itself*.
>
> \* \* \*
>
> Defendant's contention that the "claims are not directed to any specific application, . . . or any specific machine-implemented intermediate steps," but rather, seek to effectuate "the broad idea of extracting, storing and sending information . . . in any industry or commercial endeavor, for any purpose, without leaving any room for other methods" is correct.

(A21)  The District Court further analogized the computer operation in all 242 claims of the CET Patents to the computer operation in two unrelated cases,[2] and held that the computer in CET's claims is "a general purpose computing device being asked to do some unspecified sorting function." (A23)  The District Court also held that all claims of CET's Patents "attempt to patent the abstract idea of extracting information from a hardcopy document, recognize certain information on that document and save certain user selected information in computer memory. The breadth of the Patents-in-Suit is staggering . . . ." (A23)  Additionally, the District Court wrote that it was "presented with an abstract idea regarding the extraction of information from hardcopy documents and the processing of information contained in those documents." (A26)

All these statements (and others) by the District Court appear to be findings of fact – facts regarding the meaning of the claim terms, facts about the supposedly "staggering" scope of preemption.  Thus, the District Court apparently acknowledged, if only by implication, that some <u>findings of fact are necessary</u> to rule on PNC's motion to dismiss.

The meaning of various claim terms was sharply in dispute.  PNC argued that all claims "do nothing more than provide an invitation for practitioners to

---

[2]    The two cases are: *Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of Can. (U.S.)*, 687 F.3d 1266 (Fed. Cir. 2012); and *CyberFone Sys., LLC v. Cellco P'ship*, 885 F. Supp. 2d 710 (D. Del. 2012).

apply an unknown, undisclosed, and unspecified algorithm to recognize, store, and send information from a document to other applications [and] impermissibly seek to preempt the use of any algorithm or any method to process information from a document." (A207-A208)    CET, on the other hand, argued that "storing" is performed in a targeted manner and encompasses multiple sub-steps. *E.g.*, (A248) The District Court resolved this factual dispute by adopting PNC's position. *E.g.*, (A21, A23, A26)  On a motion under Fed. R. Civ. P. 12(b)(6), before any factual exploration, without any evidence, this was manifestly improper.

Claim terms do not stand in a vacuum, but must be interpreted in light of both intrinsic record and extrinsic evidence, to determine their legally operative meaning.  *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc).  Claim construction is a fact-sensitive step that almost always requires some factual development, including consideration of prosecution history. *Unique Concepts, Inc. v. Brown*, 939 F.2d 1558, 1561 (Fed. Cir. 1991) ("To ascertain the meaning of claims, we consider three sources: the claims, the specification, and the prosecution history."); *accord Autogiro Co. of Am. v. United States*, 181 Ct. Cl. 55, 384 F.2d 391, 396-98, 155 U.S.P.Q. (BNA) 697, 701-03 (Ct. Cl. 1967).  In addition, extrinsic evidence such as expert testimony, including testimony regarding how those skilled in the art would interpret the claim terms, may also be

18

used in claim construction. *Fonar Corp. v. Johnson & Johnson*, 821 F.2d 627, 631 (Fed. Cir. 1987).

"[T]he analysis under § 101, while ultimately a legal determination, is rife with underlying factual issues." *Ultramercial II*, 722 F.3d at 1339.  The "underlying factual issues" that must be resolved include both claim interpretation and other facts that bear on § 101 analysis, such as the scope of preemption. *Id.*; *see Dana Corp.* 279 F.3d at 1376. ("[A] court may not invalidate the claims of a patent without construing the disputed limitations of the claims and applying them to the allegedly invalidating acts.")  As discussed above, even the District Court here recognized the need for findings of fact, but then short-circuited all factual development.

The analysis of the claims and the scope of preemption must grapple with both the meaning and the meaningfulness of the claim limitations as written and properly construed, in context, and not a paraphrased and stripped to the core mischaracterization of the claim language.  Many of the claim terms are clearly disputed, as is the knowledge of the hypothetical person skilled in the art and the meaningfulness of the limitations that implement the ideas underlying the claims. All these disputes are factual and, at this juncture, have not been properly resolved. Because the District Court's findings of fact are manifestly improper on a motion

under Fed. R. Civ. P. 12(b)(6), brought in the pleading stage of the case, the invalidation of CET's patent claims was error and should be reversed.

**B.    The District Court Erred By Not Requiring The Accused Infringer To Establish Invalidity On A Claim-By-Claim Basis**

It is well settled that "each claim must be considered as defining a separate invention." *Jones v. Hardy*, 727 F.2d 1524, 1528 (Fed. Cir. 1984). It is also well settled that each claim carries an independent presumption of validity, and stands or falls independent of the other claims. 35 U.S.C. § 282; *Altoona Publix Theatres v. American Tri-Ergon Corp.*, 294 U.S. 477, 487 (1935); *Continental Can Co. v. Monsanto Co.*, 948 F.2d 1264, 1266-67 (Fed. Cir. 1991). And it is similarly well settled that grounds of invalidity "must be analyzed on a claim-by-claim basis." *MeadWestVaco Corp. v. Rexam Beauty and Closures, Inc.*, 731 F.3d 1258, 1264 (Fed. Cir. 2013) (citing *Ortho Pharm. Corp. v. Smith*, 959 F.2d 936, 942 (Fed. Cir. 1992)); *accord Shelcore, Inc. v. Durham Indus.*, 745 F.2d 621, 625, (Fed. Cir. 1984) ("a party challenging the validity of a claim, absent a pretrial agreement or stipulation, must submit evidence supporting a conclusion of invalidity of *each* claim the challenger seeks to destroy."). These cases, and a multitude, of others "urge a flexible, claim-by-claim approach to subject-matter eligibility that avoids rigid line drawing." *CLS Bank Int'l v. Alice Corp.*, 717 F.3d 1269, 1281 (Fed. Cir. 2013) (opinion of Lourie, J.).

20

The party seeking to invalidate claims must do so by clear and convincing evidence. *Microsoft Corp. v. i4i Limited Partnership*, 131 S.Ct. 2238, 180 L.Ed.2d 131 (2011); *Ultramercial II*, 722 F.3d at 1338; *Dana Corp.*, 279 F.3d at 1376. Thus, in the case at bar, PNC had the burden to establish invalidity through claim-by-claim analysis, and do so by clear and convincing evidence. PNC did not even attempt to do so.

The four CET Patents include a total of 242 claims. (A112-A115, A139-A141, A162-A172, A196-A199, A699-A700) In its moving papers on the motion to dismiss, PNC superficially discussed only two of the claims, claim 1 of the '855 patent, and claim 1 of the '416 patent. (A209-A211) PNC simply asserted that all other claims are similar to the two claims it actually discussed. (A208-A213.) Rather than discuss the actual claims at issue, PNC referred to "patents-in-suit," "patent claims," "claims," or "specification," *See*, *e.g.*, (A216, A219-A223, A226). PNC's Reply Brief on the motion to dismiss was also completely devoid of a claim-by-claim analysis. (A262-A280)

The District Court similarly failed to perform the requisite claim-by-claim analysis. Instead, the District Court stated that "the Patents-in-Suit focus on the processing of information in a three step process," and described its understanding of the process. (A5) The District Court then ruled that "[c]laim construction is not required to resolve this motion and determine that the Patents-in-Suit are invalid.

. . . The 'basic character of the claimed subject matter' in dispute in this action is clearly evident to the Court and no further construction of the claims is required." (A10-A11)  The District Court further opined that "the Patents-in-Suit encapsulate invalid abstract ideas, even when construed in the manner most favorable to Plaintiff." (A11)  The District Court did not explicitly set forth what it presumed to be the construction "most favorable to Plaintiff" for any of the claims.  The District Court concluded that "[w]here the claims, as here, are substantially similar and linked to the same abstract idea, the Court is free to dispose of the additional claims in a less detailed fashion." (A12)  The District Court cited *Bilski v. Kappos*, 130 S. Ct. at 3231 for this proposition. (A12)

This Court has expressly warned against the type of "wholesale" invalidation of patent claims at issue here. *E.g.*, *Dana Corp.*, 279 F.3d at 1376. The requirement for claim-by-claim analysis is firmly rooted in patent jurisprudence.  The District Court apparently believed that *Bilski v. Kappos* changed this principle, because in *Bilski* the Supreme Court affirmed a holding "that eleven (11) claims in a patent application were invalidly abstract after only analyzing two (2) of the claims in detail." (A12)  In *Bilski*, however, the patent applicants argued all eleven claims <u>together</u>. *In re Bilski*, 545 F.3d 943, 949 (Fed. Cir. 2008).  Therefore, neither *In re Bilski* nor *Bilski v. Kappos* stands for the

proposition that the Supreme Court has overruled *sub silencio* the long-standing requirement of a claim-by-claim analysis.

The District Court's invalidation of well over two hundred claims without a claim-by-claim analysis was error and should be reversed.

## C.    The Claims Of The CET Patents Are Directed To Patent Eligible Subject Matter

Five independent categories of inventions are eligible for patent protection under the patent laws: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C § 101.  The Supreme Court has consistently construed patent eligible subject matter broadly: "In choosing such expansive terms as 'manufacture' and 'composition of matter,' modified by the comprehensive 'any,' Congress plainly contemplated that the patent laws would be given wide scope." *Diamond v. Chakrabarty*, 447 U.S. 303, 308-09 (1980).  The most recent Supreme Court pronouncement bearing on the patentability of computer-based inventions is to the same effect. *Bilski v. Kappos*, 130 S.Ct. at 3225 (quoting *Chakrabarty*, 447 U.S. at 308) ("Congress took this permissive approach to patent eligibility to ensure that 'ingenuity should receive liberal encouragement.'")   This Court's view of patent eligibility is, of course, no different. *E.g.*, *CLS Bank*, 717 F.3d at 1276.

Laws of nature, physical phenomena, and abstract ideas are the three exceptions to the broad patent eligibility approach. *E.g.*, *Bilski v. Kappos*, 130 S. Ct. at 3225. The concern underlying these exceptions is that they are the basic tools of scientific and technological work, and, if patented, would impede progress. *Id.* at 3253. But the exceptions are narrow, because, "[t]aken too far, the exceptions could swallow patent law entirely." *CLS Bank*, 717 F.3d at 1277. In fact, the Supreme Court has "more than once cautioned that 'courts should not read into the patent laws limitations and conditions which the legislature has not expressed.'" *Diamond v. Diehr*, 450 U.S. 175, 182, 101 S.Ct. 1048, 1054 (1981) (quoting *Chakrabarty*, 447 U.S. at 308) (internal quote marks omitted).

Before the Supreme Court's decision in *Bilski v. Kappos*, this Court exclusively applied the MOT test for determining whether a claim is patent eligible. *In re Bilski*, 545 F.3d at 954. Under the test, a claim is patent eligible if (1) it was tied to a particular machine or apparatus, or (2) transformed a particular article into a different state or thing. *Id.* In *Bilski v. Kappos*, the Supreme Court retained the MOT test as a tool for patent eligibility determination, but held that MOT is not the exclusive patent eligibility test. *Bilski v. Kappos*, 130 S.Ct at 3231. The MOT test, however, remains "a useful and important clue, an investigative tool, for determining whether some claimed inventions are processes under § 101." *Bilski v. Kappos*, 130 S.Ct. at 3227.

Two considerations apply to the MOT analysis. First, the use of a particular machine or transformation of an article must impose meaningful limits on the claim's scope. *In re Bilski*, 545 F.3d at 961-62. Second, the involvement of the machine or transformation in the claimed process must not be merely insignificant extra-solution activity. *Id.* "[A] claim that is tied to a particular machine or brings about a particular transformation of a particular article does not pre-empt all uses of a fundamental principle in any field but rather is limited to a particular use, a specific application." *Id.* at 957. A process claim is sufficiently tied to a particular machine if that machine plays a "significant part" in the operation of the claimed method. *SiRF Tech, Inc. v. ITC*, 601 F.3d 1319, 1333 (Fed. Cir. 2010). But even where a claim fails the MOT test, the claim may still be patent eligible. *Bilski v. Kappos*, 130 S.Ct. 3218.

Following *Bilski v. Kappos*, this Court has held that it would be an error "to define 'abstract' beyond the recognition that this disqualifying characteristic should exhibit itself so manifestly as to override the broad statutory categories of eligible subject matter and the statutory context that directs primary attention on the patentability criteria of the rest of the Patent Act." *Research Corp. Tech., Inc. v. Microsoft Corp.*, 627 F.3d 859, 868 (Fed. Cir. 2010) (emphasis added). "[I]nventions with specific applications or improvements to technologies in the marketplace are not likely to be so abstract that they override the statutory

language and framework of the Patent Act." *Id*. at 869. Inventions that incorporate and rely upon "even 'a well known mathematical equation' do not lose eligibility 'because several steps of the process [use that] mathematical equation.'" *Id*. (quoting *Diamond v. Diehr*, 450 U.S. at 185) (brackets in the original).

On the motion to dismiss in the present case, PNC and the District Court unduly focused on the purported link of two of the claims to an abstract idea. "[A]ll inventions at some level embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." *Mayo Collaborative Serv. v. Prometheus Lab., Inc*., 132 S.Ct. 1289, 1293, 182 L.Ed.2d 321 (2012). Consequently, patent eligibility of the claims must be evaluated based on what each claim recites, not merely on the idea it uses, reflects, or rests upon.

As demonstrated below, each claim at issue here is integrally tied to a particular apparatus that limits its scope, recites specific technological applications, does not preempt all applications of an abstract idea, and therefore is patent eligible.

### 1.    CET's Patent Claims Fit Within The Statutory Classes Of § 101

The preambles of most of the 242 claims of CET's Patents recite a method or system. (A112-A115, A139-A141, A162-A172, A196-A199) The substantive limitations in the bodies of the claims then recite hardware or method limitations, respectively. *Id*. Therefore, each of these claims is directed to either a machine or

a process, both statutory patent eligible matter under the literal reading of 35 U.S.C. § 101.

The preambles of the remaining claims recite an "application program interface." The substantive limitations of these claims are apparatus elements, such as an "automated digitizing unit" or a "scanner," a "processor," or a "printer." (A114-A115, A141) If PNC had addressed these claims in a claim-by-claim attempt to show invalidity, CET's position would have been that, because the substantive limitations of each of these claims include elements that are clearly hardware components, each of the claims is directed to a "machine" as that term is used in 35 U.S.C. § 101. CET's position regarding construction of disputed limitations would have to be accepted in the procedural posture of the case. *See Ultramercial II*, 722 F.3d at 1339 & 1349.[3]

Therefore, each claim fits within one of the statutory classes of § 101 and is presumptively patent eligible.

---

[3] In this Brief, CET makes a number of statements regarding possible meaning of selected claim terms. CET does not intend these statements as a waiver of the arguments that the District Court erred in (1) dispensing with claim construction and factual inquiry, and (2) in not requiring PNC to establish by clear and convincing evidence that the only plausible construction was one that rendered the subject matter ineligible, in a claim-by-claim analysis.

## 2.    <u>None Of The Claims Raises Abstractness Concerns</u>

In analyzing the applicability of the judicially-made "abstractness" exception[4] to a claim that facially fits within one of the classes under § 101, the first step is to inquire whether abstractness concerns are present at all. *See CLS Bank*, 717 F.3d at 1282; *Ultramercial II*, 722 F.3d at 1355 (Lourie, J., concurring). The claims here do not raise abstractness concerns because they do not recite what amounts to mental steps or a pure business method, and require the presence of an image digitizer[5] such as a scanner connected to a specially-programmed computer.

A scanner is a device that converts an image of a hard copy document into a stream of bits that correspond to the colors and shades of specific pixels of the image. The processing of such a bit stream is generally well beyond the ability of people to perform. The computer-implemented steps of the method claims do not duplicate similar steps that can be performed by people; this is not the case where a

---

[4]    There are three recognized exceptions to the broad patent eligibility principles under § 101: laws of nature, physical phenomena, and abstract ideas. *E.g., Bilski v. Kappos*, 130 S. Ct. at 3225. In the proceedings below, PNC did not argue that the first two of these exceptions applied to the claims of CET's Patents, and the District Court did not base its decision on either the "laws of nature" or the "physical phenomena" exception. CET also does not see any relevance of these exceptions to the case before the Court in the present appeals. Consequently, CET discusses only the "abstract idea" exception.

[5]    Some of the claims are tied to a digitizing unit or digitizer. *E.g.*, claim 1 of '855 patent. (A112)  Other claims are tied to a scanner. *E.g.*, claim 14 of the '855 patent. (A113)  The discussion in this Brief may use either designation to refer to both concepts. Occasionally, however, the discussion draws a distinction between the narrower scanner and the broader digitizing unit or digitizer.

computer is used simply to perform the same steps faster than a person could perform them. To the contrary, a person could not process a stream of bits that are the output of a scanner, and process the bits to recognize the data printed on the hard copy document. The process claims are directed to labor saving methods that do not duplicate the steps that can be performed by a human being, be it mentally, with a pen and paper, or otherwise.

The claims also are not directed to core business methods where the end result is the creation or manipulation of a fundamentally abstract concept, such as performing a mathematical operation directed to an investment, tax, financial obligation, or property exchange. The claims in CET Patents are directed to document processing applications, that is, applications for processing concrete, tangible, physical items.

On the motion to dismiss in the District Court, PNC attempted to analogize the claims of CET Patents to the ones this Court considered in *Dealertrack, Inc. v. Huber*, 674 F.3d 1315 (Fed. Cir. 2012); in *Cybersource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366 (Fed. Cir. 2011); and in *Bancorp*, 687 F.3d 1266. (A217, A218, A220-A223, A225, A226)  The District Court relied on these cases. (A9, A11, A14, A16-A19, A21-A23)  All three cases stand for the proposition that mental step processes are ineligible for patent protection. The cases therefore are not on point.

In *Dealertrack*, the car loan application claims "cover a clearinghouse process using any existing or future-devised machinery." *Dealertrack*, 674 F.3d 1334. The claims "recite only that the method is 'computer aided' without specifying <u>any level</u> of involvement or detail." *Id.* (emphasis added). Notably, the District Court in *Dealertrack* had already construed the claims. *Dealertrack*, 674 F.3d at 1333. Based on that construction, which *Dealertrack* did not appeal, this Court determined that the "computer aided" itself was an abstraction, like the financial concept of a "clearinghouse" that was at issue there. *Dealertrack*, 674 F.3d at 1333-34. The computer in *Dealertrack* did not "play a significant part in permitting the claimed method to be performed." *Id.*, 674 F.3d at 1333 (quoting *Cybersource*, 654 F.3d 1366). In fact, none of the steps of the claims at issue in *Dealertrack* required the use of a computer.[6]

---

[6]   In *Dealertrack*, only claims 1, 3, and 4 were at issue with respect to validity under section 101. *Dealertrack* at 1317. Patent eligibility of claims 3 and 4 was not argued separately. *Id.* at 1331. *Dealertrack*'s claim 1 appears on page 1331 of the opinion. The steps of that claim were directed to the clearinghouse concept that did not have to be implemented on a computer. The sole computer-related requirement was in the recitation of "computer aided" in the preamble of the claim; as mentioned above, this Court determined that the "computer aided" recitation was itself an abstraction because of the lack of any structure in the specification. And, of course, the preamble does not limit the claim unless it recites essential structure or steps or is necessary to give life, meaning, and vitality to the claim. *See, e.g.*, *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999).

In *Cybersource*, the claimed methods for verifying the validity of credit card transactions over the Internet were drawn to unpatentable <u>mental</u> processes. *Cybersource*, 654 F.3d at 1376-77 ("Because claims 2 and 3 [the sole appealed claims] attempt to capture unpatentable mental processes (i.e., abstract ideas), they are invalid under §101.")

In *Bancorp.*, the claims were directed to management of life insurance policies, another type of financial product. *Bancorp.*, 687 F.3d at 1270-72.  In the claims, "the computer merely permits one to manage a stable value protected life insurance policy more efficiently than one could mentally.  Using a computer to accelerate an ineligible mental process does not make that process patent eligible." *Bancorp.*, 687 F.3d at 1279.

Each of the three cases thus involved claims directed to <u>mental</u> processes and manipulation of financial abstractions.  This was also the case in *Bilski*, where the patentees sought "patent protection for a claimed invention that explains how buyers and sellers of commodities in the energy market can protect, or hedge, against the risk of price changes." *Bilski v. Kappos*, 130 S.Ct. 3223.  In *Bilski*, the claim "as a whole is directed to the metal and mathematical process of identifying transactions that would hedge risk." *In re Bilski*, 545 F.3d at 965.

In contrast to the claims in *Dealertrack, Cybersource*, *Bancorp*, and *Bilski*, method claims with steps that inherently require the presence of a machine –

avoiding mental steps – are generally held to be directed to patent eligible subject matter.[7]  This was the case in *SiRF Tech, Inc. v. ITC*, 601 F.3d 1319 (Fed. Cir. 2010).  In *SiRF*, the claims recited an algorithm that operated on data provided by a Global Positioning System ("GPS") receiver.  *SiRF*, 601 F.3d at 1331-32.  This Court held that the claims were directed to patent eligible subject matter:

> A GPS receiver is a machine and is integral to each of the claims at issue. . . .  It is clear that the methods at issue could not be performed without the use of a GPS receiver; indeed without a GPS receiver it would be impossible to [achieve] the precise goal of the claims.
>
> We also think that the presence of the GPS receiver in the claims places a meaningful limit on the scope of the claims.  In order for the addition of a machine to impose a meaningful limit on the scope of a claim, it must play a significant part in permitting the claimed method to be performed, rather than function solely as an obvious mechanism for permitting a solution to be achieved more quickly, i.e., through the utilization of a computer for performing calculations.  We are not dealing with a situation in which there is a method that can be performed without a machine.

*SiRF*, at 1332-33.

The scanner (or another image digitizer) of the claims of the CET Patents is analogous to the GPS receiver in *SiRF*, because its presence places a meaningful limit on the scope of the claims.  Just as the claims in the *SiRF* patents could not be performed without the use of a GPS receiver to determine the position of the

---

[7]  The Supreme Court explicitly disapproved categorical exclusion of business methods from the domain of patent eligibility.  Our point here is that the claims in the CET Patents do not even raise the kind of patent eligibility concern that are present in many business method patents.

receiver, the claims of CET Patents cannot be performed without a scanner/digitizer that creates digital representations of hard copy documents. As in *SiRF*, the scanner here "is a machine and is integral to each of the claims at issue." As in *SiRF*, the scanner "play[s] a significant part in permitting the claimed method to be performed." Indeed, the tie of the claims to the scanner/digitizer is indispensable. Thus, like in *SiRF*, "[w]e are not dealing with a situation in which there is a method that can be performed without a machine." As in *SiRF*, the claims here are directed to patent eligible subject matter.

Another apposite case is *Research Corp. Tech., Inc. v. Microsoft Corp.*, 627 F.3d 859 (Fed. Cir. 2010). In *Research Corp.*, one of the issues was patent eligibility of claims describing processing of digital image pixels. *Research Corp.*, 627 F.3d at 862. "Digital images are, in fact, thousands of pixels arranged in arrays of rows and columns. Each pixel in a black-and-white image contains information about the gray level of the image at that particular position." *Id.* In *Research Corp.*, patent eligibility of both method and apparatus claims was at issue. *Id.* at 865-66. Held: "The invention presents functional and palpable applications in the field of computer technology [that] address a need in the art for a method of and apparatus for the halftone rendering of gray scale images in which a digital data processor is utilized in a simple and precise manner to accomplish the halftone rendering." *Id.* at 868-69 (internal quote marks omitted). "The fact that

some claims . . . require a 'high contrast film,' 'a film printer,' 'a memory,' and 'printer and display devices' also confirm this court's holding that the invention is not abstract." *Id*. at 869.

The claims of CET Patents similarly relate to the creation and processing of pixels of digital images of hard copy documents. Some of the claims require display devices and memory, and the use of a scanner (or another digitizer) to process hard copy documents is inherently required by CET's claims, as were film and printer in *Research Corp*. The parallel between (1) the film and printer in *Research Corp*. and (2) hard copy documents and scanner in the case at bar is unmistakable. In *Research Corp*., the printer was used to transfer digital images onto a hard copy document, in the case at bar the mirror image process takes place: digital images are created from hard copy documents and then further processed by a specially configured digital processor. As in *Research Corp*., the claims are patent eligible.

The claims here embody tangible applications and technological improvements to then-existing state-of-the-art. They are not abstractions.

### 3.     None Of The Claims Poses Risk Of Preempting An Abstract Idea

Another inquiry relevant to the analysis of claims under the "abstractness" exception is whether each claim poses any risk of preempting an abstract idea. *Ultramercial II*, 722 F.3d at 1352; *id*. at 1355 (Lourie, J., concurring) (citing *CLS*

*Bank*, 717 F.3d at 1282).  To answer this inquiry, "it is important at the outset to identify and define whatever fundamental concept appears wrapped up in the claim" and then "the balance of the claim can be evaluated to determine whether it contains additional substantive limitations that narrow, confine, or otherwise tie down the claim so that, in practical terms, it does not cover the full abstract idea itself." *CLS Bank*, 717 F.3d at 1281-82.

Here, the District Court identified the fundamental concept of the claims in these words: "the Court is presented with an abstract idea regarding the extraction of information from hardcopy documents and the processing of information contained in those documents." (A26)  The District Court also wrote that "the Patents-in-Suit: they attempt to patent the abstract idea of extracting information from a hardcopy document, recognize certain information on that document and save certain user selected information in computer memory." (A23)  Assuming *arguendo* that these statements in fact identify the fundamental concept or abstract idea of each of the 242 claims at issue, does each claim preempt the abstract idea? Even a quick look at the two claims that PNC discussed in its Brief on the Motion to Dismiss shows that the answer is: No.

Claim 1 of the '855 patent (the first of the two claims) reads as follows:

> 1. A method of processing information from a diversity of types of hard copy documents, said method comprising the steps of:

(a) receiving output representing a diversity of types of hard copy documents from an automated digitizing unit and storing information from said diversity of types of hard copy documents into a memory, said information not fixed from one document to the next, said receiving step not preceded by scanning, via said automated digitizing unit, of a separate document containing format requirements;

(b) recognizing portions of said hard copy documents corresponding to a first data field; and

(c) storing information from said portions of said hard copy documents corresponding to said first data field into memory locations for said first data field.

(A112, A699)  The claim has a number of terms, none of which has been construed by the District Court.[8]  But given any reasonable construction – and certainly a construction favorable to CET – it is clear that the claim will <u>not</u> preempt "extraction of information from hardcopy documents and the processing of information contained in those documents" or "extracting information from a hardcopy document, recognize certain information on that document and save certain user selected information in computer memory," as the District Court believed.

Claim 1 of the '855 patent will not preempt methods that include receiving output representing a diversity of types of hard copy documents from an automated

---

[8]     The unconstrued limitations include: *recognizing portions . . . corresponding to a first data field*, *storing information . . .  corresponding to said first data field into memory locations for said first data field*, *not preceded by scanning . . . of a separate document containing format requirements*, and *receiving output . . . from an automated digitizing unit*.

digitizing unit wherein the receiving step <u>is preceded</u> by scanning, via said automated digitizing unit, of a separate document containing format requirements.

Claim 1 of the '855 patent will not preempt methods that do not include <u>recognizing document portions corresponding to a particular data field</u>. In fact, the District Court did not construe the terms of the step of *recognizing*, which step may include using a complex computer interface that, for example, performs optical character recognition ("OCR") and association of the OCR'd information with expected or possible values of one of several fields.

Claim 1 of the '855 patent will not preempt methods that do not include storing the information from the portions the documents corresponding to the first data field into memory locations that corresponds to that particular data field. The District Court did not construe the terms of the step of *storing*, which step may be construed to include targeted "processor writes" of the OCR'd information to specifically targeted memory locations. For example, the claim may not preempt methods wherein the information is stored in memory in bulk form. Many other claims require such targeted writes to be performed in accordance with a "template" – another unconstrued term – created through specific interactions with a computer.

And, as discussed above, claim 1 of the '855 patent will not preempt methods performed by people, mentally and otherwise. A person cannot process a

stream of bits that are the output of an automated digitizing unit, and process the bits to recognize data corresponding to the fields. The claim is directed to a method that does not duplicate the steps that can be performed by a human being mentally or with a pen and paper.

Claim 1 of the '416 patent is the only other claim discussed by PNC in its Brief on the Motion to Dismiss. The claim reads thus:

> 1. A method of inputting information from a diversity of hard copy documents to a computer, comprising at least one of the following steps (a), (b), and (c):
>
> (a) inputting information from a hard copy document according to an interactive mode which includes the following substeps
>
>> (a)(1) scanning a hard copy document and displaying a digitized image of at least a portion of the hard copy document on a display;
>>
>> (a)(2) interactively receiving instructions from a user for identifying information on said digitized image and converting at least said identified information to converted text data corresponding to at least one field of information required by an application program; and
>>
>> (a)(3) transferring said converted text data to said field of information;
>
> (b) creating a template to enable transfer of converted text data corresponding to at least one field of information required by an application program according to an interactive template creation mode which includes the following substeps
>
>> (b)(1) scanning a hard copy document and displaying an image of at least a portion of the hard copy document on a display;

> > (b)(2) interactively receiving instructions from a user to create a template which identifies at least one location on said image as containing information to be converted to text data corresponding to a field of information required by an application program; and
>
> > (b)(3) storing said template;
>
> (c) inputting information from a hard copy document according to an automatic mode which includes the following substeps
>
> > (c)(1) scanning a hard copy document to generate document information; and
>
> > (c)(2) matching at least a portion of said document information with a template created to transfer converted text data to at least one field of information required by an application program.

(A196)

This claim recites three alternative steps (a), (b), and (c). A method in accordance with the step (a) is <u>not</u> preempted without the "transferring" step, which must include targeted "processor writes" of the OCR'd information to specific memory locations. A method in accordance with either of the steps (b) or (c) is not preempted without "template"-related limitations, which limitations the District Court chose not to construe and not to discuss in its opinion.

Moreover, in each of the three alternative steps, the claim recites "scanning" – another unconstrued term. Properly construed, "scanning" may literally mean digitizing with a scanner and not with other types of digitizers.

Claim 43 of the '416 patent reads identically to claim 1 of the '416 patent, with one exception: it recites all three of the steps (a), (b), and (c) together, meaning that the claim would not preempt processing that omits any one of the three steps. (A198)  By its terms, the scope of preemption of this claim is extremely narrow.  And it is far from the narrowest claim.  The same patent includes claims that depend from claim 43, each with a different set of additional limitations unconstrued by the District Court.

Dependent claim 44 of the '416 patent adds the following steps to those of claim 43: "defining a set of symbols which designate fields of information required by an application program; and detecting the presence of a particular one of said defined set of symbols on a hard copy document and extracting a field of information required by an application program based on said detecting." Although the scope of claim 43 has not been construed by the District Court, clearly it adds meaningful limitations to those of the already narrow claim 43, that of defining and detecting defined symbols designating specific field(s) in hard copy documents.  Clearly, "the extraction of information from hardcopy documents and the processing of information contained in those documents" does not inherently require the additional steps of this dependent claim.

There are 17 additional claims that depend from claim 43 of the '416 patent, reciting various limitations that relate to displaying a split-screen image, blocking, repeating some of the steps, and storing data as image data or as text data.

The '855 patent includes 76 claims in addition to claim 1 (which was discussed above). These additional claims include various limitations, such as prompting identification of document fields, storing data as text data or as image data, detecting/correcting errors that result from automated digitizing, receiving instructions for identifying fields in hard copy from identified characters, displaying, recognizing portions of the hard copy document corresponding to an additional field, and others.

And there are a total of 46 claims in the '508 patent, as well as 53 claims in the '465 patent.

Each of the claims does not preempt methods that do not include all of the limitations recited in the claim. Every one of these claims has not been construed. The scope of preemption of any of these claims has not been determined or even argued below. The District Court simply invalidated all these claims in a wholesale manner.

The patentees here did not seek to preempt the abstract idea of "the extraction of information from hardcopy documents and the processing of information contained in those documents," as the District Court believed. Each

claim forecloses from others the use of that idea only in conjunction with all the other limitations in the claimed processes or systems, and contains substantial and genuine human contribution that goes well beyond the disembodied fundamental concept described by the District Court.   The additional limitations represent significantly more than the underlying abstract idea of "the extraction of information from hardcopy documents and the processing of information contained in those documents."   Each claim is therefore patent eligible. *See Diamond v. Diehr*, 450 U.S. 175, 187, 191, 101 S.Ct. 1048, 67 L.Ed.2d 155 (1981) ("[The patentees] do not seek to pre-empt the use of that equation.  Rather, they seek only to foreclose from others the use of that equation in conjunction with all of the other steps in their claimed process."); *accord*, *Ultramercial II*, 722 F.3d at 1355 (Lourie, J., concurring).

### 4.    Section 101 Does Not Require Copyright-Like Recitation Of Algorithms

On the motion to dismiss in the District Court, PNC argued that the claims of CET's Patents are abstract because "they do not describe any special programming code or any specific algorithm to perform the claimed functions . . . ." (A216)   The District Court apparently accepted this argument, although it did not construe the claims, and held that the claims "seek to effectuate the broad idea of extracting, storing and sending information . . . in any industry or commercial endeavor, for any purpose, without leaving room for other

42

methods . . . ." (A21) (internal quote marks omitted, first ellipsis in the original). As we have shown above, this statement is erroneous, because none of the claims has such broad preemption scope, and some of the claims are rather narrow.

Moreover, none of the decisions of this Court or of the Supreme Court require the claims to recite specific programming code. While copyright law protects *expression* of ideas, patent protection is much broader. It extends to applications of ideas. *CLS Bank Int'l v. Alice Corp.*, 717 F.3d at 1279 (opinion of Lourie, J.)) (citing *Diamond v. Diehr*, 450 U.S. at 187). And such applications are defined by the language of the claims, read through the eyes of a person of ordinary skill in the art. *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir. 1998). As this Court explained in *Multiform Desiccants*, and reiterated in *Phillips v. AWH Corp.*,

> Such person is deemed to read the words used in the patent documents with an understanding of their meaning in the field, and to have knowledge of any special meaning and usage in the field. The inventor's words that are used to describe the invention – the inventor's lexicography – must be understood and interpreted by the court as they would be understood and interpreted by a person in that field of technology. Thus the court starts the decisionmaking process by reviewing the same resources as would that person, *viz.*, the patent specification and the prosecution history.

*Multiform Desiccants*, 133 F.3d at 1477; *Phillips v. AWH Corp.*, 415 F.3d at 1313 (quoting *Multiform Desiccants*).

In the case at bar, a person of ordinary skill in the art would have understood the type of sub-steps for targeted data manipulation that is required by selected claims.  Such person would have understood the sub-steps based on his or her peculiar knowledge of the field, based on the entire specification, and based on the prosecution history of the patents.  Such person would have understood the specific sub-steps even in the absence of the programming code or equivalent description. And such understanding is all that may be required.

The District Court short-circuited the entire process, and the evidence regarding the understanding of the terms of particular claims, and of the scope of preemption, was never considered.

## VII.  <u>CONCLUSION</u>

For the foregoing reasons, Appellant CET respectfully requests this Court to (1) reverse the District Court's Order in the PNC action, declaring all claims of the CET Patents invalid and granting PNC's motion to dismiss; (2) declare the claims to be directed to patent eligible subject matter; (3) reverse the District Court's Order in the Wells Fargo action, dismissing *sua sponte* CET's complaint against Wells Fargo, N.A.; and (4) reverse the District Court's Order in the Diebold Action, dismissing *sua sponte* CET's First Amended Counterclaims and First Amended Third-Party Complaint.

Respectfully submitted,

By: <u>/s/Jean-Marc Zimmerman</u>
ZIMMERMAN & WEISER LLP
Jean-Marc Zimmerman
Anatoly S. Weiser
226 St. Paul Street
Westfield, New Jersey 07090
Tel:  (908) 654-8000
Fax: (908) 654-7207
jmz@iplcounsel.com
aw@ iplcounsel.com

Attorneys for Content Extraction and
Transmission LLC

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 21, 2014, I caused to be filed electronically the foregoing with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the appellate CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.  I further certify that all of the participants in this case are registered CM/ECF users.

By: /s/Jean-Marc Zimmerman
ZIMMERMAN & WEISER LLP
Jean-Marc Zimmerman
Anatoly S. Weiser
226 St. Paul Street
Westfield, New Jersey 07090
Tel:  (908) 654-8000
Fax: (908) 654-7207
jmz@iplcounsel.com
aw@ iplcounsel.com

Attorneys for Content Extraction and
Transmission LLC

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that pursuant to Fed. R. App. P. 32(a)(7) and Federal Circuit Rule 28(a)(14), the foregoing Brief was prepared in MS Word 2010, is proportionally spaced, has a typeface of 14 points Times New Roman, and contains 10,690 words, excluding those sections identified in Fed. R. App. P. 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

By: <u>/s/Jean-Marc Zimmerman</u>
ZIMMERMAN & WEISER LLP
Jean-Marc Zimmerman
Anatoly S. Weiser
226 St. Paul Street
Westfield, New Jersey 07090
Tel:  (908) 654-8000
Fax: (908) 654-7207
jmz@iplcounsel.com
aw@ iplcounsel.com

Attorneys for Content Extraction and Transmission LLC

# ADDENDUM

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| CONTENT EXTRACTION AND TRANSMISSION LLC, | : | |
| | : | |
| Plaintiff, | : | No. 12-2501 (MAS) (TJB) |
| | : | |
| v. | : | |
| | : | |
| WELLS FARGO BANK, NATIONAL ASSOCIATION, | : | |
| | : | |
| Defendant. | : | |
| | : | |
| CONTENT EXTRACTION AND TRANSMISSION LLC, | : | |
| | : | |
| Plaintiff, | : | No. 12-6960 (MAS) (TJB) |
| | : | |
| v. | : | |
| | : | |
| THE PNC FINANCIAL SERVICES GROUP, INC., et al., | : | **ORDER** |
| | : | |
| Defendants. | : | |

This matter comes before the Court on Defendant the PNC Financial Services Group, Inc., and PNC Bank, N.A.'s (collectively, "PNC" or "Defendant"),[1] Motion to Dismiss pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6). (Def.'s Br., ECF No. 6-1.)[2] Plaintiff Content Extraction and Transmission LLC ("Plaintiff" or "CET"), filed Opposition. (Pl.'s Opp'n, ECF No. 8.) Defendant filed a Reply. (ECF No. 9.) The Court has carefully considered the Parties' submissions and decided the matter without oral argument pursuant to Local Civil Rule

---

[1] For purposes of this Order, the Court refers to the PNC entities as a single defendant.

[2] All cites to the record, unless noted otherwise, are to *CET v. PNC*, Civil Action No. 12-6960.

78.1. For the reasons set forth in the accompanying Opinion issued today, and other good cause shown,

**IT IS**, on this 31st day of July, 2013, **ORDERED** that:

1) Defendant's Motion to Dismiss is granted.

2) Plaintiff's U.S Patent Nos. 5,258,855 (the "855 Patent"), 5,369,508 (the "508 Patent"), 5,625,465 (the "465 Patent"), and 5,768,416 (the "416 Patent") are declared invalid as abstract ideas not patentable under 35 U.S.C. § 101.

3) The Clerk is ordered to close both civil actions listed in the above caption.

4) This Order and accompanying Opinion shall also be docketed in Civil Action No. 12-7640.

**MICHAEL A. SHIPP**
**UNITED STATES DISTRICT JUDGE**

2

**A2**

NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| CONTENT EXTRACTION AND TRANSMISSION LLC, | : | |
| | : | |
| Plaintiff, | : | No. 12-2501 (MAS) (TJB) |
| | : | |
| v. | : | |
| | : | |
| WELLS FARGO BANK, NATIONAL ASSOCIATION, | : | |
| | : | |
| Defendant. | : | |

| | | |
|---|---|---|
| CONTENT EXTRACTION AND TRANSMISSION LLC, | : | |
| | : | |
| Plaintiff, | : | No. 12-6960 (MAS) (TJB) |
| | : | |
| v. | : | |
| | : | |
| THE PNC FINANCIAL SERVICES GROUP, INC., et al., | : | MEMORANDUM OPINION |
| | : | |
| Defendants. | : | |

**SHIPP, District Judge**

      This matter comes before the Court on Defendant the PNC Financial Services Group,

Inc., and PNC Bank, N.A.'s (collectively, "PNC" or "Defendant"),[1] Motion to Dismiss pursuant

to Federal Rule of Civil Procedure ("Rule") 12(b)(6). (Def.'s Br., ECF No. 6-1.)[2] Plaintiff

Content Extraction and Transmission LLC ("Plaintiff" or "CET"), filed Opposition. (Pl.'s Opp'n,

---

[1] For purposes of this Opinion, the Court refers to the PNC entities as a single defendant.

[2] All cites to the record, unless noted otherwise, are to *CET v. PNC*, Civil Action No. 12-6960.

**A3**

ECF No. 8.) Defendant filed a Reply. (ECF No. 9.) The Court has carefully considered the Parties' submissions and decided the matter without oral argument pursuant to Local Civil Rule 78.1. For the reasons set forth below, and other good cause shown, Defendant's Motion to Dismiss is GRANTED because Plaintiff's U.S Patent Nos. 5,258,855 (the "855 Patent"), 5,369,508 (the "508 Patent"), 5,625,465 (the "465 Patent"), and 5,768,416 (the "416 Patent") (collectively, "the Patents-in-Suit") are invalid as abstract ideas not patentable under 35 U.S.C. § 101.

## I.  Background

### A.  Factual History

The following facts are drawn from the Complaint and taken as true for purposes of this Opinion. Plaintiff CET is a limited liability company organized under the laws of the State of New Jersey and has its principal place of business in New Jersey. (Compl. ¶ 1, ECF No. 1.) Defendant PNC is a combination of a financial services corporation and a national banking association with its principal place of business in Pennsylvania. (*Id.* ¶¶ 2-3.) CET alleges that PNC is the successor in interest to additional banks that "processed deposits made at ATMs during the six-year period immediately preceding the filing of this Complaint." (*Id.* ¶ 4.)

In the Complaint, Plaintiff alleges ownership over six (6) patents: the 855 Patent, the 508 Patent, the 465 Patent, the 416 Patent, U.S. Patent No. 7,259,887 (the "887 Patent") and U.S. Patent No. 7,474,434 (the "434 Patent"). (*Id.* ¶¶ 9-15.) Plaintiff alleges that PNC has infringed the 855 Patent, the 508 Patent, the 465 Patent, and the 416 Patent.[3]

---

[3] Plaintiff does not allege that PNC has infringed the 887 Patent or 434 Patent.

2

**A4**

## B.     The Patents

The 855 Patent is a process patent that was filed on March 20, 1991 and granted on

November 2, 1993. (ECF No. 1-2.) It contains 77 claims. The Abstract to the 855 Patent states:

> An information processing methodology gives rise to an application program
> interface which includes an automated digitizing unit, such as a scanner, which
> inputs information from a diversity of hard copy documents and stores
> information from the hard copy documents into a memory as stored document
> information. Portions of the stored document information are selected in
> accordance with content instructions which designate portions of the stored
> document information required by a particular application program. The selected
> stored document information is then placed into the transmission format required
> by a particular application program in accordance with transmission format
> instructions. After the information has been transmission formatted, the
> information is transmitted to the application program. In one operational mode,
> the interface interactively prompts the user to identify, on a display, portions of
> the hard copy documents containing information used in application programs or
> for storage.

(*Id.*)

All of the other Patents-in-Suit claim priority to the 855 Patent. They each include a

multitude of claims.[4] As discussed more fully below, the Patents-in-Suit focus on the processing

of information in a three step process. First, information or data from a hard copy document is

gathered by an "automated digitizing unit," such as a scanner, into computer memory. Second,

the information gathered by the scanner is recognized as corresponding to certain data fields.

Third, the information corresponding to the data fields on the hard copy documents are then

stored in corresponding data fields in computer memory. Various iterations of the patents and

claims explicitly insert a user, for example interacting with a display and selecting certain data

fields to be saved, into the process at various steps.

---

[4] The 508 Patent has 46 claims, the 465 Patent has 53 claims, and the 416 Patent has 66 claims.

**A5**

### C. Plaintiff's Complaint

CET's Complaint provides a tangible example of the convoluted process alluded to above. The Complaint contains four counts. Each count alleges that one of the Patents-in-Suit was violated in the same manner. CET states:

> Defendants infringed, actively induced the infringement of, and contributorily infringed in this judicial district the [Patents-in-Suit] by processing check and cash deposits made by customers at automatic teller machines ("ATMs") using their envelope-free deposit service such as DepositEasy service, and by processing check deposits made from mobile electronic devices using their mobile deposit service such as the Mobile Deposit service.

(Compl. ¶¶ 17, 22, 27, 32.)

> CET further alleges:

> Defendants' envelope-free deposit service [as well as its mobile deposit service] extracts information from checks and cash deposited at ATMs and then transmits the extracted information to an application program to process the deposits, in a manner defined by the claims of the [Patents-in-Suit], without permission from CET.

(*Id.* ¶¶ 18-19, 23-24, 28-29, 33-34.)

## II. Legal Standard

### A. Standard for Motion to Dismiss

Rule 8(a)(2) "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to give the defendant fair notice of what the . . . claim is and the grounds on which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). On a motion to dismiss for failure to state a claim, a "defendant bears the burden of showing that no claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005).

A district court conducts a three-part analysis when considering a Rule 12(b)(6) motion. *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). "First, the court must 'take note of the

4

**A6**

elements a plaintiff must plead to state a claim.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)). Second, the court must accept as true all of a plaintiff's well-pleaded factual allegations and construe the complaint in the light most favorable to the plaintiff. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009). The court, however, must disregard any conclusory allegations proffered in the complaint. *Id.* For example, the court is free to ignore legal conclusions or factually unsupported accusations which merely state that "the-defendant-unlawfully-harmed-me." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Finally, once the well-pleaded facts have been identified and the conclusory allegations ignored, a court must next determine whether the "facts alleged in the complaint are sufficient to show that plaintiff has a 'plausible claim for relief.'" *Fowler*, 578 F.3d at 211 (quoting *Iqbal*, 556 U.S. at 679).

Determining plausibility is a "context-specific task which requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. Plausibility, however, "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 545). In the end, facts which only suggest the "mere possibility of misconduct" fail to show that the plaintiff is entitled to relief. *Fowler*, 578 F.3d at 211 (quoting *Iqbal*, 556 U.S. at 679).

**III.**   **Analysis**

PNC moves pursuant to Rule 12(b)(6) to dismiss Plaintiff's complaint in its entirety alleging that the Patents-in-Suit are abstract ideas that lack patentability pursuant to 35 U.S.C. § 101. The main thrust of PNC's argument is that the Patents-in-Suit merely "encompass 'extracting' or 'identifying' information from a document, 'storing' the information in memory, and sending information to other application programs, in any field of commercial endeavor." (Def.'s Reply 1.) This process is allegedly abstract because the Patents-in-Suit "do nothing more

**A7**

than provide an invitation for practitioners to apply an unknown, undisclosed, and unspecified algorithm to recognize, store, and send information from a document to other applications . . . ." (Def.'s Br. 1.) CET argues that 1) Defendant's motion is premature because a claim construction hearing has not occurred, 2) Defendant's motion fails to address all of the claims contained in the Patents-in-Suit, and 3) the claims "are not directed to abstractions such as purely mental processes, laws of nature, or physical phenomena." (Pl.'s Opp'n 1-2.) As explained more fully below, the Court finds that the Patents-in-Suit are invalid and grants PNC's Motion to Dismiss.

### A.    Patentability under 35 U.S.C. § 101 Generally

Patentability is a question of law "that may be informed by subsidiary factual issues." *CyberFone Sys., LLC v. Cellco P'ship*, 885 F. Supp. 2d 710, 715 (D. Del. 2012) (citing *In re Comiskey*, 554 F.3d 967, 976 (Fed. Cir. 2009)). Section § 101 states: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." The statute is to be given a "wide scope." *Bilski v. Kappos*, 130 S. Ct. 3218, 3225 (2010) (quoting *Diamond v. Chakrabarty*, 447 U.S. 303, 308 (1980)). That scope, however, has its bounds.

The Supreme Court has delineated three exceptions to Section 101's "broad patent-eligibility principles: 'laws of nature, physical phenomena, and abstract ideas.'" *Id.* (quoting *Chakrabarty*, 447 U.S. at 309). Although these exceptions are not found or required in the text of the Patent Act, they "have defined the reach of the statute as a matter of statutory *stare decisis* going back 150 years" and serve to protect "'the storehouse of knowledge of all men . . . .'" *Id.* (citing *Le Roy v. Tatham*, 55 U.S. 156, 174-75 (1852); quoting *Funk Bros. Seed Co. v. Kalo Inoculant Co.*, 333 U.S. 127, 130 (1948)).

6

**A8**

Here, according to Defendant, the Court is allegedly confronted with an abstract idea. In order to determine whether the Patents-in-Suit are impermissibly abstract, the Court is guided by a three-part analysis.[5] Invalidity must be demonstrated by clear and convincing evidence. *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2242 (2011) (construing 35 U.S.C. § 282). The first two elements of the Court's inquiry are guided by the Machine-or-Transformation Test. Under that test, an invention is a patentable "'process' only if: '(1) it is tied to a particular machine or apparatus, or (2) it transforms a particular article into a different state or thing.'" *Bilski*, 130 S. Ct. at 3225 (quoting *In re Bilski*, 545 F.3d 943, 954 (Fed. Cir. 2008)). Satisfaction of either prong of the test is a "useful and important," although not dispositive, clue as to a claimed invention's patentability. *Id.* at 3227.

Because the Supreme Court did not hold the Machine-or-Transformation Test to be the final and sole arbiter of the patentability of a process, some courts have also considered an additional level of analysis. *See CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1371 (Fed. Cir. 2011) ("a patent claim's failure to satisfy the machine-or-transformation test is not dispositive of the § 101 inquiry"). The Court must still inquire "more generally" into the "abstract nature of [the] claim . . ." *CyberFone*, 885 F. Supp. 2d at 719 (citing *Cybersource*, 654 F.3d at 1371). This more ephemeral analysis is guided by the following: "abstract ideas constitute disembodied concepts or truths which are not 'useful' from a practical standpoint standing alone, i.e., they are not 'useful' until reduced to some practical application." *CLS Bank Int'l v. Alice Corp. Pty. Ltd.*, 685 F.3d 1341, 1349, *reh'g en banc granted, opinion vacated,* 484 F. App'x 559 (Fed. Cir. 2012) (citing *In re Alappat*, 33 F.3d 1526, 1543 (Fed. Cir. 1994),

---

[5] As noted in *Bilski*, "[t]he § 101 patent-eligibility inquiry is only a threshold test. Even if an invention qualifies as a process, . . . in order to receive the Patent Act's protection the claimed invention must also . . . be novel, *see* § 102, nonobvious, *see* § 103, and fully and particularly described, *see* § 112." 130 S. Ct. at 3225.

**A9**

abrogated by *In re Bilski*, 545 F.3d 943). Essentially, this final analysis asks whether, even though the patent may have failed the Machine-or-Transformation Test, the Court is convinced that it is not an abstract idea. *See Ultramercial, Inc. v. Hulu, LLC*, 2010-1544, 2013 WL 3111303 (Fed. Cir. June 21, 2013) ("*Ultramercial II*") ("the relevant inquiry is whether a claim, as a whole, includes meaningful limitations restricting it to an application, rather than merely an abstract idea") (citing *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1297 (2012)). The Court will apply the requisite analyses below.

**B.      Formal Claim Construction is not Required**

**1)      The Parties' Positions**

Plaintiff argues that Defendant's motion to dismiss is premature because claim construction has not occurred. (Pl.'s Opp'n 7-11.) More specifically, Plaintiff quotes the Federal Circuit's language in *Ultramercial, LLC v. Hulu, LLC*, stating that "definition of the invention via claim construction can clarify the basic character of the subject matter of the invention. Thus, claim meaning may clarify the actual subject matter . . . and can enlighten, or even answer, questions about subject matter abstractness." (*Id.* at 7) (citing 657 F.3d 1323, 1325 (Fed. Cir. 2011) ("*Ultramercial I*"), *cert. granted, judgment vacated sub nom. WildTangent, Inc. v. Ultramercial, LLC*, 132 S. Ct. 2431 (2012)). Defendant argues that "Plaintiff cannot identify a single construction of a claim term that would impact the analysis required to decide this Motion [and] there is no reason to postpone resolution of this issue until after claim construction." (Def.'s Reply 12.)

**2)      Discussion**

Claim construction is not required to resolve this motion and determine that the Patents-in-Suit are invalid. As noted by both Parties, "claim construction is not an inviolable prerequisite

**A10**

to a validity determination under § 101" but "will ordinarily be desirable—and often necessary—to resolve claim construction disputes prior to a § 101 analysis, for the determination of patent eligibility requires a full understanding of the basic character of the claimed subject matter." *Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of Canada (U.S.)*, 687 F.3d 1266, 1273-74 (Fed. Cir. 2012). The "basic character of the claimed subject matter" in dispute in this action is clearly evident to the Court and no further construction of the claims is required.

That is not to say, however, that the Court must accept Defendant's contention that the burden rests with Plaintiff to "come forward with a construction that would show the claims *were* eligible." *Ultramercial II*, 2013 WL 3111303, at *14. Rather, in the current procedural posture, the Court must adopt a construction of the claims "most favorable to the patentee" and "the complaint and the patent must by themselves show clear and convincing evidence that the claim is not directed to an application of an abstract idea, but to a disembodied abstract idea itself." *Id.*

Disposition of a patent case at this juncture is appropriate in circumstances such as those present here. *See Bilski*, 130 S. Ct. 3218; *CLS Bank Int'l v. Alice Corp. Pty. Ltd.*, 717 F.3d 1269 (Fed. Cir. 2013); *CyberFone*, 885 F. Supp. 2d at 715; *Glory Licensing LLC v. Toys R Us, Inc.*, No. 09-4252 (FSH), 2011 WL 1870591 (D.N.J. May 16, 2011), *appeal dismissed*, 459 F. App'x 916 (Fed. Cir. 2011). The Court has carefully reviewed Plaintiff's argument that formal claim construction in this case is required but declines to agree. As explained more fully below, and commensurate with the instruction of the *Ultramercial II* court, the Patents-in-Suit encapsulate invalid abstract ideas, even when construed in the manner most favorable to Plaintiff.

**A11**

### C. Invalidation of the Patents Does Not Require an Extended Claim by Claim Analysis

Plaintiff correctly maintains that *each* claim contained in the Patents-in-Suit is presumptively valid and may only be deemed invalid by clear and convincing evidence. Plaintiff is incorrect, however, when it argues that Defendant's failure to engage in an extended attack on each of the 242 claims contained in the Patents-in-Suit renders them unchallenged and therefore valid. Where the claims, as here, are substantially similar and linked to the same abstract idea, the Court is free to dispose of the additional claims in a less detailed fashion. *See Bilski v. Kappos*, 130 S. Ct. at 3231 (determining that eleven (11) claims in a patent application were invalidly abstract after only analyzing two (2) of the claims in detail); *CyberFone*, 885 F. Supp. 2d at 710 (invalidating all twenty-four (24) claims of a patent for abstractness after only conducting an analysis of the first claim); and *Glory Licensing LLC*, 2011 WL 1870591 (dismissing three (3) patents—each owned by an entity directly related to Plaintiff CET—containing 121 claims after analyzing only a single claim of a single patent in detail).

### D. The Machine-or-Transformation Test

"A claim can embrace an abstract idea and be patentable" so long as, "instead of claiming an *application* of an abstract idea, the claim is instead *to* the abstract idea itself." *Ultramercial II*, 2013 WL 3111303, at *7. The Machine-or-Transformation Test is used because it helps illuminate whether a claimed process patent passes the threshold inquiry regarding abstractness: "whether a claim, as a whole, includes *meaningful* limitations restricting it to an application, rather than merely an abstract idea." *Id.* at *8.

As a general matter, an invention that includes a machine as an integral—as opposed to superfluous—component to the claimed process, "would not pre-empt uses of the principle that do not also use the specified machine or apparatus in the manner claimed." *In re Bilski*, 545 F.3d

at 954. Similarly, "a claimed process that transforms a particular article to a specified different state or thing by applying a fundamental principle would not pre-empt the use of the principle to transform any other article, to transform the same article but in a manner not covered by the claim, or to do anything other than transform the specified article." *Id.* At its most basic level, the Machine-or-Transformation Test reveals limitations on the claimed process which indicate that the patent covers application of an abstract idea as opposed to the abstract idea itself.[6]

### 1) The Machine Prong

In order to satisfy the machine prong of the Machine-or-Transformation Test, the patentee must show that "his claim is tied to a particular machine," such that the machine imparts "meaningful limits on the claim's scope to impart patent-eligibility." *In re Bilski*, 545 F.3d at 961.

### a) The Parties' Positions

Defendant argues that that the Patents-in-Suit do not meet the machine prong because no "machine, let alone a particular machine, is used to perform any of the claimed steps." (Def.'s Br. 10.) The mere addition of a general purpose computer and an "automated digitizing unit," such as a scanner, to the processes outlined in the Patents-in-Suit, is allegedly insufficient to satisfy this prong of the test. (*Id.*) Moreover, Defendant contends that the Patents-in-Suit's failure to "describe any special programming code or any specific algorithm to perform the claimed functions of 'extracting' or 'identifying' information from a document, 'storing' the information

---

[6] The Federal Circuit has noted the increasingly limited use of the Machine-or-Transformation Test related to information technology patents, as opposed to its high level of relevance when construing industrial and mechanical patents. *See Ultramercial II*, 2013 WL 3111303, at *7 ("While machine-or-transformation logic served well as a tool to evaluate the subject matter of Industrial Age processes, that test has far less application to the inventions of the Information Age.") (citing *Bilski*, 130 S. Ct. at 3227-28).

in memory, and sending the information to other application programs" is "fatal." (*Id.* at 10-11.) Thus, PNC asserts, "[w]ithout a more specific description of the computer and the algorithm used to program the computer, the law is well-settled that this is nothing more than a general purpose computer which does not impose any meaningful limitation on the claim and thus cannot meet the 'machine' requirement." (*Id.* at 11) (citing *Dealertrack, Inc., v. Huber*, 674 F.3d 1315 (Fed. Cir. 2012); *Fort Props. v. Am. Master Lease, LLC*, 671 F.3d 1317 (Fed. Cir. 2012); *Cybersource*, 654 F.3d at 1375).

Plaintiff responds that "claim 1 of the '855 patent and claim 1 of the '416 patent are tied to a particular apparatus, which includes both (1) an automated digitizing unit (or a scanner), and (2) a computer configured to recognize and store data in a particular (targeted ) way." (Pl.'s Opp'n 20.) The requirement of these machines in the Patents-in-Suit allegedly adds a meaningful limitation to the scope of the patents and is not the mere appendage of a general purpose computer or data-gathering step. (*Id.* at 17-18.) Plaintiff asserts that the "scanner here 'is a machine and is integral to each of the claims in issue.'" (*Id.* at 18) (citing *SiRF Tech., Inc. v. Int'l Trade Comm'n*, 601 F.3d 1319, 1332 (Fed. Cir. 2010)).

Regarding the use of the computer, PNC argues that lacking "a specific description of the computer and the algorithm used to program the computer, the law is well settled that this is nothing more than a general purpose computer" that imposes no "meaningful limitation" on the Patents-in-Suit and "thus cannot meet the 'machine' requirement." (Def.'s Reply 3.) Regarding the Patents-in-Suit's use of a scanner, Defendant argues that it is merely used to gather data, "is not used in any other step in the claims," and therefore only adds "insignificant pre-solution activity . . . which does not render a claim patent eligible." (*Id.* at 7-8.)

**A14**

**b)      Discussion**

A "machine," for purposes of this test, is "'a concrete thing, consisting of parts, or of certain devices and combination of devices.' This 'includes every mechanical device or combination of mechanical powers and devices to perform some function and produce a certain effect or result.'" *In re Ferguson*, 558 F.3d 1359, 1364 (Fed. Cir. 2009) (quoting *In re Nuijten*, 500 F.3d 1346, 1355 (Fed. Cir. 2007)). Both a general purpose computer and an automated digitizing unit such as a scanner fall under that definition. Their appendage or assertion into the Patents-in-Suit's claims, however, does not automatically render the Patents-in-Suit valid. Rather, the machines must provide a meaningful limitation upon the claims. A discussion of several recent cases, four decided by the Federal Circuit, demonstrates how CET's addition of a computer and scanner to the Patents-in-Suit fails to add the requisite meaningful limitation.

**i.      Relevant Case Law**

*SiRF* involved two patents[7] related to GPS navigation technology. 601 F.3d at 1322. The primary claim involved a method by which a GPS receiver could "calculate its position without having to wait to receive time information from a satellite, thereby allowing the receiver to calculate its position more quickly and even in weak-signal environments." *Id.* at 1323. An additional claim, "extend[ed] the solution of the [primary patent and claim] from the discrete calculation of a GPS receiver's position at a particular moment to the use of a 'dynamic model' that allows the improved, repeated calculation of a GPS receiver's position as it changes over time." *Id.* These claims were challenged as overly abstract, not sufficiently tied to a machine and capable of being "performed entirely in the human mind." *Id.* at 1333.

---

[7] Four additional patents were involved in the *SiRF* litigation but not subjected to the Federal Circuit's Machine-or-Transformation Test analysis.

The Federal Circuit held that a "GPS receiver is a machine and is integral to each of the claims at issue." *Id.* at 1332. Speaking to the primary patent and claim, the court stated that the calculations and variables at the core of the claimed process could "exist only with respect to a *particular* GPS receiver that receives the [GPS] satellite signals." *Id.* The same was true of the related patent and claim. *Id.* The integral nature of the GPS receiver was clear because the receiver "play[ed] a significant part in permitting the claimed method to be performed, rather than function[ing] solely as an obvious mechanism for permitting a solution to be achieved more quickly, i.e., through the utilization of a computer for performing calculations." *Id.* at 1333. The inability of the claimed method to be "performed *without* a" GPS receiver was indicative of the receiver's indispensability to the patented process. *Id.* (emphasis added).

*Dealertrack*, also a Federal Circuit case, arose from an appeal of a district court's grant of summary judgment finding certain claims of a patent invalidly abstract. 674 F.3d at 1317. The claims at issue covered a "computer aided method of managing a credit application" in the automobile retail industry. *Id.* at 1331. Generally, the challenged claims included a process by which: 1) a credit application was received from a remote location, 2) that application was forwarded to certain lenders that may fund the automotive purchase transaction, and 3) an answer was relayed back to the applicant. *Id.* The second step had multiple versions, including sending the application to lenders sequentially until a lending approval was obtained or sending the application to multiple lenders simultaneously. *Id.*

The *Dealertrack* court affirmed the district court and found that the "claims [were] invalid as being directed to an abstract idea preemptive of a fundamental concept or idea that would foreclose innovation in this area." *Id.* at 1333. The court described the claim as merely "processing information through a clearinghouse" and that the steps outlined by the claimant did

not "'impose meaningful limits on the claim's scope.'" *Id.* (quoting *In re Bilski*, 545 F.3d at 961-62). The court further reasoned that the "claims are silent as to how a computer aids the method, the extent to which a computer aids the method, or the significance of a computer to the performance of the method. The undefined phrase 'computer aided' is no less abstract than the idea of a clearinghouse itself." *Id.* Moreover, the mere addition of "a 'computer aided' limitation to a claim covering an abstract concept, without more, is insufficient to render the claim patent eligible." *Id.* (citing *SiRF*, 601 F.3d at 1333). Similarly, limiting the claims to the field of auto loans did not provide the requisite meaningful limitation. *Id.* at 1334 ("The notion of using a clearinghouse generally and using a clearinghouse specifically to apply for car loans, like the relationship between hedging and hedging in the energy market in *Bilski* . . . , is of no consequence without more.)

*Bancorp* provides another useful lens through which to evaluate the Patents-in-Suit. In *Bancorp*, the Federal Circuit considered an appeal regarding the patent eligibility of "systems and methods for administering and tracking the value of life insurance policies in separate accounts." 687 F.3d at 1269. The court construed the plaintiff-patentee's argument as "boil[ing] down to the contention that because its claims are limited to being performed on a computer, they cannot claim only an abstract idea." *Id.* at 1277. The court rejected that argument and observed that the "computer required by some of Bancorp's claims is employed only for its most basic function, the performance of repetitive calculations, and as such does not impose meaningful limits on the scope of those claims." *Id.* at 1278. The court found that "Bancorp's patents 'attempt[ed] to patent the use of the abstract idea of [managing a stable value protected life insurance policy] and then instruct[ed] the use of well-known [calculations] to help establish

some of the inputs into the equation.'" *Id.* (quoting *Bilski*, 130 S. Ct. at 3231) (alterations in original).

The *Bancorp* court further noted that the computer alluded to in the claims was not part of a "technological advance" of any sort and was "merely employ[ed] to track, reconcile, and administer a life insurance policy with a stable value component . . . ." *Id.* at 1279. This constituted nothing more than using a computer to "more efficiently [perform] what could otherwise be accomplished manually." *Id.* Simply stated: "[u]sing a computer to accelerate an ineligible mental process does not make that process patent-eligible." *Id.* As such, the *Bancorp* court concluded that "[t]he district court correctly held that without the computer limitations nothing remains in the claims but the abstract idea of managing a stable value protected life insurance policy by performing calculations and manipulating the results." *Id.* at 1280. The limitation of the claims to the "life insurance market" did not alter the court's conclusion. *Id.* (citing *Bilski*, 130 S. Ct. at 3231).

> *CyberFone* is also instructive. The patent at issue was described as a:
>
> > [S]ystem for automatically capturing data at a point of transaction (e.g., a telephone in "transaction entry mode") and transmitting the data to one or more databases for processing and storage. A transaction entry device formats input data from a user into a data transaction, which is then transferred to an external (local or remote) database server. The server "explodes" the data transaction into its component parts "on a system-specific basis so that each component part has a one-to-one correspondence with a file."

*CyberFone*, 885 F. Supp. 2d at 712 (internal citations omitted). The defendant in *CyberFone* argued that the patent and claims at issue "merely claim[ed] the abstract concept of gathering, organizing and forwarding data." *Id.* at 716. The plaintiff asserted that the data was transformed during the process and that a telephone was required by the patent. *Id.*

16

**A18**

Before the *CyberFone* court began its analysis of the Machine-or-Transformation Test, it found it appropriate and useful to break down the claim into core components. *Id.* at 717 ("Analyzing and interpreting a claim by breaking it down into its relevant steps, as the court has done here, is consistent with Supreme Court precedent, *see e.g., Prometheus*, 132 S. Ct. at 1297-98, and consistent with the Federal Circuit's guidance in *CLS*, 685 F.3d at 1351-52.") The court described the claim at issue as a three step process:

> The first [step] entails "obtaining data transaction information entered on a telephone from a single transmission." In other words, the first step involves obtaining or capturing data. The second step entails "forming a plurality of different exploded transactions" from the single transmission. In other words, the second step involves the sorting or organizing of data into data subsets. The third and final step entails "sending said different exploded data transactions over a channel to different destinations." In other words, the last step involves sending data to a storage location.

*Id.*

Relying significantly on the cases described above, the court noted that "*Bancorp* and *SiRF* [exist on a spectrum] with respect to computer-based implementation limitations. At one end of the spectrum is *Bancorp* and a general purpose computer that is generically performing calculations; at the other end is *SiRF* and a GPS receiver that performs specific operations essential to the claimed methods." *Id.* at 718. Speaking to the claim before it, the court noted that the telephone referenced in the claim "simply function[ed] as a means for collecting data whereas the real focus of the claim is the sorting and storing." *Id.* Moreover, "[t]o the extent that a machine is also involved in the sorting or organizing step (step two), that machine exists on the *Bancorp* end of the spectrum. The machine is just a general purpose computing device being asked to do some unspecified sorting function." *Id.* at 719. The court concluded that "[e]ssentially plaintiff has claimed nothing more than the idea of sorting via machine." *Id.* The

use of a machine was not integral to the claim and therefore did not create a meaningful limitation on the claims challenged. As such, they were struck down as invalidly abstract. *Id.*

The final case to be reviewed is the Federal Circuit's most recent application of the machine prong, released just over one month ago. In *Ultramercial II*, the patent claimed "a method for distributing copyrighted products (*e.g.*, songs, movies, books) over the Internet where the consumer receives a copyrighted product for free in exchange for viewing an advertisement, and the advertiser pays for the copyrighted content." 2013 WL 3111303, at *1. The court viewed the claim as comprising the following steps:

> (1) receiving media products from a copyright holder, (2) selecting an advertisement to be associated with each media product, (3) providing said media products for sale on an Internet website, (4) restricting general public access to the media products, (5) offering free access to said media products on the condition that the consumer view the advertising, (6) receiving a request from a consumer to view the advertising, (7) facilitating the display of advertising and any required interaction with the advertising, (8) allowing the consumer access to the associated media product after such display and interaction, if any, (9) recording this transaction in an activity log, and (10) receiving payment from the advertiser.

*Id.* at *15.

Before it analyzed the claim before it, the court encapsulated the essence of the analysis regarding the machine prong, especially in the realm of computer software and methods: As long as a "computer plays a meaningful role in the performance of the claimed invention, it is as a matter of fact not likely to pre-empt virtually all uses of an underlying abstract idea, leaving the invention patent eligible." *Id.* at *13.

The *Ultramercial II* court found that the claimed invention did not attempt to patent an abstract idea. It first noted that the "claim does not cover the use of advertising as currency disassociated with any specific application of that activity. It was error for the district court to strip away these limitations and instead imagine some 'core' of the invention." *Id.* at *15. The

18

**A20**

court further reasoned that "it is clear that several steps plainly require that the method be performed through computers, on the internet, and in a cyber-market environment." *Id.* The presence of an "extensive computer interface" and lack of any claim to the concept of "sell[ing] advertising using a computer" generally "meaningfully limit[ed] the 'abstract idea at the core' of the claims." *Id.* These limitations, via both the requirement for an extensive highly programmed computer interface, as well as the "ten specific steps in the claim," sufficiently allowed the court to view the claims at issue as an *application of an abstract idea* rather than an *abstract idea alone.*

### ii. The Patents-in-Suit Fail the Machine Prong

As noted in *CyberFone*, the cases above outline a spectrum with *SiRF* and *Ultramercial II* on one end and *Bancorp*, *Dealertrack* and *CyberFone* on the other. Here, the Patents-in-Suit are located on the end of the spectrum inhabited by *Bancorp*, *Dealertrack*, and *CyberFone*. The scanner and computer referenced in the Patents-in-Suit are not integral to the claims and none of the various steps contained in the claims in the Patents-in-Suit otherwise tie the claims to a machine in a manner that would indicate that the Patents-in-Suit are an *application* of an abstract idea rather than the idea *itself*.

Although the Court must not oversimplify the claims presented to it, *see Ultramercial II*, 2013 WL 3111303 at *8, *15, the Court can state with certainty that it has concluded by clear and convincing evidence that the claims contained in the Patents-in-Suit do not pass the machine prong. Defendant's contention that the "claims are not directed to any specific application, . . . or any specific machine-implemented intermediate steps," but rather, seek to effectuate "the broad idea of extracting, storing and sending information . . . in any industry or commercial endeavor, for any purpose, without leaving any room for other methods" is correct. (Def.'s Reply 5.)

19

**A21**

Unlike *Ultramercial II*, the Patents-in-Suit are not meaningfully limited by the addition of a scanner or general purpose computer.

First, the use of the scanner is pre-solution activity that does not provide any meaningful limitation on the extent of the claims contained in the Patents-in-Suit. Unlike *SiRF*, the scanner here is not integral to the first step of the claims in which it is featured because the step in which it is used can be accomplished without using a scanner or similar device. Simply stated, gathering information from a hardcopy document can be done by hand and manually input into a general purpose computer. The fact that a scanner, or other machine, may make a given step more efficient does not render the machine integral. *See Dealertrack*, 674 F.3d at 1333-34; *Bancorp*, 687 F.3d at 1279 (addition of a machine to speed up a process which could otherwise be done manually fails the machine prong). The rationale applied in *CyberFone* is similarly persuasive. There, the court did not consider the use of the telephone in the primary step whereby information was received for further processing integral to the larger idea of "sorting and storing data." *CyberFone*, 885 F. Supp. 2d at 718. The addition of the scanner to the core activity in the Patents-in-Suit—associating information from a given field on a hard copy document to a corresponding field in a computer memory location or database—is not the type of integrality found in *SiRF* and is insufficient to pass the machine prong.

Second, the use of a computer more generally in the second and third steps of the Patents-in-Suit does not meaningfully limit their scope. Assuming, *arguendo*, that all of the steps alluded to in the Patents-in-Suit beyond the importation of data from the scanner took place on a computer, the Patents-in-Suit do not limit their scope sufficiently. For example, the computerized process in *Ultramercial II* was clearly limited to "monetizing and distributing copyrighted

products over the internet." 2013 WL 3111303, at *14. Here, there are no such restrictions on the scope of the gathering, recognizing, and sorting steps allegedly covered by the Patents-in-Suit.

Moreover, the mere use of a computer to more quickly and efficiently—or as in the case of the alleged infringement in this case, process deposits at an ATM—accomplish a given task does not create meaningful limitation on an otherwise abstract and wide-ranging concept. *See Dealertrack*, 674 F.3d at 1333-34 (a "computer aided" limitation that "does not specify how the computer hardware and database are specially programmed to perform the steps claimed in the patent" is not sufficient to pass the machine prong). Mere transposition of information from a hardcopy document to a computerized database or application according to user instructions, even accomplished on a computer, does not meet the machine prong. In fact, the analysis in *CyberFone* regarding the second and third steps of the Patents-in-Suit needs little further elaboration and is apt: "[t]o the extent that a machine is also involved in the sorting or organizing step (step two), that machine exists on the *Bancorp* end of the spectrum. The machine is just a general purpose computing device being asked to do some unspecified sorting function." 885 F. Supp. 2d at 719. The same reasoning applies here.

The presence of a computer does not meaningfully limit the basic flaw in the Patents-in-Suit: they attempt to patent the abstract idea of extracting information from a hardcopy document, recognize certain information on that document and save certain user selected information in computer memory. The breadth of the Patents-in-Suit is staggering and the inclusion of a scanner and computer into the process confers no meaningful limit upon their scope. As such, the Court has concluded that the Patents-in-Suit do not pass the machine prong of the Machine-or-Transformation Test.

### 2) The Transformation Prong

"A claimed process is patent-eligible if it transforms an article into a different state or thing. This transformation must be central to the purpose of the claimed process." *In re Bilski*, 545 F.3d at 962. For example, "[i]t is virtually self-evident that a process for a chemical or physical transformation of *physical objects or substances* is patent-eligible subject matter." *Id.* The question is more complicated, however, when "information-age processes" and "electronically-manipulated data" are involved. *Id.* at 962.

CET contends that the Patents-in-Suit pass the transformation prong because they use a "scanner to transform ink-on-paper into bit-mapped pixels" and that a computer also transforms "the bit-mapped pixels into machine-readable variable (or field) values stored in targeted memory locations . . . ." (Pl.'s Opp'n 21.) PNC argues that "[n]one of the claimed steps in the [Patents-in-Suit] effects a transformation of an article. Instead, the claims address a mere transfer of data from a hard copy document to a computer memory." (Def.'s Br. 15.) The Court agrees with PNC.

An extended analysis of this issue is not required. As the Federal Circuit recently and unequivocally stated in *Cybersource*, "mere manipulation or reorganization of data . . . does not satisfy the transformation prong." 645 F.3d at 1375. A similar conclusion was reached by the court in *Glory Licensing*, where it stated that "a 'mere transfer' of data from an electronic or hard copy document to an application program" does not constitute transformation of the underlying data. 2011 WL 1870591 at *4. *CyberFone* is consistent with *Cybersource* and *Glory Licensing*: organizing data into subsets does not render a transformation. *CyberFone*, 885 F. Supp. 2d at 717. Similarly, computer memory is not transformed when it receives electronic data. *Id.* Contrary to CET's arguments otherwise, no transformation takes places. The *conversion* of the

22

**A24**

hardcopy documents into a bitmapped image which is then manipulated and stored into computer memory does not constitute a transformation of the underlying data contained in the hardcopy document. The Patents-in-Suit fail the transformation prong of the Machine-or-Transformation Test.

### E.     General Inquiry as to Abstractness

"Defining 'abstractness' has presented difficult problems, particularly for the § 101 'process' category." *Ultramercial II*, 2013 WL 3111303 at *6. As noted above, "a process need not use a computer, or some machine, in order to avoid 'abstractness.'" *Id.* As most recently defined by the Federal Circuit, relying upon Merriam-Webster's Dictionary, "[a]n abstract idea is one that has no reference to material objects or specific examples—*i.e.*, it is not concrete." *Id.* at *7. The inquiry is whether the claimed invention is an application of an abstract idea or the abstract idea itself. Meaningful limitation on the scope of the idea, and its purported application, are highly relevant to a determination that the idea *itself* is not being patented.

This inquiry is guided by several discrete concepts. First, "a claim is not meaningfully limited if it merely describes an abstract idea or simply adds 'apply it.'" *Id.* at *10 (citing *Prometheus,* 132 S. Ct. at 1294, 1297). A claim is overly broad and abstract if it would cover "essentially all uses of the idea." *Id.* Stated differently, "[i]t is not the breadth or narrowness of the abstract idea that is relevant, but whether the claim covers every practical application of that abstract idea." *Id.* The addition of "only insignificant or token pre- or post-solution activity— such as identifying a relevant audience, a category of use, field of use, or technological environment" does not meaningfully limit a claim. *Id.* (citations omitted).

Second, "the Supreme Court has stated that a claim is not meaningfully limited if its purported limitations provide no real direction, cover all possible ways to achieve the provided

result, or are overly-generalized." *Id.* at *11 (citing *Prometheus*, 132 S. Ct. at 1300). This means that "simply appending conventional steps, specified at a high level of generality, to laws of nature, natural phenomena, and abstract ideas cannot make those laws, phenomena, and ideas patentable." *Prometheus*, 132 S. Ct. at 1300.

Here, the Court is presented with an abstract idea regarding the extraction of information from hardcopy documents and the processing of information contained in those documents. As noted above, the integration of a scanner or computer into the claimed process does not provide any meaningful limitation on the Patents-in-Suit's scope. Similarly, no meaningful transformation of the information in the underlying data contained in the hardcopy documents occurs. Similar to the claimed process in *CyberFone*, the Patents-in-Suit, "broken down into its component parts, recite[] steps by which data is obtained, sorted and stored." *CyberFone*, 885 F. Supp. 2d at 719. As such, "[t]hese steps represent nothing more than a disembodied concept of data sorting and storage" and the Court is left with the inexorable conclusion that "the abstract nature" of the Patents-in-Suit is "manifestly apparent." *Id.* The Patents-in-Suit represent abstract concepts and are not eligible for patent protection.

## IV.    Conclusion

For the reasons set forth above, and other good cause shown, it is hereby ordered that Defendant's Motion to Dismiss is GRANTED and this case will be closed. Due to the invalidity of the Patents-in-Suit, Civil Action No. 12-2501, *CET v. Wells Fargo, N.A.*, is also DISMISSED.

**MICHAEL A. SHIPP**
**UNITED STATES DISTRICT JUDGE**

Dated: July 31, 2013